## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Case No. 09-20206** |
| **BNP PETROLEUM CORPORATION,** | § | |
| | § | **Chapter 11** |
| **DEBTOR.** | § | |

### AFFIDAVIT OF PAUL BLACK IN SUPPORT OF FIRST DAY MOTIONS

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME the undersigned authority, on this day personally appeared Paul Black known to me to be a credible person, and who upon oath did depose and say:

1.      "My name is Paul Black.  I am over the age of eighteen (18), and am of sound mind.

2.      I am CEO & Chairman  of BNP Petroleum Corporation ("BNP" or the "Debtor"). The Debtor's corporate headquarters is located in Corpus Christi, Texas.

3.      I am familiar with the day-to-day operations, business affairs, and books and records of the Debtor.

4.      On April 3, 2009 (the "Petition Date"), Baker Hughes Oilfield Operations, Inc., Schlumberger Technology Corporation, and La Copa Field Services, Inc. (collectively, the "Petitioning Creditors") filed an involuntary petition (the "Involuntary Petition") against BNP.

5.      On May 20, 2009, BNP filed an answer to the Involuntary Petition, denying the allegations therein.

6.      On June 2, 2009, Raptor Capital International, LLC ("Raptor") filed three notices of transfer of claim pursuant to which Raptor provided notice that the claims of the Petitioning Creditors against BNP had been unconditionally sold, transferred and assigned to Raptor.

7.   On June 2, 2009, Raptor and the Petitioning Creditors filed a Joint Motion for Substitution of Parties [Dkt. No. 52], requesting that Raptor be substituted as the petitioning creditor in BNP's pending involuntary bankruptcy case (Case No. 09-20206) (the "Motion to Substitute").   On June 26, 2009, the Court entered an order granting the Motion to Substitute [Dkt. No. 67].

8.   All "first-day" motions filed by the Debtor are subject to the Consent Order and Motion to Convert.

9.   No trustee or examiner has been appointed, and no official committee of unsecured creditors has yet been formed.

10.   To enable the Debtor to operate more effectively and avoid the adverse effects of its Chapter 11 case, the Debtor has requested various types of relief in "first-day" motions filed with the Court concurrently herewith.

11.   I submit this affidavit (the "Affidavit") in support of the Debtor's first-day motions.  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant first day motion.  Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial conditions.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Affidavit.

12.   Part I of this affidavit describes the Debtor's business and the circumstances surrounding the filing of their Chapter 11 petitions.  Part II sets forth the relevant facts in support of the Debtor's various first-day motions and applications.

# I.

# BACKGROUND

A.   **Background and History of the Debtor**

13.     The Debtor is primarily an oil and gas operator and was founded in 1990, with offices in Houston, Texas and Corpus Christi, Texas.   The Debtor has operations throughout South Texas.  The company's operations include the exploration, development, and production of petroleum reserves.   The Debtor is engaged in a full-cycle exploration and production program that includes the purchase of land, seismic interpretation, drilling, facilities and pipeline construction, and oil and natural gas production.   The company's strategy for growth is to increase its reserves and production through exploration, development and acquisition of projects principally in South Texas.  Since its founding, the Debtor has successfully applied its technical knowledge and commercial experience to expand its interests into real estate development and oil field services management.

B.   **Events leading to the Chapter 11 Filings**

14.     The Debtor has suffered financially as a result of unpaid accounts receivable and a sharp decline in natural gas prices.  In the first quarter of 2008, the Debtor's affiliate, BNP Oil & Gas Properties, Ltd. ("BNP Properties"), was offered financing from  Societe Generale Bank for a $16 million credit facility.  This financing agreement would have enabled BNP Properties to pay an account receivable due to the Debtor of more than $4 million.  However, the financing agreement failed to close as a direct result of BNP Properties' minority partner's breach of their partnership agreement.   In the second quarter of 2008, I, as the owner of BNP Properties exercised my rights under a termination agreement in an attempt to obtain similar financing benefits that had been lost in the first quarter of 2008.   However, again as a result of BNP

Properties' minority partner's actions (this time it was a breach of the termination agreement), the second opportunity for BNP Properties to obtain a significant capital infusion also failed.

