IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| BNP PETROLEUM CORPORATION | § | Case No. 09-20206 |
| | § | (Chapter 11) |
| Debtor. | § | |

**JOINT MOTION OF SEASHORE INVESTMENT MANAGEMENT TRUST AND HECTOR CANALES, AS TRUSTEE FOR THE BLACK CHILDREN'S INDEPENDENT TRUST FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE**

**IF YOU WANT A HEARING, YOU MUST REQUEST ONE IN WRITING AND YOU MUST RESPOND SPECIFICALLY TO EACH PARAGRAPH OF THIS PLEADING. YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY (20) DAYS FROM THE DATE YOU WERE SERVED AND GIVE A COPY TO THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF.**

**IF A PARTY REQUESTS EMERGENCY CONSIDERATION, THE COURT MAY ACT EXPEDITIOUSLY ON THE MATTER. IF THE COURT ALLOWS A SHORTER RESPONSE TIME THAN TWENTY DAYS, YOU MUST RESPOND WITHIN THAT TIME. IF THE COURT SETS AND EMERGENCY HEARING BEFORE THE RESPONSE TIME WILL EXPIRE, ONLY ATTENDANCE AT THE HEARING IS NECESSARY TO PRESERVE YOUR RIGHTS. IF AN EMERGENCY HEARING IS NOT SET, YOU MUST RESPOND BEFORE THE RESPONSE TIME EXPIRES.**

**MOVANT HAS REQUESTED THAT THIS MOTION BE CONSIDERED AT THE NEXT UPCOMING HEARING IN THE CASE ON AUGUST 25, 2009 AT 9:30 A.M.**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Seashore Investment Management Trust ("Seashore") and Hector Canales, Trustee for

the Black Children's Independent Trust ("Canales") (together, the "Movants"), parties-in-interest

in this bankruptcy case, hereby file their Motion of Seashore Investment Management Trust for Appointment of a Chapter 11 Trustee (the "Motion").  In support thereof, Seashore respectfully represents as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND OF EVENTS PRIOR TO THE BANKRUPTCY CASE

2.     The assets now placed at issue in this bankruptcy case (at least virtually all of the material assets of value, the oil and gas properties that were apparently fraudulently conveyed to the Debtor on the eve of conversion to chapter 11) and certain of the liabilities at issue in this bankruptcy case are actually part of a long running scheme by entities controlled by Paul Black to prevent providing information to, and block and avoid obligations owed to, and property rights of, Seashore Investment Management Trust (and also interfere directly with the rights of Black Children's Independent Trust (the "Trust")), a number of which rights will likely be determined in an arbitration proceeding that is currently pending and soon to be heard.  The bankruptcy proceeding is merely an attempt to stage an "end run" around a fair determination of such property rights, and "launder" the assets through a bankruptcy proceeding done with little or no due process, proposed in violation of existing Fifth Circuit law concerning the sale of all assets, all premised on an "emergency" 75 day DIP Loan needed only for the payment of pre-conversion fees to professionals and pre-conversion expenses, and all orchestrated at the hands of Paul Black and parties that are now or have been affiliated with Paul Black.

3.     The ongoing disputes between Seashore and the Trust, on the one hand, and Paul Black's various controlled entities (including BNP Petroleum, PBF Investments, and the various entities in which Seashore has or had joint ownership) on the other hand, have been at issue in Corpus area courts since April 2008.  The initial court proceedings were initiated by Seashore to seek discovery and other orders in advance and in aid of arbitration.  Most recently, an arbitration proceeding, initiated by Paul Black, is currently pending before the American Arbitration Association ("AAA"), which includes the same parties (but currently excluding BNP Petroleum).  *PBF Investments v. Toby Shor and Seashore Investments Trust,* AAA Arbitration No. 70-198-161-09 (AAA Dallas, TX) (the "Arbitration").

**Discovery Proceedings In Aid of Arbitration**

4.     The Discovery Action (defined below) was filed in April 2008 by Plaintiffs Toby Shor and Seashore seeking relief against Paul Black ("Black"), BNP Petroleum Corporation ("BNP," or the "Debtor"), PBF Investments ("PBF"), and various entities jointly owned by Black affiliates, as majority owners, and Seashore.  The Discovery Action was filed pursuant to Section 171.086(a) of the Texas Civil Practice and Remedies Code, which authorizes a Texas Court to make various orders – including discovery orders -- in aid of an anticipated arbitration proceeding.  *Toby Shor et al. v. Paul Black et al.*, Cause No. 08-60699-1, in the County Court of Law No. 1, Nueces County, Texas (the "Discovery Action").

5.     As set out in the Application filed in the Discovery Action on April 9, 2008 (the "Application"), Seashore sought information in connection with transactions between Black and his affiliates, as embodied in a set of agreements between them beginning in the year 2000 (these are the same agreements referenced in the August 6, 2009 Affidavit of Paul Black in Support of First Day Orders filed in this bankruptcy case).  Seashore and Black/PBF jointly

owned a group of entities, being operated by Black, including BNP Holdings, BNP Oil & Gas Properties, Ltd. ("BNP Properties"), and others (together, the "Jointly-Owned Entities"), each of whom is a defendant in the pending Discovery Action.  BNP (the Debtor, which was jointly owned until 2006) was the operator of most or all of BNP Properties' mineral interest holdings, and Black's operation and control of the Debtor is therefore at the heart of numerous accounting and cash flow concerns already raised in ongoing litigation proceedings.  A restructuring agreement executed by Black in 2006 stipulated an unpaid debt of at least $14 million owed to Seashore by several of the PBF/Seashore Jointly-Owned Entities (the "2006 Restructuring Agreement").  The Discovery Action sought discovery in aid of arbitration and the preservation of documents related to Black's operation of the Jointly-Owned Entities.  All relief sought was pursuant to Texas Civil Practice and Remedies Code Section 171.086's provisions authorizing orders in aid of an anticipated arbitration.

