IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| BNP PETROLEUM CORPORATION | § | Case No. 09-20206 |
| | § | (Chapter 11) |
| Debtor. | § | |

## MOTION OF SEASHORE INVESTMENT MANAGEMENT TRUST FOR STAY/ABSTENTION IN FAVOR OF PENDING ARBITRATION PROCEEDINGS

A HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST 25, 2009 AT 9:30AM, BEFORE JUDGE RICHARD S. SCHMIDT, 1133 N. SHORELINE BLVD., 2ND FLOOR, CORPUS CHRISTI, TEXAS 78401. IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY (20) DAYS FROM THE DATE YOU WERE SERVED AND GIVE A COPY TO THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF.

IF A PARTY REQUESTS EMERGENCY CONSIDERATION, THE COURT MAY ACT EXPEDITIOUSLY ON THE MATTER. IF THE COURT ALLOWS A SHORTER RESPONSE TIME THAN TWENTY DAYS, YOU MUST RESPOND WITHIN THAT TIME. IF THE COURT SETS AN EMERGENCY HEARING BEFORE THE RESPONSE TIME WILL EXPIRE, ONLY ATTENDANCE AT THE HEARING IS NECESSARY TO PRESERVE YOUR RIGHTS. IF AN EMERGENCY HEARING IS NOT SET, YOU MUST RESPOND BEFORE THE RESPONSE TIME EXPIRES.

PLEASE NOTE THAT AN EMERGENCY HEARING IS BEING REQUESTED ON THIS MATTER ON AUGUST 25, 2009.

Seashore Investment Management Trust ("Seashore"), a party-in-interest in this

bankruptcy case, pursuant to 28 U.S.C.§§157 and 1334 and 9 U.S.C.§3[1], files its *Motion of*

---

[1] The corollary state law provision is Tex. Civil Prac. & Remedies Code §171.021.

*Seashore Investment Management Trust for Stay/Abstention in Favor of Pending Arbitration Proceedings* (the "Motion").  In support thereof, Seashore respectfully represents as follows:

### Summary of Requested Relief

Seashore on the one hand, and Paul Black and various entities he owns or controls on the other hand, are in pending arbitration proceedings before the American Arbitration Association to resolve disputes that have been outstanding for some time.   Among the disputes in the Arbitration are Seashore's rights and claims against non-debtor BNP Oil & Gas Properties, Ltd. ("BNP Properties") including any lien rights in BNP Properties mineral interests which Black now not only seeks to transfer to this Debtor but somehow have this Court approve such non-debtor's transfer to the Debtor.  Black, through the Debtor, is engaging in forum shopping by attempting to select out from the pending Arbitration issues that Black, the Debtor and BNP Properties have acknowledged are subject to arbitration.

There have been state court proceedings between these parties since April, 2008.  Mr. Black and his various entities, including the Debtor, demanded almost 6 months ago that the issues by and between the parties be adjudicated by arbitration pursuant to provisions in underlying agreements, including his alleged counter claims against Seashore.   The AAA has vetted a list of arbitrators and the parties submitted preliminary objections and rankings of the arbitrator candidates on August 3, 2009.  A panel has not yet been appointed, but the AAA's appointment is expected to be imminent.

The issues before the Arbitration are numerous and currently involve non-Debtor parties. None of the issues involve any provisions under or rights granted by the Bankruptcy Code.  The extent of Mr. Black's insider transactions and transfers at this point are unknown due mainly to Mr. Black's failure to fully comply with various discovery orders.  However, Mr. Black has admitted to conversion of approximately $3 million to his personal benefit by diverting corporate

monies.  Mr. Black has failed to provide proper documentation and/or account for millions of dollars in other insider transfers.  Essentially, Mr. Black has set up a process with no transparency or accountability in which he freely moves significant funds by and between his various entities and himself, all to his benefit and to the detriment of other parties and creditors such as Seashore.

