**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re | § | |
| | § | |
| BNP PETROLEUM CORPORATION | § | **Case No. 09-20206** |
| | § | **(Chapter 11)** |
| Debtor. | § | |

**MOTION OF SEASHORE INVESTMENT MANAGEMENT TRUST FOR RELIEF
FROM THE AUTOMATIC STAY TO ADD DEBTOR AS A PARTY TO
<u>PENDING ARBITRATION PROCEEDINGS</u>**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST 25, 2009 AT 9:30AM, BEFORE JUDGE RICHARD S. SCHMIDT, 1133 N. SHORELINE BLVD., 2ND FLOOR, CORPUS CHRISTI, TEXAS 78401. IIF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY (20) DAYS FROM THE DATE YOU WERE SERVED AND GIVE A COPY TO THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF.**

**IF A PARTY REQUESTS EMERGENCY CONSIDERATION, THE COURT MAY ACT EXPEDITIOUSLY ON THE MATTER. IF THE COURT ALLOWS A SHORTER RESPONSE TIME THAN TWENTY DAYS, YOU MUST RESPOND WITHIN THAT TIME. IF THE COURT SETS AN EMERGENCY HEARING BEFORE THE RESPONSE TIME WILL EXPIRE, ONLY ATTENDANCE AT THE HEARING IS NECESSARY TO PRESERVE YOUR RIGHTS. IF AN EMERGENCY HEARING IS NOT SET, YOU MUST RESPOND BEFORE THE RESPONSE TIME EXPIRES.**

**PLEASE NOTE THAT AN EMERGENCY HEARING IS BEING REQUESTED ON THIS MATTER ON AUGUST 25, 2009.**

Seashore Investment Management Trust ("<u>Seashore</u>"), a party-in-interest in this bankruptcy case, pursuant to Bankruptcy Code section 362(d) and Bankruptcy Rule 4001, files its *Motion of Seashore Investment Management Trust for Relief from the Automatic Stay to Add*

*Debtor as a Party to Pending Arbitration Proceedings* (the "Motion"). In support thereof, Seashore respectfully represents as follows:

<u>**Summary of Requested Relief**</u>

Seashore requests the Court lift the automatic stay to add the Debtor to a pending Arbitration. The Debtor, Paul Black and various of his entities initiated the Arbitration in March 2009 so that disputes that have been outstanding for some time, including state court proceedings since April 2008, be heard via arbitration pursuant to existing agreements. Consistent with the Debtor's prior acknowledgement of the arbitration process and to permit the Arbitration to adjudicate all issues between Seashore and Black and his entities, Seashore asks that the stay be lifted so that the Debtor can be joined as a party to the Arbitration.

The focus of the arbitration is Paul Black and various non-debtor entities he owns or controls, including BNP Oil & Gas Properties, Ltd. ("BNP Properties"), and Seashore's rights and claims to and ownership in oil and gas interests that BNP Properties owns. In an attempt to circumvent the very arbitration he initiated, Black and the Debtor now seek to somehow have this Court make rulings regarding BNP Properties mineral interests and by definition Seashore's relative rights and claims to those non-debtor interests. These are the very issues Black asked to be determined in the Arbitration. Seashore is a substantial creditor of BNP Properties and BNP Properties was contractually obligated to grant Seashore a lien and security interest in the properties Black now seeks to transfer to the Debtor. Not surprisingly, Black and BNP Properties seeks to ignore and trample on Seashore's rights which determination will occur in the Arbitration.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157(b) and 1334.   This motion is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A). [1] Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND OF PRIOR EVENTS TO BANKRUPTCY CASE

2.     The ongoing disputes between Seashore and Paul Black's various controlled entities (including the Debtor here, PBF Investments, and the various entities in which Seashore has or had joint ownership), have been at issue in Corpus area courts since April 2008.   The initial court proceedings were initiated by Seashore to seek discovery and other orders in advance and in aid of arbitration.   Most recently, an arbitration proceeding, initiated by Paul Black, the Debtor and other of his entities is currently pending before the American Arbitration Association ("AAA"), which includes the same parties.   *PBF Investments v. Toby Shor and Seashore Investments Trust,* AAA Arbitration No. 70-198-161-09 (AAA Dallas, TX) (the "Arbitration").