15.     As a result of the minority partner's breach of the termination agreement, BNP Properties was also unable to "hedge" its interest in its partnership reserves of 6.41 BCF of natural gas, as was contemplated by BNP Properties upon effectuation of a certain termination agreement.  At the time BNP Properties sought to hedge its portion of the natural gas reserves, the price of natural gas exceeded $13.50 per KCF.  Natural gas prices then fell substantially to around $4 per KCF, creating a loss to BNP Properties of more than  $31 million.  As a result of these losses, BNP Properties has not been able to pay its largest creditor – the Debtor BNP Petroleum Corporation.

16.     In addition to the Debtor's unpaid accounts receivable, natural gas prices fell significantly from $15/mmbtu in the third quarter of 2008, to under $4/mmbtu today.  This sharp decline in natural gas prices combined with the current global economic recession has caused the Debtor to experience a corresponding decline in revenue and cash flow.  The resulting constraint on liquidity has negatively impacted the Debtor's ability to satisfy all of its debt obligations. The rising debt obligations precipitated the filing of the Involuntary Petition on April 3, 2009.  The Debtor has consented to an order for relief and has requested conversion of its case from chapter 7 to chapter 11 because it believes it can successfully reorganize its business.

C.     **Debt Structure**

17.     The Debtor did not hold any significant secured debt prior to the assignment of assets from BNP Properties to the Debtor on or about August 5, 2009.  The Debtor, however, was and still is a guarantor under that certain promissory note in an amount of approximately $4,023,426.42 (including interest and principal as of approximately July 31, 2009) (the "Prepetition Note") executed by BNP Properties and made payable to Margrave Holdings and

Walter Oblach (successors by assignment from The Frost National Bank) (the "Prepetition Lenders") and the associated deeds of trust, security agreements and related collateral documents (together with the Prepetition Note, the "Prepetition Credit Documents"). However, as a result of an assignment of assets from BNP Properties, the Debtor holds, or will hold secured indebtedness in approximately the amount of the Prepetition Note. The indebtedness under the Prepetition Note has been in default since December 2008. Therefore, although the Debtor holds, or will hold, secured debt under the Prepetition Note, the Debtor has always been (and still is) primarily liable for the prepetition indebtedness by virtue of its guaranty of the Prepetition Note.

18.     The Debtor's revenues for fiscal year 2008 were approximately $7.496 million, and its revenues for the period January 1, 2009 to May 31, 2009 were approximately $201,368.00. As of the Petition Date, the Debtor employed approximately six (6) full-time employees.

## II.

## FACTS IN SUPPORT OF FIRST DAY ORDERS

19.     Concurrently with the filing of its Consent Order and Motion to Convert, the Debtor has filed, for the Court's approval, a number of motions and applications (the "First Day Motions") that the Debtor believes are necessary to enable it to operate in Chapter 11 with a minimum disruption and loss of productivity. The Debtor respectfully requests that the Court grant each of the First Day Motions as a critical element in achieving maximization of the Debtor's estates. A description of each of the First Day Motions is provided below. The Court can, by hearing the above motions on an emergency basis, prevent the loss of Debtor's workforce which is necessary to the on-going operations of the Debtor and ensure the Debtor has

a continued, adequate source of cash with which to operate its business until a final hearing can occur.

A.     **Emergency Motion for Order Authorizing Payment of Prepetition Employee Obligations**

20.     As of the Petition Date, the Debtor employed approximately six (6) people in hourly, salaried, supervisory, management and administrative positions who perform the functions necessary to the continued operation of the business of the Debtor on a day-to-day basis.  Of these six (6) employees, approximately two (2) are operations employees who are paid on an hourly basis.  The remaining employees hold supervisory and administrative positions. Additionally, as of the Petition Date, the Debtor employs approximately two (2) contract employees, of which one (1) is an operation employee and one (1) holds an administrative position.  Hereinafter, "Employees" shall refer to all employees of the Debtor and, to the extent applicable, those few contract employees who contract directly with the Debtor.