6.    The Nueces County Court's resulting Order, dated May 13, 2008, found that Shor's application met the requirements of Section 171.086 for orders in support of an anticipated arbitration[1] and authorized further discovery under the auspices of an appointed Special Discovery Master, Hon. Robert Pate of Corpus Christi (the "Special Master").  The parties subsequently held numerous hearings and teleconferences with Judge Pate, who issued several discovery orders pursuant to his authority as court-appointed Special Master.

**Defendants' Termination**

7.    Within days after Seashore's Application seeking information about how Black was operating the Jointly-Owned Entities and information about where the money of such entities was going, Black/PBF sought to derail Seashore's access to information by purporting to

---

[1] The Order specifically provides:  "The Court finds and the Parties stipulate that any actions taken in accordance with this order shall not constitute a waiver of arbitration."  May 13, 2008 Order, at 5.

terminate (the "<u>Termination</u>") the various partnerships under the provisions of a certain Termination Agreement (as modified by the 2006 Restructuring Agreement).[2]

8.       The alleged Termination necessarily entailed allocation of the entities' assets and liabilities as of a specified termination date, which Black contended to have occurred on May 12, 2008.  Additionally, the Termination would have provided Seashore a security interest in the oil and gas properties recently transferred to the Debtor.   Seashore immediately (and then repeatedly) requested (then demanded) a balance sheet setting out the partnerships' assets and liabilities to be allocated so that the alleged Termination and division of the partnerships could be effectuated.  While Black/BNP had provided certain documentation, Black/BNP consistently failed and refused to provide the balance sheet information and information on the assets and liabilities at issue.  Ultimately, Seashore obtained court orders from the Special Master requiring Black to provide financial information as of the alleged May 12, 2008 termination date.  See, e.g, Nov. 24, 2008 Discovery Order of Special Master, at 3 (Item I(A)(a)) and 4 (Item I(B)) (ordering compliance by January 15, 2009).  Black, however, still failed to provide this information, in violation of the Special Master's order.  Rather than comply with the Discovery Order of the Special Master, Black initiated a new state court action.  PBF Investments v. Toby Shor and Seashore Investments Trust, Cause No. 09-60343-3, in the County Court of Law No. 3, Nueces County, Texas.

**The Pending Arbitration**

9.       Black – acting through PBF Investments – initiated the current Arbitration on or about March 7, 2009.   PBF's initial claims focused on the Termination process – the process of dividing the assets and liabilities of the previously Jointly-Owned Entities such as BNP

---

[2] The April 2008 notice of termination did not conform to the requirements of the Termination Agreement.  It did, at least, signal Black/PBF's desire that the partnerships be unwound, an idea Seashore supported provided adequate information be provided and any improper transfers were disclosed and recovered.

Properties.  Seashore has responded and counterclaimed, joining Black personally and the Jointly-Owned Entities (but excluding, for now, BNP Petroleum due to the bankruptcy stay).[3]

10.     The Arbitration shall deal with a variety of issues including such issues as the debts owed among the related "BNP entities" and those owed to Seashore, Seashore's rights, interests and ownership with respect to various oil and gas properties, defalcations and fiduciary breaches by the CEO of the Debtor, Paul Black, and Black's wrongful use of his control of the Debtor to divert funds owed to Seashore and/or to entities owned in part by Seashore.  The AAA has vetted a list of arbitrators, and the parties submitted preliminary objections and rankings of the arbitrator candidates on August 3, 2009.  A panel has not yet been appointed, but the AAA's appointment is expected to be imminent.

**Black's History of Wrongful Diversion of Funds Held in Fiduciary Capacity**

11.     It is undisputed the Paul Black has, on prior occasions, wrongfully diverted *millions of dollars* of funds he controlled in a fiduciary capacity.  His own lawyer, Shelby Jordan, has acknowledged in writing, in an investigatory "comfort letter" given to the now-former Trustee of Seashore, that Black had already been caught withdrawing $3 million from various partnerships in transactions described (by his own lawyer) as being "without prior notice to Seashore," "without approval [by] Seashore" and in violation of the "require[ments of] the partnership agreement."  In the February 17, 2004 "Comfort Letter" to Seashore's Trustee, Jordan further explained that most of the unauthorized withdrawals were "used to fund improvements on [personal] homestead of the Blacks" and other inappropriate purposes.  Indeed,

---

[3]     PBF attempted to disrupt the AAA's arbitration process by asking County Court at Law No. 3 to impose selected arbitrators in contravention of the AAA's rules.  Seashore opposed that effort and asked that the matter be transferred back to Judge Vargas in County Court No. 1, where it had been pending.  Judge Martinez declined to transfer, but instead denied the request that he appoint an arbitrator, and then stayed the entire action in County Court No. 3 pending the Arbitration.

Black has stated that a portion of the approximately $14 million note owed to Seashore was in compensation of this conspicuous fiduciary breach by Black.

**Millions More Recently Disbursed to Black and Affiliates**

12.     More recently, Seashore obtained additional evidence that Black's practices have continued.  In documents obtained in the Discovery Action, the information identified *several million more* in funds Black had apparently distributed to himself and his friends and affiliates out of certain jointly-owned entities.  On November 24, 2008, the Special Master ordered Black to produce support (invoices, etc.) "explaining, documenting or supporting" approximately $7 million of such suspicious disbursements.[4]   To date (and as explained below), Black has failed and refused to comply with the Special Master's Order.