Pursuant to existing statutes and case law, this Court is required to stay and/or abstain as to all these matters.  The Debtor has been a party to the state court proceedings from the inception and again, was one of the parties who demanded that the underlying issues by decided by arbitration.   Indeed the Debtor (and other Black-controlled entities) has regularly acknowledged and consented that its disputes with Seashore are subject to arbitration.  The Debtor has moved to compel arbitration of Seashore's claims, has sought and obtained an order sending the parties to mediation as a prerequisite to arbitration, and has sought and obtained discovery from Seashore in aid and advance of arbitration pursuant to Texas Civil Practice and Remedies Code Section 171.086(a) (discovery and other proceedings in aid and advance of arbitration).

The Debtor was not originally named as a party to the Arbitration by Seashore because of the filing of the initial involuntary petition (and Debtor's counsel's contention that the automatic stay prevented inclusion of the Debtor in the arbitration).  Through this Motion[2], Seashore seeks abstention as to all the issues before the Arbitration, including the distribution and ownership of BNP Properties mineral interests which determination is a necessary precondition to it attempting any insider transfer of its mineral interests to the Debtor as contemplated by the Debtor's motion for bid procedures and to sell.

_____

[2] Contemporaneously herewith, Movant is also filing a motion to lift stay to add the Debtor to its counterclaims in the Arbitration so that a complete determination of the relative rights and claims by and between Seashore and Black and his entities can occur in the Arbitration.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1334.  But for the existence of agreements to arbitrate between Seashore, Paul Black and various other Black owned or controlled entities, venue would be proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The Court has jurisdiction of this motion pursuant to 9 U.S.C.§3.

## BACKGROUND OF PRIOR EVENTS TO BANKRUPTCY CASE

2.      The ongoing disputes between Seashore and Paul Black's various controlled entities (including the Debtor here, PBF Investments, and the various entities in which Seashore has or had joint ownership), have been at issue in Corpus area courts since April 2008.  The initial court proceedings were initiated by Seashore to seek discovery and other orders in advance and in aid of arbitration.  Most recently, an arbitration proceeding, initiated by Paul Black, the Debtor and other of his entities is currently pending before the American Arbitration Association ("AAA"), which includes the same parties.   *PBF Investments v. Toby Shor and Seashore Investments Trust,* AAA Arbitration No. 70-198-161-09 (AAA Dallas, TX) (the "Arbitration").

**Discovery Proceedings In Aid of Arbitration**

3.      The Discovery Action (defined below) was filed in April 2008 by Plaintiffs Toby Shor and Seashore seeking relief against Paul Black ("Black"), the Debtor, PBF Investments ("PBF"), and various entities jointly owned by Black affiliates, as majority owners, and Seashore.  The Discovery Action was filed pursuant to Section 171.086(a) of the Texas Civil Practice and Remedies Code, which authorizes a Texas Court to make various orders – including discovery orders -- in aid of an anticipated arbitration proceeding.  *Toby Shor et al. v. Paul Black et al.*, Cause No. 08-60699-1, in the County Court of Law No. 1, Nueces County, Texas (the "Discovery Action").

4.      As set out in the Application filed in the Discovery Action on April 9, 2008 (the "Application"), Seashore sought information in connection with transactions between Black and his affiliates, as embodied in a set of agreements between them beginning in the year 2000 (these are the same agreements referenced in the August 6, 2009 Affidavit of Paul Black in Support of First Day Orders filed in this bankruptcy case).  Seashore and Black/PBF jointly owned a group of entities, being operated by Black, including BNP Holdings, BNP Properties, and others (together, the "Jointly-Owned Entities"), each of whom is a defendant in the pending Discovery Action.  The Debtor, which was jointly owned until 2006, was the operator of most or all of BNP Properties' mineral interest holdings.  Black's operation and control of the Jointly-Owned Entities is therefore at the heart of numerous accounting and cash flow concerns already raised in ongoing litigation proceedings.  A restructuring agreement executed by Black in 2006 stipulated an unpaid debt of at least $14 million in principle owed to Seashore by several of the PBF/Seashore Jointly-Owned Entities (the "2006 Restructuring Agreement").  The Discovery Action sought discovery in aid of arbitration and the preservation of documents related to Black's operation of the Jointly-Owned Entities.  All relief sought was pursuant to Texas Civil Practice and Remedies Code Section 171.086's provisions authorizing orders in aid of an anticipated arbitration.