**Discovery Proceedings In Aid of Arbitration**

3.     The Discovery Action (defined below) was filed in April 2008 by Plaintiffs Toby Shor and Seashore seeking relief against Paul Black ("Black"), the Debtor, PBF Investments ("PBF"), and various entities jointly owned by Black affiliates, as majority owners, and Seashore.   The Discovery Action was filed pursuant to Section 171.086(a) of the Texas Civil Practice and Remedies Code, which authorizes a Texas Court to make various orders – including discovery orders -- in aid of an anticipated arbitration proceeding.   *Toby Shor et al. v. Paul Black*

---

[1] For clarity purposes, while a motion to lift stay is a core proceeding, the underlying Arbitration is not a core proceeding.  *See In re Wood*, 825 F.2d 90 (5th Cir. 1987).

*et al.*, Cause No. 08-60699-1, in the County Court of Law No. 1, Nueces County, Texas (the "Discovery Action").

4.      As set out in the Application filed in the Discovery Action on April 9, 2008 (the "Application"), Seashore sought information in connection with transactions between Black and his affiliates, as embodied in a set of agreements between them beginning in the year 2000 (these are the same agreements referenced in the August 6, 2009 Affidavit of Paul Black in Support of First Day Orders filed in this bankruptcy case).  Seashore and Black/PBF jointly owned a group of entities, being operated by Black, including BNP Holdings, BNP Properties, and others (together, the "Jointly-Owned Entities"), each of whom is a defendant in the pending Discovery Action.  The Debtor, which was jointly owned until 2006, was the operator of most or all of BNP Properties' mineral interest holdings.  Black's operation and control of the Jointly-Owned Entities is therefore at the heart of numerous accounting and cash flow concerns already raised in ongoing litigation proceedings.  A restructuring agreement executed by Black in 2006 stipulated an unpaid debt of at least $14 million in principle owed to Seashore by several of the PBF/Seashore Jointly-Owned Entities (the "2006 Restructuring Agreement").  The Discovery Action sought discovery in aid of arbitration and the preservation of documents related to Black's operation of the Jointly-Owned Entities.  All relief sought was pursuant to Texas Civil Practice and Remedies Code Section 171.086's provisions authorizing orders in aid of an anticipated arbitration.

5.      The Nueces County Court's resulting Order, dated May 13, 2008, found that Shor's application met the requirements of Section 171.086 for orders in support of an anticipated arbitration[2] and authorized further discovery under the auspices of an appointed

---

[2] The Order specifically provides:  "The Court finds and the Parties stipulate that any actions taken in accordance with this order shall not constitute a waiver of arbitration."  May 13, 2008 Order, at 5.

Special Discovery Master, Hon. Robert Pate of Corpus Christi (the "Special Master").  The parties subsequently held numerous hearings and teleconferences with Judge Pate, who issued several discovery orders pursuant to his authority as court-appointed Special Master.

**Defendants' Termination**

6.      Within days after Seashore's Application seeking information about how Black was operating the Jointly-Owned Entities and information about where the money of such entities was going, Black/PBF sought to derail Seashore's access to information by purporting to terminate (the "Termination") the various partnerships under the provisions of a certain Termination Agreement (as modified by the 2006 Restructuring Agreement).[3]  The Termination and BNP Properties are before the Arbitration.

7.      The alleged Termination necessarily entailed allocation of the entities' assets and liabilities as of a specified termination date, which Black contended to have occurred on May 12, 2008.  Additionally, the Termination would have provided Seashore a security interest in the oil and gas properties which Black now seeks to transfer to the Debtor.  Seashore immediately (and then repeatedly) requested (then demanded) a balance sheet setting out the partnerships' assets and liabilities to be allocated so that the alleged Termination and division of the partnerships could be effectuated.  While Black/BNP Properties provided certain documentation, they consistently failed and refused to provide the balance sheet information and information on the assets and liabilities at issue.  Ultimately, Seashore obtained court orders from the Special Master requiring Black to provide financial information as of the alleged May 12, 2008 termination date. See, e.g, Nov. 24, 2008 Discovery Order of Special Master, at 3 (Item I(A)(a)) and 4 (Item I(B)) (ordering compliance by January 15, 2009).  Black, however, still failed to provide this

---

[3] The April 2008 notice of termination did not conform to the requirements of the Termination Agreement.  It did, at least, signal Black/PBF's desire that the partnerships be unwound, an idea Seashore supported provided adequate information be provided and any improper transfers were disclosed and recovered.

information, in violation of the Special Master's order.  Rather than comply with the Discovery

Order of the Special Master, Black initiated a new state court action.  *PBF Investments v. Toby*

*Shor and Seashore Investments Trust*, Cause No. 09-60343-3, in the County Court of Law No. 3,

Nueces County, Texas.