21.     Continued service by all of the Employees is vital to the Debtor's ongoing operations and its ability to successfully reorganize.  Many of the Employees cannot afford to miss a paycheck.  Any disruption in their pay would be devastating to themselves and their families and most certainly result in some Employees seeking employment elsewhere. Accordingly, it is absolutely critical to the Debtor's reorganization efforts that the Debtor maintain its Employees.  To minimize the personal hardship the Employees would suffer if the Debtor's employee-related obligations were not paid when due, and to maintain the Employees' morale at this critical time, the Debtor seeks authority to honor the various categories of Employee Obligations that are described below, all in the ordinary course of business and without further notice or application to the Court.

<u>Employee Compensation, Taxes and Expense Reimbursement</u>

22.     The Debtor believes that, as of the expected date of entry of the Order for Relief ("Relief Date"), certain wages, salaries, commissions or other compensation (collectively, "<u>Employment Compensation</u>") earned prior to the Relief Date remain unpaid.  This is because the consent to the Relief Order was filed during the Debtor's normal payroll period.  For example, the last employee payroll was paid on July 31, 2009 for the payroll period ending July 25, 2009 (the "<u>July 31 Payroll</u>").  Some payroll-related taxes (such as employer FICA payments) and withholding taxes also have accrued with respect to compensation payable for periods ending on or prior to the Relief Date, and some taxes must be paid immediately related to the payroll.  The Debtor believes that total unpaid Employee Compensation and related taxes as of the Relief Date does not exceed $10,000.00.   None of the Employees are expected to have unpaid claims in this category that would exceed $4,000.00 each.

23.     The Debtor also reimburses Employees for certain business expenses that they incur, including mileage reimbursement for travel, entertainment expenses for customer entertainment, and travel expenses (collectively, the "<u>Employee Expense Reimbursements</u>"). There typically is a delay between the dates when expenses are incurred and the dates when Employees actually obtain reimbursement for such expenses.  As a result, Employees have undoubtedly incurred expenses, prior to the Relief Date, for which the Employees have not yet sought reimbursement.   The Debtor's average monthly outlays for Employee Expense Reimbursement are $1,600.00.  The Debtor believes that the accrued but unpaid prepetition

claims for Employee Expense Reimbursements do not exceed $38,000.00 for direct reimbursement obligations to Employees.[1]

24.    The Debtor may have issued checks to some Employees, prior to the Relief Date, in payment of claims for Employee Compensation or for Employee Expense Reimbursements. Some of these checks may not yet have been presented for payment or may not yet have cleared the banking systems and, accordingly, will not have been honored as of the Relief Date, particularly those checks issued after the July 31 Payroll.  In the absence of an order permitting payments with respect to these checks, certain Employees may temporarily be deprived of compensation or reimbursements to which they are legitimately entitled.   Thus, the Debtor requests that all checks drawn, whether pre- or post-petition, on the payroll and reimbursement accounts at: (i) Frost National Bank, account number xxxx-xx-1057 (payroll account); (ii) Frost Nation Bank, account number xxxx-xx-8552 (reimbursement account); and (iii) 1st Community Bank, account number xx-220 (reimbursement account) (collectively, the "Employee Accounts") be honored by Frost Nation Bank, to the extent funds are available to do so.

25.    The Debtor proposes to continue to pay accrued prepetition Employee Compensation, prepetition claims for Employee Expense Reimbursements, to honor prepetition checks drawn on the Employee Accounts issued for Employee Compensation, to issue replacement checks for Employee Expense Reimbursements not honored and to which any and all unpaid obligations  accrued prepetition and to continue to apply accrued payroll-related taxes for their intended purposes, in order to preserve the morale of the Employees whose efforts are critical to the success of the Debtor's reorganization.