**Funds Transferred to BNP Petroleum**

13.     On November 24, 2008, the Special Master also ordered Black to produce records related to *another $10-plus million* of net transfers advanced from certain Jointly-Owned Entities to the Black-owned and controlled BNP (now the Debtor).  The Special Master ordered Black specifically to produce reconciliations of the transfers between BNP and BNP Properties.  The Special Master's Order specifically envisioned further related rulings once the reconciliations were produced, but Black simply failed and refused to produce those documents and, thus, further discovery has been thwarted.

14.     Importantly and ironically, purported debts claimed to have been owed *by* the partnerships *to* BNP are a central feature of the elaborate schemes orchestrated.  Seashore has

---

[4] Item (D)(a) of that order, orders Black to produce "Any and all invoices, contracts and other support or source documents, from February 17, 2004 going forward and through the present, explaining, documenting or supporting the nature of the disbursement reflected on Exhibit 1."  Exhibit. 1 to that Order lists over $10 million in disbursements, the majority of which were subsequent to February 2004.

tried for over a year to learn if such debts *exist at all* or if, to the contrary, BNP owed money to the partnerships or to Seashore.

## Black's History and Continuing Practice of Withholding Information from His Fiduciary Beneficiaries

15.     As alluded above, Seashore has been in two County Courts, a Special Master proceeding and now the Arbitration and still can't get even very-basic information (information already *ordered to be produced*) from Black about its interests and Black's fiduciary operation of those interests.  Regrettably, Mr. Black's *own children* (through their trustee) is pursuing entities controlled by Mr. Black through the Court seeking disclosure of what he has done with their interests.  *See Hector Canales (as Trustee of the Black Children's Independent Trust) v. PBF Investments, Ltd*, Cause No. 09-60343-3-A, in the County Court of Law No. 3, Nueces County, Texas.

16.     As noted above, Black has been ordered to produce accounting information related to the intended Termination of the relationship with Seashore.  Black, however, has demonstrated that he cannot be trusted or relied upon to provide operational reports (of the type that will be required by the United States Trustee's Office and the Bankruptcy Court) even after being compelled to do so under Court order.  On November 24, 2008, Black was ordered (the "November Court Order") to provide and produce a detailed balance sheet of the Jointly-Owned Entities as of the May 12, 2008 alleged date of the Termination, *and* subsequent operating information about the related income and expenses:

> (a)  A balance sheet, including full and detailed listings of all assets and liabilities (including all payables and receivables and all property owned) of all jointly-owned entities as of May 12, 2008.

> (b)  An accounting report of income and expenses/disbursements attributable to the interests owned by Seashore or Toby Shor from May 12, 2008 through the present

8

(which may be an accounting pertaining to all of the working interests pertaining to the properties operated by BNP and jointly-owned by the parties).

17.      Nearly a year and a half after the May 12, 2008 alleged Termination date, and nine months after the November Court Order, Black still has not complied.  This is precisely the type of operating report that is critical and mandatory from a debtor in bankruptcy, and Black has demonstrated that he cannot be trusted to prepare and provide such information, *even when under Court order to do so.*

**The Black Children's Trust Lawsuit**

18.      Seashore and the trade creditors who dealt with Mr. Black are not the only ones being stonewalled.  The Trust, established for the benefit of *Paul Black's own children* and which owns one-third of PBF, an entity that was Seashore's co-owner in the Jointly-Owned Entities, has initiated legal action twice in the past year seeking information from Black about their interests and the operation of the entities.  Canales, Trustee of the Black Children's Independent Trust, sought to intervene in the original County Court at Law No. 1 discovery proceeding against Black and the various BNP entities, seeking information from Black.  Even after Black initiated the conflicting proceedings in County Court at Law No. 3, the Trust intervened there – again seeking information from their fiduciary Paul Black.   That intervention was severed into a separate action. *See  Hector Canales (as Trustee of the Black Children's Independent Trust) v. PBF Investments, Ltd*, Cause No. 09-60343-3-A, in the County Court of Law No. 3, Nueces County, Texas.  Amazingly, though the Trust did finally obtain an order giving them the right to discovery produced by Black and the companies he operated, Black and PBF have sought *mandamus* against Judge Martinez to block the discovery.   *See In re PBF Investments, Ltd*, Case No. 13-09-361-CV in the Court of Appeals, Thirteenth District, Corpus Christi Division (mandamus proceeding)  The information sought to be blocked by Black is

owed to an entity to whom Black owes a fiduciary duty.  Black is unabashed about fighting to keep information away from even those to whom he owes fiduciary duties.

## **BANKRUPTCY CASE BACKGROUND**

19.     On April 3, 2009 (the "Filing Date"), an involuntary chapter 7 petition was filed against BNP Petroleum Corporation ("BNP" or "Debtor", as applicable) by three of its unpaid vendors, namely Baker Hughes Oilfield Operations, Inc. ("Baker Hughes"), Schlumberger Technology Corporation ("Schlumberger"), and La Copa Field Services, Inc. ("La Copa") (the "Petitioning Creditor(s)").

20.     On April 20, 2009, T. Hunt Inc. d/b/a T&T Construction ("Hunt") filed its *Motion to Join in Involuntary Petition as Additional Petitioning Creditor* (Docket No. 12) (the "Hunt Motion"), wherein Hunt requested a Court order adding them as a Petitioning Creditor.

21.     On April 20, 2009, J.M. Davidson, Inc. ("Davidson") filed its *Motion to Join in Involuntary Petition as an Additional Petitioning Creditor* (Docket No. 12), wherein Davidson requested a Court order adding them as a Petitioning Creditor.