5.      The Nueces County Court's resulting Order, dated May 13, 2008, found that Shor's application met the requirements of Section 171.086 for orders in support of an anticipated arbitration[3] and authorized further discovery under the auspices of an appointed Special Discovery Master, Hon. Robert Pate of Corpus Christi (the "Special Master").  The

---

[3] The Order specifically provides:  "The Court finds and the Parties stipulate that any actions taken in accordance with this order shall not constitute a waiver of arbitration."  May 13, 2008 Order, at 5.

parties subsequently held numerous hearings and teleconferences with Judge Pate, who issued several discovery orders pursuant to his authority as court-appointed Special Master.

**Defendants' Termination**

6.      Within days after Seashore's Application seeking information about how Black was operating the Jointly-Owned Entities and information about where the money of such entities was going, Black/PBF sought to derail Seashore's access to information by purporting to terminate (the "Termination") the various partnerships under the provisions of a certain Termination Agreement (as modified by the 2006 Restructuring Agreement).[4]  The Termination and BNP Properties are before the Arbitration.

7.      The alleged Termination necessarily entailed allocation of the entities' assets and liabilities as of a specified termination date, which Black contended to have occurred on May 12, 2008.  Additionally, the Termination would have provided Seashore a security interest in the oil and gas properties which Black now seeks to transfer to the Debtor.  Seashore immediately (and then repeatedly) requested (then demanded) a balance sheet setting out the partnerships' assets and liabilities to be allocated so that the alleged Termination and division of the partnerships could be effectuated.  While Black/BNP Properties provided certain documentation, they consistently failed and refused to provide the balance sheet information and information on the assets and liabilities at issue.  Ultimately, Seashore obtained court orders from the Special Master requiring Black to provide financial information as of the alleged May 12, 2008 termination date. See, e.g, Nov. 24, 2008 Discovery Order of Special Master, at 3 (Item I(A)(a)) and 4 (Item I(B)) (ordering compliance by January 15, 2009).  Black, however, still failed to provide this information, in violation of the Special Master's order.  Rather than comply with the Discovery

---

[4] The April 2008 notice of termination did not conform to the requirements of the Termination Agreement.  It did, at least, signal Black/PBF's desire that the partnerships be unwound, an idea Seashore supported provided adequate information be provided and any improper transfers were disclosed and recovered.

Order of the Special Master, Black initiated a new state court action. *PBF Investments v. Toby Shor and Seashore Investments Trust*, Cause No. 09-60343-3, in the County Court of Law No. 3, Nueces County, Texas.

**The Pending Arbitration**

8.     Black – acting through PBF Investments – initiated the current Arbitration on or about March 7, 2009.   PBF's initial claims focused on the Termination process – the process of dividing the assets and liabilities of certain non-Debtor Jointly-Owned Entities such as BNP Properties.   Seashore has responded and counterclaimed, joining Black personally and the Jointly-Owned Entities (but excluding the Debtor because of the alleged automatic stay).[5]

9.     The Arbitration shall deal with a variety of issues including such issues as the debts owed among the related "BNP entities" and those owed to Seashore, Seashore's rights, interests and ownership with respect to various oil and gas properties (including the properties Black hopes to transfer to the Debtor in yet another insider deal), defalcations and fiduciary breaches by the CEO of the Debtor, Paul Black, and Black's wrongful use of his control of the Debtor to divert funds owed to Seashore and/or to entities owned in part by Seashore.   The AAA has vetted a list of arbitrators, and the parties submitted preliminary objections and rankings of the arbitrator candidates on August 3, 2009.   A panel has not yet been appointed, but the AAA's appointment is expected to be imminent.

<u>**BANKRUPTCY CASE BACKGROUND**</u>

10.     On April 3, 2009 (the "<u>Filing Date</u>"), an involuntary chapter 7 petition was filed against BNP Petroleum Corporation ("<u>BNP</u>" or "<u>Debtor</u>", as applicable) by three of its unpaid

---

[5]          PBF attempted to disrupt the AAA's arbitration process by asking County Court at Law No. 3 to impose selected arbitrators in contravention of the AAA's rules.  Seashore opposed that effort and asked that the matter be transferred back to Judge Vargas in County Court No. 1, where it had been pending.  Judge Martinez declined to transfer, but instead denied the request that he appoint an arbitrator, and then stayed the entire action in County Court No. 3 pending the Arbitration.

vendors, namely Baker Hughes Oilfield Operations, Inc. ("Baker Hughes"), Schlumberger Technology Corporation ("Schlumberger"), and La Copa Field Services, Inc. ("La Copa") (the "Petitioning Creditor(s)").