**The Pending Arbitration**

8.      Black – acting through PBF Investments – initiated the current Arbitration on or

about March 7, 2009.   PBF's initial claims focused on the Termination process – the process of

dividing the assets and liabilities of certain non-Debtor Jointly-Owned Entities such as BNP

Properties.   Seashore has responded and counterclaimed, joining Black personally and the

Jointly-Owned Entities (but excluding the Debtor).[4]

9.      The Arbitration shall deal with a variety of issues including such issues as the

debts owed among the related "BNP entities" and those owed to Seashore, Seashore's rights,

interests and ownership with respect to various oil and gas properties (including the properties

Black hopes to transfer to the Debtor in yet another insider deal), defalcations and fiduciary

breaches by the CEO of the Debtor, Paul Black, and Black's wrongful use of his control of the

Debtor to divert funds owed to Seashore and/or to entities owned in part by Seashore.  The AAA

has vetted a list of arbitrators, and the parties submitted preliminary objections and rankings of

the arbitrator candidates on August 3, 2009.  A panel has not yet been appointed, but the AAA's

appointment is expected to be imminent.

---

[4]      PBF attempted to disrupt the AAA's arbitration process by asking County Court at Law No. 3 to impose
selected arbitrators in contravention of the AAA's rules.  Seashore opposed that effort and asked that the matter be
transferred back to Judge Vargas in County Court No. 1, where it had been pending.  Judge Martinez declined to
transfer, but instead denied the request that he appoint an arbitrator, and then stayed the entire action in County
Court No. 3 pending the Arbitration.

## **BANKRUPTCY CASE BACKGROUND**

10.     On April 3, 2009 (the "Filing Date"), an involuntary chapter 7 petition was filed against BNP Petroleum Corporation ("BNP" or "Debtor", as applicable) by three of its unpaid vendors, namely Baker Hughes Oilfield Operations, Inc. ("Baker Hughes"), Schlumberger Technology Corporation ("Schlumberger"), and La Copa Field Services, Inc. ("La Copa") (the "Petitioning Creditor(s)").

11.     On April 20, 2009, T. Hunt Inc. d/b/a T&T Construction ("Hunt") filed its *Motion to Join in Involuntary Petition as Additional Petitioning Creditor* (Docket No. 12) (the "Hunt Motion"), wherein Hunt requested a Court order adding them as a Petitioning Creditor.

12.     On April 20, 2009, J.M. Davidson, Inc. ("Davidson") filed its *Motion to Join in Involuntary Petition as an Additional Petitioning Creditor* (Docket No. 12), wherein Davidson requested a Court order adding them as a Petitioning Creditor.

13.     On June 2, 2009, Raptor Capital International, LLC ("Raptor") filed three separate notices of transfer of claim (the "Notices"), wherein Raptor stated that it had purchased the claims of Baker Hughes, Schlumberger, and La Copa (Docket Nos. 49, 50, 51).  Attached to each of the Notices was an *Assignment of Claim* (the "Assignments"), wherein Raptor, as buyer, represented, in relevant part, the following:

> (d) the Buyer is not an affiliate of the Debtors; (e) the Purchase Price to be paid by Buyer to Seller under this Assignment consists solely of cash of Buyer and does not in anyway consist of cash of the Debtor; (f) Debtor is not the direct or indirect source of the Purchase Price; and (g) no insider of the Debtor (as that term is defined in the Bankruptcy Code § 101) is the direct or indirect source of the Purchase Price.

Assignments, ¶ 8.  Upon information and belief, Raptor intends to be part of a group to buy the assets of the Debtor, a deal arranged by Paul Black prior to the conversion of the case.

14.     On June 2, 2009, Raptor filed its *Joint Motion for Substitution of Parties* (Docket No. 52) (the "Substitution Motion"), wherein Raptor requested, pursuant to the Assignments, that it be substituted as a petitioning creditor in place of Baker Hughes, Schlumberger, and La Copa. On June 26, 2009, the Court entered its order granting Raptor's Substitution Motion (Docket No. 67) (the "Substitution Order").

15.     On June 10, 2009, Precision Energy Services, Inc. ("Precision") filed its *Expedited Motion of Precision Energy Services, Inc. to Join in Involuntary Petition* (Docket No. 62) (the "Precision Motion"), wherein Precision requested a Court order adding them as a Petitioning Creditor.  On June 30, 2009, BNP filed an objection to the Precision Motion, wherein BNP asserted that Precision did not satisfy the requirements of 11 U.S.C. § 303 to become a Petitioning Creditor (Docket No. 70) (the "Precision Objection").