---

[1] While Paul Black, CEO of the Debtor, has not been drawing a salary from BNP since January 1, 2009, Mr. Black has incurred reimbursable expenses for the direct benefit of the Debtor during the gap period (i.e. after April 3, 2009) and prior to the Relief Date in the amount of approximately $36,000.00.

Severance Obligations

26.     The Debtor has, since January 2, 2009, reduced its work force from ten (10) to six (6) employees.  The Debtor has no severance obligations with respect to this reduction in work force.  The Debtor also believes that a minor reduction in force is possible in the future, and the Debtor desires to apply their typical procedures to such severance actions taken in the future. The Debtor requests that they be allowed to maintain their existing policies and proceeding regarding non-management employees.

Accrued Vacation Time

27.     Certain Employees have accrued rights to vacation time pursuant to existing vacation pay plans, policies and procedures of the Debtor.  The Debtor proposes to honor, in the ordinary course of its business and in accordance with these existing plans, policies and procedures, the Employees' entitlement to vacation time that has accrued prior to the date of the commencement of the Debtor's Chapter 11 case and which becomes usable subsequent thereto, in order to preserve the morale of the Debtor's Employees.  The continuing honoring of such accrued vacation time does not involve any cash outlay by the Debtor, but is merely an accrued right to future paid vacation leave.

Sick Leave Plan

28.     The Debtor has a sick leave plan that is designed to continue the Employee's income if they are temporarily unable to work because of illness or injury.  Benefits accrue at 6.67 days per month for up to 10 days of paid sick leave, and benefits are available after 90 days of employment.  The continued honoring of such sick leave plan does not involve any cash outlay by the Debtor, but is merely a right to paid leave under the covered circumstances.

Health Insurance Benefits

29.     The Debtor has established various plans and policies to provide Employees with medical coverage (collectively, the "Health Benefits").   The Debtor pays 100% of the Employees' general medical insurance premiums and a portion of the Employees' dental insurance premium.[2]  Employees are responsible for paying for any additional medical coverage, including the cost to insure other non-Employee family members.   The Debtor's payment of premiums are, for all intents and purposes, additional compensation to Employees that the Debtor is obligated to provide.

30.     The Debtor wishes to provide uninterrupted Health Benefits to all current Employees in order to minimize any potential adverse impact of this Chapter 11 case on the morale of the Employees.

31.     The Debtor's estimated net monthly Health Benefits costs (after offsetting payroll deductions) include approximately $2,393.00 per month in premiums.

Insurance Benefits

32.     The Debtor provides eligible Employees with basic group life insurance coverage and basic group accidental death and dismemberment ("AD&D") insurance coverage (collectively, the "Insurance Benefits").   The Debtor automatically provides this coverage and, for most Employees, pays a portion of the cost thereof.   The estimated total monthly Insurance Benefits costs to the Debtor is $149 per month.   The Insurance Benefits coverage is, for all intents and purposes, additional compensation to Employees that the Debtor is obligated to provide.

33.     Because any failure to maintain these Insurance Benefit coverages would be injurious to the Employees' morale, welfare and expectations, the Debtor seeks authority to

---

[2] Humana, Inc. is the Employees' health care provider for general medical and dental insurance.

maintain the prepetition Insurance Benefits, and to pay claims and expense relating thereto, in the ordinary course of Debtor's business and in accordance with existing policies and practices.

<u>Retirement Plan</u>

34.     The Debtor has also adopted a retirement plan for their Employees, which has a 401(k) option for employee deferrals and provides for discretionary company contributions (the "<u>Retirement Plan</u>").   Eligible Employees are permitted to contribute up to 100% of their compensation on a pre-tax basis, but no more than $16,500.00.  Eligible Employees over the age of 50 can make an additional $5,500.00 contribution for 2009 as a catch up contribution.  The Retirement Plan provides for the Debtor's discretionary safe harbor matching contribution of up to 100% of the first 5% of an Employee's deferred compensation, but only for those eligible Employees who have been employed by the Debtor for 365 days.  The Retirement Plan also provides that the Debtor may make an additional annual discretionary contribution to the Plan. Historically, the Debtor typically did not make an annual discretionary contribution to Employees.  The amounts held under the Retirement Plan are invested in investment funds maintained under the Retirement Plan in accordance with the Retirement Plan's investment guidelines and the directions of each participant of 401(k) accounts.