22.     On June 2, 2009, Raptor Capital International, LLC ("Raptor") filed three separate notices of transfer of claim (the "Notices"), wherein Raptor stated that it had purchased the claims of Baker Hughes, Schlumberger, and La Copa (Docket Nos. 49, 50, 51).  Attached to each of the Notices was an *Assignment of Claim* (the "Assignments"), wherein Raptor, as buyer, represented, in relevant part, the following:

> (d) the Buyer is not an affiliate of the Debtors; (e) the Purchase Price to be paid by Buyer to Seller under this Assignment consists solely of cash of Buyer and does not in anyway consist of cash of the Debtor; (f) Debtor is not the direct or indirect source of the Purchase Price; and (g) no insider of the Debtor (as that term is defined in the Bankruptcy Code § 101) is the direct or indirect source of the Purchase Price.

Assignments, ¶ 8.  Upon information and belief, Raptor or its principals intend to be part of a group to buy the assets of the Debtor, a deal arranged by Paul Black prior to the conversion of the case.

23.     On June 2, 2009, Raptor filed its *Joint Motion for Substitution of Parties* (Docket No. 52) (the "Substitution Motion"), wherein Raptor requested, pursuant to the Assignments, that it be substituted as a petitioning creditor in place of Baker Hughes, Schlumberger, and La Copa. On June 26, 2009, the Court entered its order granting Raptor's Substitution Motion (Docket No. 67) (the "Substitution Order").

24.     On June 10, 2009, Precision Energy Services, Inc. ("Precision") filed its *Expedited Motion of Precision Energy Services, Inc. to Join in Involuntary Petition* (Docket No. 62) (the "Precision Motion"), wherein Precision requested a Court order adding them as a Petitioning Creditor.  On June 30, 2009, BNP filed an objection to the Precision Motion, wherein BNP asserted that Precision did not satisfy the requirements of 11 U.S.C. § 303 to become a Petitioning Creditor (Docket No. 70) (the "Precision Objection").

25.     On June 12, 2009, Scomi Oiltools, Inc. ("Scomi") filed its *Motion of Scomi Oiltools, Inc. to Join in Involuntary Petition as Additional Petitioning Creditor* (Docket No. 65) (the "Scomi Motion"), wherein Scomi requested a Court order adding them as a Petitioning Creditor.  On June 30, 2009, BNP filed an objection to the Scomi Motion, wherein BNP asserted that Scomi did not satisfy the requirements of 11 U.S.C. § 303 to become a Petitioning Creditor (Docket No. 71) (the "Scomi Objection").  On July 6, 2009, Scomi filed its response to the Scomi Objection (Docket No. 74) (the "Scomi Response").

26.     On July 14, 2009, a *Stipulation Between BNP Petroleum Corporation and Precision Energy Services, Inc. and Scomi Oiltools, Inc.* (Docket No. 81) (the "Stipulation") was

filed.  The Stipulation, in relevant part, provided that "BNP consents to Scomi and Precision joining the involuntary petition as petitioning creditors…."  Stipulation, p. 1.

27.     On August 5, 2009, BNP filed its motion to convert this case to a case pending under chapter 11.  On August 7, 2009, the Court entered its order approving BNP's motion to convert.  During that time period, BNP acquired possession of significant oil and gas properties owned by a Black controlled entity and became obligated for significant secured debt obligations.

28.     According to the Debtor's first day pleadings, BNP "is primarily an oil and gas operator [which] has operations throughout South Texas."  Black Affidavit, ¶ 13.

29.     Paul Black is the Chairman and Chief Executive Officer ("CEO") of the Debtor.  Black Affidavit, ¶ 2.  Black is also the sole and/or majority owner of several other affiliated entities, including BNP Properties, from which the oil and gas properties were transferred in an insider, secret transaction, on the eve of the first day hearings.[5]  Black Affidavit, ¶ 14.  BNP Properties owned the oil and gas properties upon which the Debtor operates until just prior to the "first day" hearings, and the Debtor has claimed that BNP Properties also owes over $4 million to the Debtor.

30.     Prior to the Filing Date, the Debtor was obligated to conduct various oil and gas production and development activities on oil and gas properties owned, in part, by various Black controlled entities, including BNP Properties.  Despite the substantial income which should have been created by the oil and gas properties (the revenues of which presumably should be substantially greater than the cost of operations), the Debtor has claimed that BNP Properties

---

[5] Seashore is the other partner of BNP Properties.

previously provided no revenue to maintain the operations of its properties.[6]   However, the Debtor's books and records or, importantly, the books and records of BNP Properties, have not been provided in order to examine these claims, despite the prior Special Master's order requiring such production and over a year's effort to attempt to obtain such information.  Upon information and belief, payments that should have been made to BNP by BNP Properties were, in part, diverted by Black for unknown uses.  Seashore seeks discovery to confirm these facts and believes, on information and belief, that such discovery will reveal improper business policies.

31.     The Debtor, based on the facts as they are stated in their pleadings, blames its declining financial condition in large part on the failure of BNP Properties to pay what is claimed to be an account receivable in excess of more than $4 million.  Black Affidavit, ¶ 14.  The Debtor has neglected to provide any information regarding the nature of the services and/or goods provided to BNP Properties with regard to this $4 million account receivable, nor has Black identified with any factual basis why BNP Properties could not pay such obligations.  However, as implied in Black's first-day affidavit, BNP Properties apparently has not made any payments on account of this delinquent account receivable.  Further, upon information and belief, the Debtor apparently made no effort to pursue payment of this delinquent account receivable, despite Black's own concession that the inability to collect on this account receivable was a precipitating factor in the financial downfall of the Debtor.  Black Affidavit, ¶ 14.  Despite the obvious insider relationship, Black has failed to provide any clarity to this situation.