11.     On April 20, 2009, T. Hunt Inc. d/b/a T&T Construction ("Hunt") filed its *Motion to Join in Involuntary Petition as Additional Petitioning Creditor* (Docket No. 12) (the "Hunt Motion"), wherein Hunt requested a Court order adding them as a Petitioning Creditor.

12.     On April 20, 2009, J.M. Davidson, Inc. ("Davidson") filed its *Motion to Join in Involuntary Petition as an Additional Petitioning Creditor* (Docket No. 12), wherein Davidson requested a Court order adding them as a Petitioning Creditor.

13.     On June 2, 2009, Raptor Capital International, LLC ("Raptor") filed three separate notices of transfer of claim (the "Notices"), wherein Raptor stated that it had purchased the claims of Baker Hughes, Schlumberger, and La Copa (Docket Nos. 49, 50, 51).  Attached to each of the Notices was an *Assignment of Claim* (the "Assignments"), wherein Raptor, as buyer, represented, in relevant part, the following:

> (d) the Buyer is not an affiliate of the Debtors; (e) the Purchase Price to be paid by Buyer to Seller under this Assignment consists solely of cash of Buyer and does not in anyway consist of cash of the Debtor; (f) Debtor is not the direct or indirect source of the Purchase Price; and (g) no insider of the Debtor (as that term is defined in the Bankruptcy Code § 101) is the direct or indirect source of the Purchase Price.

Assignments, ¶ 8.  Upon information and belief, Raptor intends to be part of a group to buy the assets of the Debtor, a deal arranged by Paul Black prior to the conversion of the case.

14.     On June 2, 2009, Raptor filed its *Joint Motion for Substitution of Parties* (Docket No. 52) (the "Substitution Motion"), wherein Raptor requested, pursuant to the Assignments, that it be substituted as a petitioning creditor in place of Baker Hughes, Schlumberger, and La Copa.

On June 26, 2009, the Court entered its order granting Raptor's Substitution Motion (Docket No. 67) (the "Substitution Order").

15.     On June 10, 2009, Precision Energy Services, Inc. ("Precision") filed its *Expedited Motion of Precision Energy Services, Inc. to Join in Involuntary Petition* (Docket No. 62) (the "Precision Motion"), wherein Precision requested a Court order adding them as a Petitioning Creditor.  On June 30, 2009, BNP filed an objection to the Precision Motion, wherein BNP asserted that Precision did not satisfy the requirements of 11 U.S.C. § 303 to become a Petitioning Creditor (Docket No. 70) (the "Precision Objection").

16.     On June 12, 2009, Scomi Oiltools, Inc. ("Scomi") filed its *Motion of Scomi Oiltools, Inc. to Join in Involuntary Petition as Additional Petitioning Creditor* (Docket No. 65) (the "Scomi Motion"), wherein Scomi requested a Court order adding them as a Petitioning Creditor.  On June 30, 2009, BNP filed an objection to the Scomi Motion, wherein BNP asserted that Scomi did not satisfy the requirements of 11 U.S.C. § 303 to become a Petitioning Creditor (Docket No. 71) (the "Scomi Objection").   On July 6, 2009, Scomi filed its response to the Scomi Objection (Docket No. 74) (the "Scomi Response").

17.     On July 14, 2009, a *Stipulation Between BNP Petroleum Corporation and Precision Energy Services, Inc. and Scomi Oiltools, Inc.* (Docket No. 81) (the "Stipulation") was filed.  The Stipulation, in relevant part, provided that "BNP consents to Scomi and Precision joining the involuntary petition as petitioning creditors…."  Stipulation, p. 1.

18.     On August 5, 2009, BNP filed its motion to convert this case to chapter 11.  On August 7, 2009, the Court entered its order approving BNP's motion to convert.  During that time period, BNP acquired possession of significant oil and gas properties and become obligated for significant secured debt obligations.