16.     On June 12, 2009, Scomi Oiltools, Inc. ("Scomi") filed its *Motion of Scomi Oiltools, Inc. to Join in Involuntary Petition as Additional Petitioning Creditor* (Docket No. 65) (the "Scomi Motion"), wherein Scomi requested a Court order adding them as a Petitioning Creditor.  On June 30, 2009, BNP filed an objection to the Scomi Motion, wherein BNP asserted that Scomi did not satisfy the requirements of 11 U.S.C. § 303 to become a Petitioning Creditor (Docket No. 71) (the "Scomi Objection").  On July 6, 2009, Scomi filed its response to the Scomi Objection (Docket No. 74) (the "Scomi Response").

17.     On July 14, 2009, a *Stipulation Between BNP Petroleum Corporation and Precision Energy Services, Inc. and Scomi Oiltools, Inc.* (Docket No. 81) (the "Stipulation") was filed.  The Stipulation, in relevant part, provided that "BNP consents to Scomi and Precision joining the involuntary petition as petitioning creditors…."  Stipulation, p. 1.

18.     On August 5, 2009, BNP filed its motion to convert this case to chapter 11.  On August 7, 2009, the Court entered its order approving BNP's motion to convert.  During that

time period, BNP acquired possession of significant oil and gas properties and become obligated for significant secured debt obligations.

19.     According to the Debtor's first day pleadings, BNP "is primarily an oil and gas operator [which] has operations throughout South Texas."  Black Affidavit, ¶ 13.

20.     Paul Black ("Black") is the Chairman and Chief Executive Officer ("CEO") of the Debtor.  Black Affidavit, ¶ 2.  Black is also the sole and/or majority owner of several other affiliated entities, including BNP Oil & Gas Properties, Ltd. ("BNP Properties"), from which the oil and gas properties were transferred in an insider, secret transaction, on the eve of the first day hearings.[5]  Black Affidavit, ¶ 14.  BNP Properties owned the oil and gas properties upon which the Debtor operates until just prior to the "first day" hearings.

21.     Prior to the Filing Date, the Debtor was obligated to conduct various oil and gas production and development activities on oil and gas properties owned, in part, by various Black controlled entities, including BNP Properties.  Despite the substantial income created by the oil and gas properties (the revenues of which presumably should be substantially greater than the cost of operations), the Debtor has claimed that BNP Properties previously provided no revenue to maintain the operations of its properties.  However, the Debtor's books and records or, importantly, the books and records of BNP Properties, have not been provided in order to examine these claims.  Upon information and belief, payments that should have been made to the Debtor by BNP Properties were, in part, diverted by Black for improper purposes.  Seashore seeks discovery to confirm these facts and believes that such discovery will reveal improper business policies.

22.     The Debtor blames its declining financial condition in large part on the failure of BNP Properties to pay an account receivable in excess of more than $4 million.  Black Affidavit,

---

[5] Seashore is the other partner of BNP Properties.

¶ 14.  The Debtor has neglected to provide any information regarding the nature of the services and/or goods provided to BNP Properties with regard to this $4 million account receivable, nor has Black identified with any factual basis why BNP Properties could not pay such obligations. However, as implied in Black's first-day affidavit, BNP Properties apparently not made any payments on account of this delinquent account receivable.  Further, upon information and belief, the Debtor apparently made no effort to sue or collect on this delinquent account receivable, despite Black's own concession that the inability to collect on this account receivable was a precipitating factor in the financial downfall of the Debtor.  Black Affidavit, ¶ 14. Despite the obvious insider relationship, Black has failed to provide any clarity to this situation.

23.    This delinquent account receivable is not the only detriment that a Black-related entity has caused the Debtor.  In fact, and as noted by Black in his first-day affidavit, the Debtor was the guarantor of BNP Properties' pre-petition secured indebtedness to Margrave Holdings and Walter Oblach (the "Prepetition Lenders") in the amount of $4,023,426.42 (the "Pre-Petition Note"),[6] a note which "has been in default since December 2008."  Black Affidavit, ¶ 17. According to Black, BNP Properties assigned its assets to the Debtor "on or about August 5, 2009".  Black has failed to identify the value of the assets transferred, or whether the properties have been referred by a third party appraiser.  Notably, in its recent pleadings, the Debtor now appears to state that the properties have not yet been transferred by BNP Properties to the Debtor but will do so as part of Black's orchestrated deal with Blackgate Resources, Inc. ("Blackgate").