35.     All Employee contributions are vested after 365 days of service, when the employee becomes eligible to participate in the Retirement Plan.   Employer safe harbor contributions are always 100% vested.  Employer contributions are vested 20% after 2 years of services, 40% after 3 years of service, 60% after 4 years of service, 80% after 5 years of service, and 100% after 6 years of service.

36.     The Debtor seeks authority to continue to make the matching contributions and the Debtor's other contributions as provided by the Retirement Plan and, pursuant to the Retirement Plan's provisions, to give credit for a participating Employee's prepetition service

when calculating the Debtor's contributions. The Debtor believes that a failure to make the contributions will be detrimental to the morale and expectations of participating Employees, and that, on the other hand, the prospect of receiving the matching contributions and a portion of the contributions will encourage Employees to remain in the Debtor's service. The amounts to be paid qualify as priority unsecured claims under Section 507(a)(4) of the Bankruptcy Code and will not exceed the limits imposed by that section.

<div align="center">Pre-Petition Deductions from Employees' Paychecks</div>

37.     The Debtor also deducts charges from Employees' payroll checks for a variety of purposes including: payment of premiums for life insurance, general health insurance, dental insurance, contribution to the 401(k) Retirement Plan; and supplemental insurance (collectively, the "Employee Deductions"). These deductions represent property of the Employees. The Debtor seeks to confirm its authority to continue to apply these deductions for their intended purposes, in accordance with existing policies and practices.

<div align="center">Request for Authority for Banks and Other Financial Institutions to Honor Checks
Issued to Pay Prepetition Employee Obligations</div>

38.     In order to effectuate the relief sought in this Motion relating to the payment of the Employee Obligations, the Debtor also seeks an order authorizing all applicable banks and other financial institutions at which the Debtor's accounts are maintained to honor any checks, drafts or wire transfers dated prior to, on, or after the Relief Date upon representation by the Debtor that the particular checks, drafts or wire transfers were written in payment of the Employee Obligations, as defined above, including all checks draw on the Employee Accounts.

**B.**     **Emergency Motion for Order (A) Authorizing Maintenance of Prepetition Bank Accounts and Cash Management System and Continued Use of Existing Business Forms, Books and Records and (B) Approving Investment Accounts and Procedures**

Maintenance of Prepetition Bank Accounts and Cash Management System
and Continued Use of Existing Business Forms, Books and Records

39.     The Debtor uses a cash management procedure in the ordinary course of business that is designed to permit the efficient collection, investment and application of funds.   The Debtor seeks permission to continue their existing cash management practices, without need for the opening of a new debtor-in-possession bank account (except to the extent that the Debtor elects to do so in the ordinary course of its business).   The Debtor also seeks relief from any requirement that it open a new set of books and records.

40.     A list of the Debtor's current bank accounts is attached to the Motion as Exhibit A.  Additionally, a chart providing an analysis of the cash management structure of the Debtor is attached to the Motion as Exhibit B.  The Debtor intends to utilize the existing cash management structure as provided in Exhibit B.

41.     The Debtor, additionally, seeks relief from any requirement that it open a new bank account upon the commencement of its Chapter 11 case and seek authorization, during the pendency of the Chapter 11 case, to continue to use its existing bank accounts and its existing cash management system (except as noted herein, and to the extent that the Debtor elects to open new accounts in the ordinary course of its business).   Permitting the Debtor to maintain its existing bank accounts and existing cash management system (or to make only such changes as are appropriate in the ordinary course of business) will prevent disruption of the Debtor's operations and will not prejudice any party in interest. The Debtor will maintain complete and accurate records of all transfers of funds in and out of the bank accounts.