32.     This delinquent account receivable is not the only detriment that a Black-related entity has caused the Debtor.  In fact, and as noted by Black in his first-day affidavit, the Debtor

---

[6] The DIP Loan Budget reflects that the revenues from an alleged 55% ownership in the oil and gas properties is more than sufficient to satisfy 100% of the operating costs of 100% of the oil and gas properties.

was the guarantor of BNP Properties' pre-petition secured indebtedness to Margrave Holdings and Walter Oblach (the "Prepetition Lenders") in the amount of $4,023,426.42 (the "Pre-Petition Note"),[7] a note which "has been in default since December 2008."   Black Affidavit, ¶ 17. According to Black, BNP Properties assigned its assets to the Debtor "on or about August 5, 2009", but stated in Court that it occurred on the night prior to the "first day hearings".   Black has failed to identify the value of the assets transferred, or whether the properties have been evaluated by a third party appraiser.   Prior to the assignment of BNP Properties' assets, the Debtor "did not hold any significant secured debt…."   *Id*.   Yet, after the assignment of BNP Properties' assets the night before the first day hearings, the Debtor is now encumbered with secured debt in excess of $4 million, attempting to provide "adequate protection" to such lender in the oil and gas properties.  *Id*.  As the majority owner of BNP Properties, Black presumably acted on behalf of BNP Properties in assigning the assets to the Debtor, and, as the Chairman and CEO of the Debtor, Black presumably acted on behalf of the Debtor in accepting such assignment, orchestrating the transaction in a clear self-dealing transaction, even while in a pending bankruptcy proceeding.

33.     In its DIP Financing motion (Docket No. 99) (the "DIP Financing Motion"), the Debtor seeks to provide adequate protection liens to the Prepetition Lenders on account of this secured indebtedness, no doubt another pre-arranged and self-dealing transaction.  Furthermore, pursuant to the DIP Financing Motion, the Debtor seeks Court authority to obtain $1 million in financing from Blackgate Resources, Inc. ("Blackgate"), which is one of the three parties, all

---

[7] In the proposed interim DIP Financing order filed on the Court docket on August 5, 2009, the Debtor attempts to stipulate that it is indebted to the Prepetition Lenders in the amount of $5 million.  No documentation has been filed with the Court or provided to Seashore to verify the actual amount of prepetition secured indebtedness owed to the Prepetition Lenders.  Nonetheless, Seashore notes that the Debtor's first-day pleadings and proposed order are already providing inconsistent and contradictory information, making it difficult, if not impossible, for Seashore and other creditors to receive an accurate forecast of the Debtor's financial position.

represented by one counsel, seeking to buy the assets transferred in the dark of the night from Black's left pocket to his right pocket on the evening before the first day hearings.  Although it is troubling in and of itself that the DIP Financing Motion neglected to disclose Blackgate's secret status as the buyer of the assets, it is even more troubling when considering some of the particularly onerous terms included in the DIP Loan, such as (i) the 75-day maturity date, and (ii) explicit authority for Blackgate to credit bid its outstanding indebtedness in any purchase of the Debtor's assets.   The DIP Loan Budget reveals that such loan is simply not needed for operations, and that the Debtor's only need for the funds is to fund pre-conversion costs, which are not necessarily payable under after confirmation of a plan, and are subordinate to any administrative claims post-conversion.

34.     As a result of the numerous questionable insider transactions discussed above, BNP has not been able to pay its debts to virtually all vendors from which it purchased various goods and services during 2009.  Assuming the facts as stated by the Debtor, the failure by Black to provide any cash from the Black controlled entity BNP Properties to the Black controlled Debtor led directly to the huge accumulation of trade debt and the filing of the present bankruptcy case.  Now, the Debtor is creating an emergency, where none really exists, to quickly convey assets without disclosing any information, in circumvention of nearly all parties' rights.

### SUMMARY OF GROUNDS FOR APPOINTMENT OF A TRUSTEE

35.     Seashore and the Trust assert that the Debtor's current Chairman and CEO, Paul Black, is not capable of exercising his independent fiduciary duty to creditors because he is ensnared in a web of conflicting insider relationships and divided loyalties.  If left to his own devices, Black will likely continue to precipitate behind-the-scenes insider transactions and divert monies owed to BNP to other Black related entities.  As reflected above, Black has refused

to provide information on the transfers between BNP and BNP Properties even after being compelled to do so by a court and the Special Master--this is directly relevant to his role as CEO of the Debtor.  It is believed that due to the lack of information and disclosure on the part of Black, no outside party will be able to independently verify the accuracy of any disclosures made by Black on behalf of BNP.  Seashore and the Trust have separately sought documents of Black in other litigation proceedings, as outlined extensively above, but Black has continuously sought to prevent production of documents and has sought to evade disclosure of information in direct violation of Court orders.  Further, as the Chairman and CEO of the Debtor, Black cannot be expected to conduct and/or authorize a legitimate, good faith review of avoidance actions, the large majority of which, upon information and belief, may represent transfers to Black or Black-related entities.  As a result, the Debtor's estate will continue to be substantially prejudiced, and the prospects for creditors' recovery will diminish every day, due to this huge conflict of interest.

36.     The appointment of a chapter 11 trustee will bring credibility and an independent perspective to operations of the Debtor as well as the Black related entities.  A chapter 11 trustee will also conduct a legitimate, good faith review of the Debtors' books and records to provide creditors and the Court with an accurate forecast of the financial prospects of BNP.  Further, and of great importance to creditors, a chapter 11 trustee will also be able to analyze independently the various insider dealings that the Debtor, acting under the direction of its Chairman and CEO, Black, has engaged in preconversion to determine which of those relationships (i) should be avoided, or (ii) give rise to a claim or cause of action in favor of the Debtor's estate against Black.