19.     According to the Debtor's first day pleadings, BNP "is primarily an oil and gas operator [which] has operations throughout South Texas."  Black Affidavit, ¶ 13.

20.     Paul Black ("Black") is the Chairman and Chief Executive Officer ("CEO") of the Debtor.  Black Affidavit, ¶ 2.  Black is also the sole and/or majority owner of several other affiliated entities, including BNP Oil & Gas Properties, Ltd. ("BNP Properties"), from which the oil and gas properties were transferred in an insider, secret transaction, on the eve of the first day hearings.[6]  Black Affidavit, ¶ 14.  BNP Properties owned the oil and gas properties upon which the Debtor operates until just prior to the "first day" hearings.

21.     Prior to the Filing Date, the Debtor was obligated to conduct various oil and gas production and development activities on oil and gas properties owned, in part, by various Black controlled entities, including BNP Properties.  Despite the substantial income created by the oil and gas properties (the revenues of which presumably should be substantially greater than the cost of operations), the Debtor has claimed that BNP Properties previously provided no revenue to maintain the operations of its properties.  However, the Debtor's books and records or, importantly, the books and records of BNP Properties, have not been provided in order to examine these claims.  Upon information and belief, payments that should have been made to the Debtor by BNP Properties were, in part, diverted by Black for improper purposes.  Seashore seeks discovery to confirm these facts and believes that such discovery will reveal improper business policies.

22.     The Debtor blames its declining financial condition in large part on the failure of BNP Properties to pay an account receivable in excess of more than $4 million.  Black Affidavit, ¶ 14.  The Debtor has neglected to provide any information regarding the nature of the services and/or goods provided to BNP Properties with regard to this $4 million account receivable, nor

---

[6] Seashore is the other partner of BNP Properties.

has Black identified with any factual basis why BNP Properties could not pay such obligations. However, as implied in Black's first-day affidavit, BNP Properties apparently not made any payments on account of this delinquent account receivable. Further, upon information and belief, the Debtor apparently made no effort to sue or collect on this delinquent account receivable, despite Black's own concession that the inability to collect on this account receivable was a precipitating factor in the financial downfall of the Debtor. Black Affidavit, ¶ 14. Despite the obvious insider relationship, Black has failed to provide any clarity to this situation.

23.     This delinquent account receivable is not the only detriment that a Black-related entity has caused the Debtor. In fact, and as noted by Black in his first-day affidavit, the Debtor was the guarantor of BNP Properties' pre-petition secured indebtedness to Margrave Holdings and Walter Oblach (the "Prepetition Lenders") in the amount of $4,023,426.42 (the "Pre-Petition Note"),[7] a note which "has been in default since December 2008." Black Affidavit, ¶ 17. According to Black, BNP Properties assigned its assets to the Debtor "on or about August 5, 2009". Black has failed to identify the value of the assets transferred, or whether the properties have been referred by a third party appraiser. Notably, in its recent pleadings, the Debtor now appears to state that the properties have not yet been transferred by BNP Properties to the Debtor but will do so as part of Black's orchestrated deal with Blackgate Resources, Inc. ("Blackgate").

24.     Prior to any assignment of BNP Properties' assets, the Debtor "did not hold any significant secured debt…." *Id*. Yet, after the assignment of BNP Properties' assets the night before the first day hearings, the Debtor is now encumbered with secured debt in excess of $4 million, and possibly in excess of $5 million pursuant to the Pre-Petition Note. *Id*. As the

---

[7] In the proposed interim DIP Financing order filed on the Court docket on August 5, 2009, the Debtor attempts to stipulate that it is indebted to the Prepetition Lenders in the amount of $5 million. No documentation has been filed with the Court or provided to Seashore to verify the actual amount of prepetition secured indebtedness owed to the Prepetition Lenders. Nonetheless, Seashore notes that the Debtor's first-day pleadings and proposed order are already providing inconsistent and contradictory information, making it difficult, if not impossible, for Seashore and other creditors to receive an accurate forecast of the Debtor's financial position.

majority owner of BNP Properties, Black presumably acted on behalf of BNP Properties in assigning the assets to the Debtor, and, as the Chairman and CEO of the Debtor, Black presumably acted on behalf of the Debtor in accepting such assignment a clear self-dealing transaction.