24.    Prior to any assignment of BNP Properties' assets, the Debtor "did not hold any significant secured debt…."  *Id*.  Yet, after the assignment of BNP Properties' assets the night

---

[6] In the proposed interim DIP Financing order filed on the Court docket on August 5, 2009, the Debtor attempts to stipulate that it is indebted to the Prepetition Lenders in the amount of $5 million.  No documentation has been filed with the Court or provided to Seashore to verify the actual amount of prepetition secured indebtedness owed to the Prepetition Lenders.  Nonetheless, Seashore notes that the Debtor's first-day pleadings and proposed order are already providing inconsistent and contradictory information, making it difficult, if not impossible, for Seashore and other creditors to receive an accurate forecast of the Debtor's financial position.

before the first day hearings, the Debtor is now encumbered with secured debt in excess of $4 million, and possibly in excess of $5 million pursuant to the Pre-Petition Note.  *Id.*  As the majority owner of BNP Properties, Black presumably acted on behalf of BNP Properties in assigning the assets to the Debtor, and, as the Chairman and CEO of the Debtor, Black presumably acted on behalf of the Debtor in accepting such assignment a clear self-dealing transaction.

25.     In its DIP Financing motion (Docket No. 99) (the "DIP Financing Motion"), the Debtor seeks to provide adequate protection liens to the Prepetition Lenders on account of this secured indebtedness, no doubt another pre-arranged and self-dealing transaction.  Furthermore, pursuant to the DIP Financing Motion, the Debtor seeks Court authority to obtain $1 million in financing from Blackgate, which is one of the three parties, all represented by one counsel, seeking to buy the assets transferred in the dark of the night from Black's left pocket to his right pocket.  Although it is troubling in and of itself that the DIP Financing Motion neglected to disclose Blackgate's status as the buyer of the assets, it is even more troubling when considering some of the particularly onerous terms included in the DIP Loan, such as (i) the 75-day maturity date and (ii) explicit authority for Blackgate to credit bid its outstanding indebtedness in any purchase of its affiliate's assets.

26.     As a result of the numerous questionable insider transactions discussed above, including Black's apparent diversion of funds from entities related to the Debtor, BNP has not been able to pay its debts to virtually all vendors from which it purchased various goods and services.  This diversion of cash by Black's BNP Properties entity led to the huge accumulation of trade debt and the filing of the present bankruptcy case.

27.     The recent filings provide some clarification of what Black is attempting to do through this bankruptcy proceeding.  The bid procedures and sale motion state that the insider

assignment by BNP Properties to the Debtor has yet to take place.  Astonishingly, Black seeks this Court's approval for non-debtor BNP Properties insider transfer to the Debtor as a prerequisite of the Debtor then transferring these same properties to Blackgate (not coincidentally, Black has cut another insider deal benefitting himself personally via overrides and other interests).  There is no authority cited for how this Court would have jurisdiction over BNP Properties, a non-debtor entity, insider transfer into the Debtor nor how this could occur in violation of the pending Arbitration. Not surprisingly, there is no disclosure that the BNP Properties issues are in the Arbitration.

## RELIEF REQUESTED

28.     Cause exists, including lack of adequate protection, for relief from the automatic stay pursuant to Bankruptcy Code section 362(d)(1) to permit the Debtor to be added to the pending Arbitration.

29.     As more fully developed in the separate Motion for Stay/Abstention in Favor of Pending Arbitration Proceedings filed contemporaneously herewith, Seashore cites the clear statutory and case law for abstention so that all issues pending in the Arbitration can proceed and will be decided by the arbitration panel.  As a matter of federal and state law, arbitration provisions are enforceable and once arbitration is invoked, courts are required to stay underlying proceedings and defer to arbitration.  Federal Arbitration Act, [9 U.S.C.§§1 et seq]; Texas Civil Practice & Remedies Code §171.921.   Although the Debtor was a party to the underlying state proceedings and was included by Black when he invoked the arbitration, Seashore did not include the Debtor as a party to the Arbitration due to the filing of the involuntary petition and any arguable stay.