42.     The Debtor's existing cash management accounts function smoothly and permit the efficient collection of cash for the benefit of the Debtor and all parties in interest. Any requirement that the Debtor open a new account would potentially result in confusion and delays and hinder the efficient use of the Debtor's resources.

43.     The Debtor also seeks a waiver of the requirement in the United States Trustee's "Operating Guidelines and Reporting Requirements for Chapter 11 Cases" (the "Trustee's Guidelines") that it open new sets of books and records as of the date of the Consent Order. The Debtor submits that compliance with this requirement would create severe and unnecessary administrative burdens. The Debtor has in place sophisticated, computerized record keeping systems and will be able to ensure that all prepetition and postpetition transactions are properly accounted for.

**C.     Emergency Motion for Interim and Final Orders (I) Authorizing Debtors to Incur Post-Petition Debt Pursuant to Bankruptcy Code Section 364(c), (II) Approving use of Cash Collateral, (III) Granting Liens and Security Interests, And (IV) Scheduling Final Hearing**

44.     An immediate and critical need exists for the Debtor to obtain the DIP Loan (as set forth in the relevant Motion) and use the Cash Collateral in order to continue the operation of its business. Without access to post-petition financing, the Debtor will not have sufficient funds to enable it to maintain business relationships with vendors, suppliers, and customers, and, otherwise, to finance its business operations. Consequently, the Debtor's continued viability and ability to reorganize depends heavily upon the expeditious approval of the DIP Loan.

45.     The Debtor is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, or pursuant to sections 364(a) and (b) of the Bankruptcy Code. Under the circumstances, no source of credit on similar or more favorable terms other than the DIP

Financing (as described in the motion for debtor-in-possession financing (the "DIP Motion")), whether interim or otherwise, exists.

46.     The post-petition lender is willing to provide the DIP Financing to or for the benefit of the Debtor only in accordance with the terms of the DIP loan agreement (attached as Exhibit A to the DIP Motion) and the "Financing Order." The Interim Financing Order has been submitted as Exhibit C to the DIP Motion.

47.     Without the DIP Financing, the Debtor will not have sufficient funds to continue the purchase of supplies and to meet its current operating expenses, including payment of post-petition payroll, payroll taxes, inventory suppliers, overhead and other expenses necessary for the reorganization of the Debtor's business. The Debtor's reorganization efforts require the DIP Financing provided herein.

48.     In the Debtor's business judgment, the DIP Financing provides the Debtor with the best source of post-petition financing and, therefore, the best opportunity for the Debtor to successfully obtain confirmation of a plan. The Debtor has requested that the Lender provide the DIP Financing in order to provide funds to be used solely for such purposes set forth in the Financing Order in order to avoid immediate and irreparable harm to the Debtor's estate, which will occur if the Financing Order is not immediately approved. Without the DIP Financing, the Debtor will be unable to retain or pay employees, to maintain its assets, to attempt to reorganize their affairs, or to perform any of the tasks which the Debtor believes are necessary to maximize the value of its assets.

49.     The DIP Financing will benefit the Debtor and the Debtor's estates. The ability of the Debtor to attempt to reorganize its business depends upon the Debtor's ability to obtain the DIP Financing from the DIP Lender.

50.     Good, adequate and sufficient cause justifies the granting of the relief requested herein.  The extension of credit as provided under the terms and conditions in the DIP Financing Documents and the Financing Order is actual and necessary to preserve the estate, and will avoid immediate and irreparable harm to the Debtor, its estate and assets.

51.     The DIP Facility has been negotiated in good faith and at arm's-length between the Debtor and DIP Lender.  Any loans and other financial accommodations made to the Debtor shall have been extended in good faith, as that term is used in section 364(e) of the Code, and DIP Lender shall be entitled to all protections afforded thereunder.  The terms of the loan provided under the DIP Facility are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and are supported by reasonably equivalent value and fair consideration.

And further Affiant sayeth not.

AFFIANT:

_____

Paul Black
CEO & Chairman, BNP Petroleum Corporation

SWORN TO AND SUBSCRIBED BEFORE ME, the undersigned authority, on the 5th day of August, 2009.