## ARGUMENT

37.     Seashore and the Trust request that the Court appoint a chapter 11 trustee to manage the business and affairs of the Debtor pursuant to section 1104(a) of the Bankruptcy Code.   "[I]n considering a motion for the appointment of a trustee, a bankruptcy court is not required to conduct a full evidentiary hearing." *In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990) *(citing In re Casco Bay Lines, Inc.,* 17 B.R. 946, 950 (1st Cir. B.A.P. 1982)).   Moreover, the Court may appoint a trustee *sua sponte. See In re Bibo, Inc.,* 76 F.3d 256 (9th Cir. 1996); *In re Ngan Gung Rest., Inc.,* 195 B.R. 593 (S.D.N.Y. 1996).

38.     Section 1104(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—
>
> (1)  for <u>cause</u>, including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management, either <u>before</u> or after the commencement of the case, or similar cause . . . or
>
> (2)  if such appointment is in the <u>interests of creditors</u>, any equity security holders, and other interests of the estate . . . or
>
> (3)  if grounds exist to convert or dismiss the case under Section 1112, but the court determines that the appointment of a trustee or examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1104(a)(emphasis added). The facts here compel appointment of a trustee under either the objective test set forth in 11 U.S.C. § 1104(a)(1) or the subjective "best interests" test set forth in 11 U.S.C. §§ 1104(a)(2) and 1104(a)(3).

**A.**      ***Cause Exists for the Appointment of a Chapter 11 Trustee Under Section 1104(a)(1) of the Bankruptcy Code***

39.      Section 1104(a)(1) of the Bankruptcy Code provides for the appointment of a trustee for "cause."   Under section 1104(a)(1) of the Bankruptcy Code, the moving party can establish "cause" by showing "fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management . . . ." 11 U.S.C. § 1104(a)(1). This list is not exhaustive; the Court may find "cause" for other reasons not specified in the Bankruptcy Code. *See In re Cardinal Indus., Inc.,* 109 B.R. 755, 765 (Bankr. S.D. Ohio 1990) ("[t]he examples of cause enumerated in § 1104(a)(1) are not exhaustive; the Court may find that cause exists for a reason not specifically set forth in the statute."); *In re Colorado-Ute Elec. Ass'n., Inc.,* 120 B.R. 164, 174 (Bankr. D. Colo. 1990).   Further, "[t]he court may consider both prepetition, as well as postpetition conduct in determining the necessity of a trustee."   *In re Microwave Prods. of Am., Inc.*, 102 B.R. 666, 671 (Bankr. W.D. Tenn. 1989).

40.      The particular type of conduct that has been found to constitute "cause" under 1104(a)(1) ranges across a broad variety of circumstances. Courts have found "cause" under section 1104(a)(1) of the Bankruptcy Code where creditors have simply lost confidence in the debtor's management.   *See Cardinal*, 109 B.R. at 766 (The loss of confidence by creditors in debtor's management "is cause which requires this Court to order the appointment of an independent trustee pursuant to 11 U.S.C. § 1104(a)(1)."); *In re Colorado-Ute Elec. Ass'n., Inc.,* 120 B.R. at 176 (stating, as a reason to appoint a trustee, "the Court concludes that the creditors sincerely and justifiably lack confidence in management"); *In re Madison Mgmt. Group, Inc.,* 137 B.R. 275, 281 (Bankr. N.D. Ill. 1992) ("lack of confidence in the debtor's management may constitute cause").  Here, there can be no doubt that BNP's creditors have lost confidence in Debtor's management.  This is evidenced by the fact that seven of the Debtors'

creditors, who are owed substantial sums of money by the Debtors, have sought, at various times, to become involuntary petitioning creditors and have all alleged that the Debtor has been unable to pay its debts as they become due.  Seashore and the Trust, parties that have been damaged by the activities of Black and BNP, join in the chorus of parties who voice a lack of confidence in the Debtors' current management.

41.     A number of cases also indicate that "cause" is shown under section 1104(a)(1) where the debtor maintains inaccurate, incomplete recordkeeping. *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1229 n.15 (3d Cir. 1989) (citing several cases for this proposition).   Prepetition, affiliates of BNP controlled by Black were obtaining significant revenue from the proceeds of oil and gas properties but not remitting those proceeds to BNP, the operator of the properties.  The Debtor's books and records, or any information by Black's other entity and properties, fail to reflect the receipt, much less the disposition, of funds which should have been provided to BNP.  Neither creditors nor the Court can be expected to receive an accurate forecast of the Debtor's prospects for reorganization with the records currently available.  As such, "cause" exists to appoint an independent chapter 11 trustee to review the Debtor's books and records for the benefit of all parties-in-interest.

42.     Similarly, courts have found "cause" in the presence of conflicts of interest and questionable transactions with affiliates and/or other insiders. *See, e.g.  Sharon Steel*, 871 F.2d at 1229 n.16 (citing cases finding cause for, among other things, conflicts of interest); *In re Patman Drilling Int'l, Inc.*, 2008 Bankr. LEXIS 715, at *16 (Bankr. N.D. Tex. March 14, 2008) ("'Cause' exists in this case because of the overwhelming conflicts of interest of the Debtor's management...."); *Tradex Corp. v. Morse*, 339