25.     In its DIP Financing motion (Docket No. 99) (the "DIP Financing Motion"), the Debtor seeks to provide adequate protection liens to the Prepetition Lenders on account of this secured indebtedness, no doubt another pre-arranged and self-dealing transaction.  Furthermore, pursuant to the DIP Financing Motion, the Debtor seeks Court authority to obtain $1 million in financing from Blackgate, which is one of the three parties, all represented by one counsel, seeking to buy the assets transferred in the dark of the night from Black's left pocket to his right pocket.  Although it is troubling in and of itself that the DIP Financing Motion neglected to disclose Blackgate's status as the buyer of the assets, it is even more troubling when considering some of the particularly onerous terms included in the DIP Loan, such as (i) the 75-day maturity date and (ii) explicit authority for Blackgate to credit bid its outstanding indebtedness in any purchase of its affiliate's assets.

26.     As a result of the numerous questionable insider transactions discussed above, including Black's apparent diversion of funds from entities related to the Debtor, BNP has not been able to pay its debts to virtually all vendors from which it purchased various goods and services.  This diversion of cash by Black's BNP Properties entity led to the huge accumulation of trade debt and the filing of the present bankruptcy case.

27.     The recent filings provide some clarification of what Black is attempting to do through this bankruptcy proceeding.  The bid procedures and sale motion state that the insider assignment by BNP Properties to the Debtor has yet to take place.  Astonishingly, Black seeks this Court's approval for non-debtor BNP Properties insider transfer to the Debtor as a

prerequisite of the Debtor then transferring these same properties to Blackgate (not coincidentally, Black has cut another insider deal benefitting himself personally via overrides and other interests). There is no authority cited for how this Court would have jurisdiction over BNP Properties, a non-debtor entity, insider transfer into the Debtor. Not surprisingly, there is no disclosure that the BNP Properties issues are in the Arbitration.

### **RELIEF REQUESTED**

28.     The Federal Arbitration Act [9 U.S.C.§1 et seq ] (and similar Texas law) requires this Court to abstain in favor of the pending Arbitration. These clear statutory provisions provide no discretion to the Court under the circumstances present here. Once arbitration is invoked, courts are required to stay underlying proceedings and defer to arbitration. Federal Arbitration Act, [9 U.S.C.§§3].

This provision states as follows:

> If any suit or proceeding be brought in any of the courts of the United States upon an issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall upon application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing that the applicant for the stay is not in default of proceeding with such arbitration.

See also, Texas Civil Prac. & Remedies Code §171.021.

29.     The issues by and between Seashore, Black and BNP Properties involve an agreement which contains an arbitration provision which was the basis for Black, the Debtor and BNP Properties invocation of arbitration in the first place. The Fifth Circuit has acknowledged that under the circumstances here, such stay and abstention is binding on a bankruptcy court. *In re Gandy*, 299 F.3d 489 (5th Cir. 2002). Other appellate courts and lower courts uniformly agree. *In re Electric Mach. Enters., Inc.*, 479 F.3d 791 (11th Cir. 2007); *In re Mintze*, 434 F.3d 222 (3rd Cir. 2006); *In re Daiseytek, Inc.*, 323 B.R. 180 (N.D. Tex. 2005).

30.     These cases are guided by the U.S. Supreme Court's decision in *Shearson/Am.
Express v. McMahon*, 482 U.S. 220 (1987).   There, the Court held that the Federal Arbitration
Act is enforceable even in statutory based causes of action unless clearly overridden by a
contrary congressional command.  *McMahon*, at 226.    *Gandy* and other decisions hold, that as
to non-core matters, a bankruptcy court has no discretion and must abstain and defer to
arbitration. *Gandy*, at 495.