30.     With respect to pending proceedings, the case law is not uniform on the applicability of the stay.  Some cases focus on the identity of the parties, eg if the debtor is the

plaintiff no stay, other cases hold that even if the debtor is the plaintiff, if the defendant seeks an affirmative counterclaim, the stay applies to that counterclaim and still other cases define the issue more narrowly by determining whether the counterclaim is mandatory or permissive.  *See generally*, *U.S. Abatement Corp. v. Mobil Exploration & Producing U.S., Inc.* *(In re U.S. Abatement Corp.)*, 39 F.3d 563, 568 (5th Cir. 1994) ("We have previously held that counterclaims asserted by a debtor are not actions 'against the debtor' which are subject to the automatic stay."); *Koolik v. Markowitz*, 40 F.3d 567, 568 (2d Cir. 1994) ("Whether an action or proceeding is 'against' the debtor is determined by the posture of the parties at the commencement of the action or proceeding, not by which party has initiated [a subsequent] appeal. … Thus, an answer that asserts a counterclaim against a plaintiff who becomes a bankruptcy debtor is an 'action or proceeding against the debtor' within the meaning of § 362(a)(1), notwithstanding the fact that the plaintiff initiated the lawsuit."); *Trans Caribbean Lines, Inc. v. Tracor Marine, Inc.*, 49 B.R. 360, 362 (S.D. Fla. 1985) ("Section 362 does not stay the independent prosecution of a counterclaim by a party in reorganization.").

31.     Here, the Debtor was the plaintiff in the second state court action and would effectively the plaintiff with respect to the Arbitration.  Therefore, there is a question on whether the stay would preclude Seashore's counterclaims against it.  However, out of an abundance of caution, Seashore requests that any arguable stay be lifted so that Seashore can add the Debtor to the Arbitration.  *See In re Chestnut*, 422 F.3d 298 (5th Cir. 2005) (stay applies even when the estate's interest is only arguable even if it is later determined to be non-existent).

32.     Courts in this district and elsewhere, when deciding whether to permit an ongoing proceeding to continue, perform an equitable balancing test weighing the harm caused to the parties if the stay remains in effect versus the harm caused to the estate by having the stay lifted.  *In re Piperi*, 133 B.R. 846 (Bankr. S.D. Tex. 1990).  Here, the balancing clearly weighs in favor

of lifting the stay.  That balance in favor of lifting the stay becomes even more profound considering the clear law on arbitration as cited and discussed in Seashore's motion for stay/abstention which is adopted herein by reference.  Cases outside this district evaluate a multi-factor test to determine whether to lift the stay.  *See In re United States Brass*, 176 B.R. 11 (Bankr. E.D. Tex. 1995) (citing 12 factors).

33.     Under any test, based upon the facts and circumstances here, cause clearly exists to lift the stay.  The Court should also consider the fact that here the Arbitration does not currently, and even with the Debtor's involvement, would still not involve any core proceedings. *See In re Wood*, 825 F.2d 90 (5th Cir. 1987) ("if the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding")  *Id*. at 97.   *See also WRT Creditors Liquidation Trust v. C.I.B.C Oppenheimer Corp.*, 75 F. Supp.2d 596 (S.D. Tex. 1999).  As a non-core matter, the Court would not have jurisdiction.

34.     Further, the Court should consider that the Arbitration will go forward, and for reasons of obvious judicial economy, it makes more sense to include the Debtor in the overall determination of the relative rights and claims between Seashore and Black and his entities.  Not lifting the stay so that the Debtor can be joined to the Arbitration creates piecemeal proceedings and potentially inconsistent results.  Lastly, lifting the stay negates any issues about forum shopping.

WHEREFORE, Seashore requests that the Court lift the automatic stay so that Seashore can add the Debtor as a party to the pending Arbitration and for such other and further relief to which it is entitled.

Respectfully submitted this 18th day of August 2009.

> **KING & SPALDING, LLP**
>
> By:  /s/ Henry J. Kaim_____
> Henry J. Kaim
> Texas Bar No. 11075400
> HKaim@kslaw.com
> Mark W. Wege
> Texas Bar No. 21074225
> MWege@kslaw.com
> Edward L. Ripley
> Texas Bar No. 16935950
> Eripley@kslaw.com
> 1100 Louisiana, Suite 4000
> Houston, Texas  77002
> Telephone:  (713) 751-3200
> Fax: (713) 751-3290
>
> **ATTORNEYS  FOR  SEASHORE  INVESTMENT
> MANAGEMENT TRUST**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the foregoing has been served upon the parties registered with the Clerk's Office electronic noticing facilities as listed on the attached Master Service List or by first class mail, postage prepaid, on this 18th day of August 2009.

 /s/ Henry J. Kaim_____
Henry J. Kaim