_____
Notary Public - State of Texas

_____
Printed Name of Notary Public

C. D. KINCAID

My Commission Expires:

November 30, 2012

C. D. KINCAID
Notary Public, State of Texas
My Commission Expires
November 30, 2012

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the above and foregoing instrument has been

served on the parties listed in the attached Service List via electronic means as listed on the court's

ECF noticing system or by regular U. S. First Class Mail on this 5th day of August, 2009.

<div style="margin-left:40%">

By: <u>/s/ Marcy E. Kurtz  </u>
Marcy E. Kurtz

</div>

8/5/2009

# BNP PETROLEUM CORPORATION
## SERVICE LIST AS OF AUGUST 5, 2009

**Debtor**

BNP Petroleum Corporation
500 N. Water Street, Suite 300
Corpus Christi, TX 78471

Raptor Capital International LLC
113 Barksdale Professional Center
Newark, DE 19711

John F. Higgins
Meredith McIntyre Marshall
Porter & Hedges LLP
1000 Main Street, 36th Floor
Houston, TX 77002
**Attorneys for Raptor
Capital International LLC**

**United States Trustee**

Office of the U.S. Trustee
606 N. Carancahua
Corpus Christi, TX 78476

**Top 20 Creditors**

Patterson-UTI Drilling Company
PO Box 260111
Dallas, TX 75326-0111

Raptor Capital International LLC
113 Barksdale Professional Center
Newark, DE 19711

Scomi Oiltools, Inc.
PO Box 973869
Dallas, TX 75397-3869

CC Forbes Company LP
PO Box 250
Alice, TX 78333

BNP Commercial Properties, Ltd.
500 N. Water Street, Ste 510
Corpus Christi, TX 78471

Precision Energy Services Inc
PO Box 200698
Dallas, TX 75320-0698

Roywell Services, Inc.
PO Box 1329
Bellaire, TX 77402-1329

HBP Partners, Ltd
500 N. Water Street, Ste 300
Corpus Christi, TX 78471

Genesis Well Service
5100 Pool Road
Collyville, TX 76034

Texas Energy Services LP
PO Box 2108
Alice, TX 78333

Exterran Energy Solutions LP
P O Box 201160
Dallas, TX 75320-1160

D & B Rental Service
1800 FM 237
Yorktown, TX 78164

Delano Specialty, Inc.
PO Box 270297
Corpus Christi, TX 78427-0297

Timco Services
P O Box 53564
La Fayette, LA 70505

T Hunt Inc.
PO Box 806
Taft, TX 78390

Integrated Production Services Inc.
PO Box 746
Alice, TX 78333-0746

INEXS
1980 Post Oak Blvd, Ste. 2050
Houston, TX 7705

Black Warrior Wireline
5729 Leopard St.,  Bldg. 9
Corpus Christi, TX 78408

Oil Patch Petroleum, Inc.
1526 N. Padre Island Dr.
Corpus Christi, TX 78408

Strata Control Services Inc.
PO Box 272
Crowley, LA 70527-0272

HB Rentals
Dept. 2131
PO Box 122131
Dallas, TX 75312-2131

Alice Southern Equipment Service
PO Box 2058
Alice, TX 78333-2058

**Parties Requesting Notice**

Scott T. Citek
Lamm & Smith, P.C.
3730 Kirby Drive, Suite 650
Houston, Texas 77098
**Attorney for Roywell Services Inc.**

Eric M. English
King & Spalding LLP
1100 Louisiana, Suite 4000
Houston, TX 77002
Email: eenglish@kslaw.com
**Attorney for Valerus Compression
Services, LP**

W. Lee Keeling
Walker Keeling & Carroll LLP
PO Box 108
Victoria, TX 77902-0108
Email: lkeeling@wkcfirm.com
**Attorneys for NBC Oilfield
Equipment Inc.**