B.R. 823, 835 (D. Mass. 2006) ("[Q]uestionable business transactions with related companies may also serve as grounds for appointment of a trustee."); *In re Tahkenitch Tree Farm P'ship*, 156 B.R. 525, 527 (Bankr. E.D. La. 1993) ("[T]he Court finds that the 'cause' for appointment of a trustee is PCP's conflict with Yorkshire which prevents PCP from acting as agent for the [debtor] in a fair and unbiased manner, and that in at least some instances, [the general partner] is acting in its own interests rather than on behalf of [the debtor]."). The filing of a chapter 11 bankruptcy petition imposes upon a debtor-in-possession a fiduciary duty to all of its creditors to administer the assets and business of the estate in the interest of those creditors. *In re Bellevue Place Assoc.*, 171 B.R. 615, 623-24 (Bankr. N.D. Ill. 1994) *aff'd* 1994 U.S. Dist. LEXIS 17409 (N.D. Ill. Dec. 6, 1994). Such fiduciary obligations include a duty of loyalty which precludes officers and directors from engaging in any self-dealing. *Id.* at 624. Conflicting personal interests of officers and directors that interfere with the exercise of their fiduciary duties to all creditors constitute cause to appoint a trustee pursuant to section 1104(a)(1) of the Bankruptcy Code. *Id.* Here, it appears that affiliates of the Debtor controlled by Black are failing to remit funds owed to BNP, and perhaps to Black's other entities. As a result, BNP is expending resources on oil and gas properties and incurring lien claims on such assets, but not receiving any of the payments from the revenues of the properties, without any explanation by Black. Furthermore, the Debtor, with Black at the helm, seeks Court authority to enter into an onerous financing arrangement with Blackgate, whose buyer status was not properly disclosed in the DIP Financing Motion. The Debtors' Chairman and CEO, Black, cannot be expected to authorize the Debtor to investigate and pursue causes of action against himself or other Black-related entities; this is an

obvious conflict of interest and constitutes "cause" to appoint an independent chapter 11 trustee.

43.     On the facts presented here, the conflicting personal interests of the Debtor's senior management is more than sufficient cause to appoint a trustee pursuant to 11 U.S.C. § 1104(a)(1).  Seashore and the Trust, among other creditors and parties-in-interest (as evidenced by the filing of the involuntary petition), have lost confidence in the Debtor's management, which is in large part due to Black's gross mismanagement of the estate, the related Black entities and improper conflicts of interest.  Further, the appointment of a trustee will facilitate a transparent relationship with Seashore, the Trust and other creditors, enabling the more efficient resolution of disputes and the bankruptcy case generally going forward.

44.     Once cause is demonstrated, the Bankruptcy Code mandates the appointment of an impartial chapter 11 trustee.  *See Tradex Corp.*, 339 B.R. at 826 (stating that a court is required to appoint a trustee once the movant meets its burden); *In re Bellevue Place Assocs.,* 171 B.R. at 622 ("[a] bankruptcy court is required to order the appointment of a trustee where 'cause' exists"); *In re Bonded Mailings, Inc.,* 20 B.R. 781, 786 (Bankr. E.D.N.Y. 1982) ("where such cause as is enumerated has been shown, the courts have no discretion but must appoint a trustee."); *In re McCordi Corp.,* 6 B.R. 172, 176-78 (Bankr. S.D.N.Y. 1980).  Therefore, appointment of a chapter 11 trustee is warranted under section 1104(a)(1) of the Bankruptcy Code.

**B.      The Appointment of a Chapter 11 Trustee is in the Best Interests of Creditors Pursuant to Section 1104(a)(2) of the Bankruptcy Code**

45.     Section 1104(a)(2) of the Bankruptcy Code sets forth a "best interests of creditors" test that emphasizes a court's broad equity powers to engage in a cost-benefit analysis

in making the decision whether the appointment of a trustee is appropriate. Some factors that courts have considered under section 1104(a)(2) of the Bankruptcy Code are:

(1)     the trustworthiness of the debtor;

(2)     the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitation;

(3)     the confidence or lack thereof of the business community and of creditors in present management; and

(4)     the benefits derived by the appointment of a trustee, balanced against the cost of appointment.

*In re Euro-Am. Lodging Corp.,* 365 B.R. 421, 427 (Bankr. S.D.N.Y. 2007); *Tradex Corp.,* 339 B.R. at 829.

46.     Numerous courts have appointed a trustee relying solely upon the "best interests" test. *See, e.g., In re Microwave Prods,* 102 B.R. at 676-77; *In re L.S. Good & Co.,* 8 B.R. 312, 315 (Bankr. N.D. W.Va. 1980).  Indeed, appointment of a trustee may be warranted even where no "cause" exists. *Sharon Steel,* 871 F.2d at 1226; *Bellevue Place Assocs.,* 171 B.R. at 623. Instead of focusing on cause, courts under section 1104(a)(2) of the Bankruptcy Code will act on "the practical realities and necessities" of a case. *In re Euro-Am. Lodging Corp.,* 365 B.R. at 427; *In re Ionosphere Clubs, Inc.,* 113 B.R. at 168.

47.     Many of the cases appointing a trustee in the "best interests" of creditors considered the same factors as those considered for a finding of "cause" to appoint a trustee. *See, e.g., Sharon Steel,* 871 F.2d at 1120-21 (appointment of trustee under section 1104(a) of the Bankruptcy Code for cause *and* in the best interests of the creditors and the estate). However, under this less stringent standard, the moving party need not show wrongful behavior on the part of management, as long as a meaningful benefit from the appointment of a trustee is shown and the benefit outweighs the burdens and expenses. *See, e.g., Cardinal*