31.     The Fifth Circuit in *Gandy,* and its prior opinion, *In re Nat'l Gypsum*, 118 F.3d
1056 (5th Cir. 1997), note that a bankruptcy court only has discretion if the underlying actions
derive from the Bankruptcy Code and enforcement would conflict with the purposes of the
Bankruptcy Code.  *Gandy*, *Id* at 495 (*citing*, *Nat'l Gypsum*, 118 F.3d at 1067).  Decisions from
other appellate courts agree.  *See*, *In re Elect. Mach. Enters., Inc.*, *Id.*   *McMahon*, *Gandy* and
similar decisions all hold that the party opposing arbitration has the burden to show that
Congress intended to preclude arbitration of the specific type of claim being asserted.
*McMahon*, at 227; *Gandy*, at 495.  *See also*,  *In re Electric. Mach. Enters.*, *Id* at 798.

32.     The cases also state that merely trying to define the issue as simply a core/non-
core proceeding does not provide a definitive answer.  Decisively, the Arbitration here does not
involve  a  core  proceeding. [8]    These  are  state  law  issues  involving  no  provisions  of  the
Bankruptcy Code.  Importantly, the case law is quite clear that "even as to core proceedings, the
bankruptcy court will not have discretion to override an arbitration agreement unless it finds that
the proceedings are based on provisions of the Bankruptcy Code that 'inherently conflict' with
the Arbitration Act or that arbitration would 'necessarily jeopardize' the objectives of the
Bankruptcy Code." *MBNA Am. Bank. v. Hill*, 436 F.3d 104, 108 (2nd Cir. 2006).  See also, *In re*

---

[8] *See Wood v. Wood*, 825 F.2d 90 (5th Cir. 1987).   State law causes of action not based on any right created by
federal bankruptcy law and that can arise outside the context of bankruptcy are, by definition, non-core.  *WRT
Creditors Liquidation Trust v. C.I.B.C Oppenheimer Corp.*, 75 F. Supp.2d 596 (S.D. Tex. 1999).

*Payton Constr. Corp.*, 399 B.R. 352, 362-363 (Bankr. D. Mass. 2009) ("[T]he core/non-core distinction does not, however, affect whether a bankruptcy court has the discretion to deny enforcement of an arbitration agreement.")  *See also*, *In re Daisytek, Inc.*, 323 B.R. 180, 187 (N.D. Tex. 2005 (in reversing a bankruptcy court's order declining to abstain in favor of arbitration and remanding back to bankruptcy court, the District Court noted " if the court determines that a proceeding does not derive exclusively from the Code, the court has no choice but to abstain and allow the parties to arbitrate the matter.")

33.     These decisions require the court to look beyond the procedural remedy before the court and instead "the proper focus is on the underlying nature of the proceedings" and the cause of action. *Daisytek*, at 187. The Arbitration here is a non-core matter, arises pursuant to state law and is not based upon any Bankruptcy Code sections.  Moreover, the Arbitration involves non-debtor parties and numerous issues over which this Court does not and would not have jurisdiction.   Accordingly, under the facts and circumstances here, the law is clear that this Court has no discretion but is required to abstain in favor of the pending Arbitration.

34.     In the alternative, the Court should enter an order abstaining from the issues in the Arbitration pursuant to the mandatory and permissive abstention provisions in Section 1334.  *See* 28 U.S.C. § 1334(c) ("Section 1334") (providing standards for mandatory and permissive abstention).  As discussed below, both the mandatory and permissive abstention provisions are met under the facts of this case, and therefore, abstention should occur.

**Mandatory Abstention**

      35.      28 U.S.C. 28 U.S.C. § 1334(c)(2) provides:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could have not been commenced in a court of the United States absent jurisdiction under this section, the district court **shall** abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2) (emphasis added).  "Abstention over a proceeding is mandatory under section 1334(c)(2) … if each of the above elements set forth are present."  *Republic Reader's Serv., Inc. v. Magazine Serv. Bureau, Inc. (In re Republic Reader's Serv., Inc.)*, 81 B.R. 422, 428 (Bankr. S.D. Tex. 1987).

      36.      Here, all of the elements mandate that this Court abstain in favor of the Arbitration.  All the issues in the Arbitration involve interpretation of agreements under Texas state law that do not rely upon or implicate any provisions of the Bankruptcy Code.  Absent the happenstance of the bankruptcy case, there would otherwise be no arguable, independent basis for a federal court to have jurisdiction over any of the issues in the Arbitration.  The issues before the Arbitration are not "core" issues and neither "arise under" nor "arise in" a case under Title 11.  Further, the Arbitration does not involve even "related to" issues.  As such, and pursuant to Section 1334(c)(2), the bankruptcy court shall abstain from resolution of the issues presented in the Arbitration.  *See id*.