Carl Doré, Jr.
Doré & Associates, Attorneys, P.C.
17171 Park Row, Suite 350
Houston, TX 77084
Email: carldore@doreassociates.com
**Attorney for Smith International Inc.**

Diane W. Sanders
Linebarger Goggan Blair & Sampson, LLP
The Terrace II
2700 Via Fortuna Dr, Ste 400
P.O. BOX 17428
Austin, TX 78760-7428
Email: austin.bankruptcy@publicans.com
**Attorney for Kenedy County, Kleburg
County & Nueces County**

Richard R. Stedman, II
Sessions, Fishman, Nathan &Israel, L.L.P.
3850 N. Causeway Blvd., Suite 200
Metairie, LA 70002-7227
Email: rstedman@sessions-law.biz
**Attorney for H.B. Rentals, LC; Warrior
Energy Services Corporation; and Stabil
Drill Specialties, LLC**

Kevin M. Maraist
Anderson Lehrman Barre & Maraist, LLP
Gaslight Square
1001 Third Street, Ste. 1
Corpus Christi, TX 78404
Email: kmaraist@albmlaw.com
**Attorney for Exterran Energy
Solutions, LP**

Gerald C. DeLaunay
Perrin, Landry, deLaunay, Dartez & Ouellet
225 La Rue France
Lafayette, LA 70508
**Attorney for Timco Services Inc.**

Joel H. Thomas
Molly P. Thomas
408 West Market Street
P. O. Box 37
Sinton, Texas 78387
**Attorney for T Hunt Inc. D/B/A T & T
Construction and J. M. Davidson, Inc.**

Henry J. Kaim
King & Spalding LLP
1100 Louisiana, Suite 4000
Houston, TX 77002
HKaim@kslaw.com
**Attorney for Seashore Investment
Management Trust**

Jeffrey J. Cotner
John S. Black
Gibbs & Bruns LLP
1100 Louisiana, Suite 5300
Houston, TX 77002
jcotner@gibbs-bruns.com
jblack@gibbs-bruns.com
**Attorney for Seashore Investment
Management Trust**

Stephen J. Jabbour
Jabbour Law Offices
P.O. Box 1129
Victoria, TX 77902
**Attorney for Billy's Lease Service, Inc.**

Ronald A. Simank
Schauer & Simank, P.C.
615 North Upper Broadway,
Suite 2000-MSC 159
Corpus Christi, TX 78477
**Attorney for Texas Energy Services LP
And Forbes Energy Service LLC, Genesis
Well Service, TASCO Tool Services and
Texas Energy Services, LP**

Steven P. Vangel
Sara M. Banks
Hill Rivkins & Hayden LLP
712 Main Street, Suite 1515
Houston, TX 77002
**Attorneys for SCOMI Oiltools, Inc.**

John Ely
Ewing & Jones PLLC
6363 Woodway, Suite 1000
Houston, TX 77057
|jely@ewingjones.com
**Attorney for Mustang Gas
Compression LLC**

Edward L. Rothberg
Hugh M. Ray III
Weycer Kaplan Pulaski & Zuber PC
11 Greenway Plaza, Suite 1400
Houston, TX 77046
hray@wkpz.com
**Attorneys for Precision Energy
Services Inc.**

Errol John Dietze
Dietze & Reese
108 N. Esplanade
P.O. Box 841
Cuero, TX 77954
**Attorney for Pete Dlugosch
dba D&B Rental Service**

Norman D. Jones
106 N. Main, Suite 100
Victoria, TX 77901
**Attorney for Jones & Allen, Inc.**

McGuire Industries, Inc.
2416 West 42nd Street
Odessa, TX 79764-6309

Scott J. Duncan
Porter, Rogers, Dahlman & Gordon, P.C.
800 North Shoreline Blvd., Suite 800S
Corpus Christi, Texas 78401
Email: sduncan@prdg.com
**Attorney for Top Notch Energy Services, Inc.**

Gordon Blaine Morgan
Canales-Morgan Law Offices
724 Buffalo Street
Corpus Christi, TX 78401
**Attorney for S&D Vacuum Services**