*Indus.,* 109 B.R. at 766; *In re Microwave Prods., Inc.,* 102 B.R. at 675.  In fact, courts have determined that appointment of a trustee is in the best interests of creditors when creditors have lost confidence in the debtor's management, the debtor maintains inaccurate or incomplete books and records, the debtor engages in and/or fails to account for significant insider transactions, and the debtor fails to investigate and/or pursue potential preference and/or fraudulent transfer actions.  *See, e.g., Patman Drilling*, 2008 Bankr. LEXIS 715, at *17 (finding appointment of a trustee warranted under section 1104(a)(2) where a "majority of the Debtor's creditor body has lost confidence in the Debtor's management…."); *Euro-Am. Lodging Corp.*, 365 B.R. at 428 (Where a debtor's managers "suffer from material conflicts of interest, an independent trustee should be appointed under § 1104(a)(2)."); *Cardinal Indus.*, 109 B.R. at 766-67 (court finds appointment of a trustee warranted under section 1104(a)(2) when, among other things, the debtor failed to provide creditors with full and accurate data); *Microwave Prods.*, 102 B.R. at 672 ("A trustee may be appointed for misconduct or self-dealing, such as questionable business dealings between a debtor corporation and related entities.");  *In re Evans*, 48 B.R. 46 (Bankr. W.D. Tex. 1985) (finding appointment of a trustee under section 1104(a)(2) warranted where the debtor failed to file income tax returns and investigate and prosecute potential preference and fraudulent transfer actions); *In re L&S Good & Co.*, 8 B.R. 312, 315 (Bankr. N.D.W. Va. 1980) (finding appointment of a trustee warranted under section 1104(a)(2) where, among other things, "[t]he magnitude of the number of inter-company transactions places current management of [the debtor's subsidiary] in a position of having grave potential conflicts of interest" thereby creating a presumption that such management will not be able to impartially investigate and/or pursue inter-company claims).  As Chairman and CEO of the Debtor, Black, as a fiduciary of the Debtor's estate, cannot be expected to impartially investigate and/or pursue causes of action

23

against himself or other Black related and controlled entities.  This prevalent conflict of interest, coupled with the Debtor's apparent failure to pursue obligations owed to BNP, warrants the appointment of a trustee under section 1104(a)(2).

48.     Here, the appointment of a trustee would be in the best interests of the Debtor's estate.  An independent trustee could quickly maximize the value of the Debtor's assets for creditors and is therefore in the best interests of creditors. The interests of creditors would be served by having an independent trustee take control of the Debtors' operations at this early stage of the cases in order to review and hire professionals, as necessary, to review the Debtors' books and records and provide the Court and creditors with an accurate forecast of the Debtors' financial condition

49.     Every factor in this case points to the appointment of a chapter 11 trustee under section 1104(a)(2) of the Bankruptcy Code as a proper and necessary action by the Court.  If left unchecked, Black will continue to operate the BNP entities to the detriment of creditors, as well as his obligations to Seashore and the Trust.  The creditors are bearing all the risk of this case, while Black may well be squandering the assets of the estate.  All creditors in this case are best served by the appointment of a chapter 11 trustee.

**C.     The Appointment of a Chapter 11 Trustee is Also Justified Under Sections 1112(b)(1) and 1104(a)(3) of the Bankruptcy Code**

50.     A court can appoint a trustee under section 1104(a)(3) of the Bankruptcy Code "if grounds exist to convert or dismiss the case under section 1112 of the Bankruptcy Code, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1104(a)(3). Grounds for conversion or dismissal under section 1112 of the Bankruptcy Code include "(A) substantial or continuing loss to or diminution

24

of the estate and the absence of a reasonable likelihood of rehabilitation; [and] (B) gross mismanagement of the estate . . . ."  11 U.S.C. § 1112(b)(1).

51.     The facts in this case clearly show the substantial and continuing loss to the estate and the ongoing, gross mismanagement of the estate, all of which would support conversion of the case to chapter 7 pursuant to section 1112 of the Bankruptcy Code.  Nonetheless, Seashore and the Trust are not seeking conversion at this time.  Rather, the appointment of a chapter 11 trustee is a more appropriate option under the circumstances due to, among other reasons, the apparent value of the estate and the increased flexibility afforded a chapter 11 trustee over a chapter 7 trustee. Thus, the extant grounds for conversion or dismissal under section 1112 of the Bankruptcy Code provide additional support for the appointment of a chapter 11 trustee pursuant to section 1104(a)(3) of the Bankruptcy Code.

52.     A trustee should be appointed under section 1104(a)(3) of the Bankruptcy Code when such an appointment is in the "best interests of creditors and the estate."  11 U.S.C. § 1104(a)(3).  As Seashore and the Trust have shown above, appointment of a chapter 11 trustee is in the best interests of the creditors.  Further, appointment of a chapter 11 trustee, rather than conversion or dismissal under section 1112 of the Bankruptcy Code, is in the best interests of the estate as such an appointment will preserve the value of the estate and provide for the appointment of an independent trustee with more flexibility in this matter, better enabling the trustee to maximize the value of the estate.

## VII.    CONCLUSION

WHEREFORE, Seashore and the Trust request a Court order appointing a chapter 11 trustee and such other and further relief as the Court may deem just and proper.

Respectfully submitted this 12th day of August 2009.

**KING & SPALDING, LLP**

By: /s/ Henry J. Kaim
    Henry J. Kaim
    Texas Bar No. 11075400
    HKaim@kslaw.com
    Mark W. Wege
    Texas Bar No. 21074225
    MWege@kslaw.com
    1100 Louisiana, Suite 4000
    Houston, Texas  77002
    Telephone:  (713) 751-3200
    Fax: (713) 751-3290

**ATTORNEYS FOR SEASHORE
INVESTMENT MANAGEMENT TRUST**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the foregoing has been served upon the parties registered with the Clerk's Office electronic noticing facilities or by first class mail, postage prepaid, as listed on the attached Master Service List on this 12th day of August 2009.

 /s/ Henry J. Kaim_____
Henry J. Kaim