**Permissive Abstention**

      37.   To the extent that the Court finds that mandatory abstention is inapplicable, permissive abstention is appropriate.  28 U.S.C. § 1334(c)(1) provides:

> Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law,

> from abstaining from hearing a particular proceeding arising under
> title 11 or arising in or related to a case under title 11.

28 U.S.C. § 1334(c)(1).  To determine whether permissive abstention is appropriate, case law

from this district provides that a bankruptcy court consider several factors.  Here, the applicable

factors all weigh in favor of abstention, as provided below:

- the effect or lack thereof on the efficient administration of the estate if the court recommends … abstention;

- extent to which state law issues predominate over bankruptcy issues;

- difficult or unsettled nature of applicable law;

- presence of related proceeding commenced in state court or other nonbankruptcy proceeding;

- jurisdictional basis, if any, other than § 1334;

- degree of relatedness or remoteness of proceeding to main bankruptcy case;

- the substance rather than the form of an asserted core proceeding;

- the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;

- the burden of the bankruptcy court's docket;

- the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

- the existence of a right to a jury trial;

- the presence in the proceeding of nondebtor parties;

- comity;

- the possibility of prejudice to other parties in the action.

*See Gilbane Bldg. Co. v. Air Sys. Inc. (In re Encompass Servs. Corp.)*, 337 B.R. 864, 878 (Bankr.

S.D. Tex. 2006).  *See also Republic Reader's Serv., Inc. v. Magazine Serv. Bureau, Inc. (In re

Republic Reader's Serv., Inc.)*, 81 B.R. 422, 429 (Bankr. S.D. Tex. 1987) (providing similar

factors).

38.     The pending Arbitration meets the applicable permissive abstention factors.

Currently, the Arbitration only involves non-debtor parties but as noted above, Seashore is also

moving to lift the stay to add the Debtor so that the panel can hear and provide complete relief as to all the various Black insider issues.   There are no core bankruptcy issues involved and Black and the Debtor, after invoking the arbitration, cannot now be heard to complain about having that process continue.   Based on the facts and circumstances here, this Court should exercise its discretion under Section 1334(c)(1) and abstain from hearing and deciding issues already being considered in the Arbitration.   So that there is no legitimate dispute later, the stay/abstention shall permit the Arbitration go forward, including among other issues, Seashore's rights and claims to and/or ownership interest in mineral interests of non-debtor BNP Properties.   The Arbitration panel's determination on these issues are a necessary precondition to any transfer by BNP Properties of any of BNP Properties mineral interests to the Debtor.   Although not a condition to the enforcement of the Arbitration, Seashore also requests that the Debtor be joined as a party to the Arbitration.

WHEREFORE, Seashore requests that the Court stay and abstain from any issues pending before the Arbitration, including but not limited to Seashore's rights and claims to and/or ownership interest in mineral interests of non-debtor BNP Properties so that the Arbitration can determine the relative rights, claim and ownership interests of Seashore before BNP Properties purports to transfer any of its mineral interests to the Debtor or any other party. Seashore also requests such other and further relief to which it is entitled.

Respectfully submitted this 18th day of August 2009.

**KING & SPALDING, LLP**

By: /s/ Henry J. Kaim_____
Henry J. Kaim
Texas Bar No. 11075400
HKaim@kslaw.com
Mark W. Wege
Texas Bar No. 21074225
MWege@kslaw.com
Edward L. Ripley
Texas Bar Number 16935950
eripley@kslaw.com
1100 Louisiana, Suite 4000
Houston, Texas  77002
Telephone:  (713) 751-3200
Fax: (713) 751-3290

**ATTORNEYS  FOR  SEASHORE  INVESTMENT
MANAGEMENT TRUST**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the foregoing has been served upon the parties registered with the Clerk's Office electronic noticing facilities as listed on the attached Master Service List or by first class mail, postage prepaid, on this 18th day of August 2009.

 /s/ Henry J. Kaim_____
Henry J. Kaim