IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 09-20206 |
| BNP PETROLEUM CORPORATION, | § | |
| | § | Chapter 11 |
| DEBTOR. | § | |

**DEBTOR'S OBJECTION TO SEASHORE'S MOTION TO APPOINT A CHAPTER 11
TRUSTEE AND DEBTOR'S RESPONSE TO VARIOUS JOINDERS IN THAT MOTION**
**(Relates to Docket Nos. 140, 160, 202, and 219)**

TO THE HONORABLE UNITED STATES BANKRUPTCY COURT:

BNP Petroleum Corporation ("BNP" or the "Debtor"), files this (1) Objection to the Joint

Motion of Seashore Investment Management Trust and Hector Canales, as Trustee for the Black

Family Children's Independent Trust for Appointment of a Chapter 11 Trustee [Dkt. No. 140];

and (2) Response to Various Joinders in that Motion [Dkt. Nos. 160, 202, and 219] (the

"Objection"), and in support of the Objection, the Debtor respectfully states as follows:

**FACTUAL BACKGROUND**

1.      On April 3, 2009 (the "Petition Date"), an involuntary petition (the "Involuntary

Petition") was filed against BNP in the United States Bankruptcy Court for the Southern District

of Texas, Corpus Christi Division (the "Court").

2.      On August 5, 2009, the Debtor filed a Consent to Entry of Order for Relief,

consenting to an order for relief under Chapter 7 of the Bankruptcy Code [Dkt. No. 90].  The

Debtor also filed a Motion to Convert its case to a case under Chapter 11 of the Bankruptcy Code

[Dkt. No. 91] (the "Motion to Convert").

3.      On August 7, 2009, the Court entered an order for relief under Chapter 7 of the

Bankruptcy Code (the "Order for Relief") [Dkt. No. 115] and also entered an order granting the

Motion to Convert [Dkt. No. 116].  This case is now pending as a Chapter 11 case with the Debtor in possession of its assets.

4.      On August 12, 2009, the Debtor filed a Motion of the Debtor for an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Certain Assets; (B) Scheduling an Auction and Hearing to Consider Approval of the Sale; (C) Approving Notice Relating to the Sale; and (D) Granting Related Relief [Dkt. No. 156] (the "Bidding Procedures Motion")

5.      On August 12, 2009, the Debtor filed a Motion for an Order Approving the Sale of Assets Free and Clear of Liens, Claims and Encumbrances and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases [Dkt. No. 158] (the "Sale Motion").

6.      On August 12, 2009, Seashore Investment Management Trust ("Seashore") presumably acting through its Trustee, Toby Shor, and Hector Canales, Trustee for the Black Children's Independent Trust (the "Independent Trust"), filed a Joint Motion for the Appointment of a Chapter 11 Trustee [Dkt. No. 140] (the "Trustee Motion").

7.      On August 12, 2009, Precision Energy Services, Inc. ("Precision") filed an Amended Joinder in the Trustee Motion [Dkt. No. 160] (the "Precision Joinder").

8.      On August 18, 2009, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").

9.      On August 21, 2009, Vantage Tubulars LP ("Vantage") filed its joinder to the Trustee Motion [Dkt. No. 202], and on August 26, 2009, CWC LP filed a joinder identical to the one filed by Vantage [Dkt. No. 219] (collectively, the "Vantage/CWC Joinder").

10.     On August 24, 2009, the Debtor took the deposition of Ms. Toby Shor, in her capacity as trustee of Seashore in order to try to have her articulate her reasons for seeking the appointment of a trustee in the case as well as certain of her objections to various pleadings she had filed to date in the case.   Attached hereto as **Exhibit A** are relevant cited pages of the deposition transcript ("Toby Shor Deposition Transcript").

## OBJECTION

11.     The Debtor objects to the Trustee Motion and to the various joinders thereto because (1) the Independent Trust lacks standing in this case to seek the appointment of a trustee; (2) no cause exists for the appointment of a trustee and none has been or can be undisputedly alleged; and (3) such appointment is not in the best interest of creditors of the Debtor's estate. The Debtor requests that this Court deny the relief requested in the Trustee Motion and any joinders thereto.

## SUMMARY OF ARGUMENT

12.     Nothing alleged in the Trustee Motion or any of the joinders thereto supports the serious and irreparable damage that would be caused by the ultimate penalty of removing the Debtor from being in charge of its own affairs and its own reorganization.   The claims asserted in the Trustee Motion and the various joinders can be readily distilled and resolved without the drastic and inappropriate step of appointing a Chapter 11 trustee.

13.     There is one predominant party, an insider to an affiliate of the Debtor and a debtor to the Debtor–Seashore–who wants information from the Debtor and its principal and related entities and affiliates.   Maybe several of the creditors in the case hold a similar view. Nothing the Debtor has filed to date—not a single pleading filed in its bankruptcy case prevents

that flow of information either inside the bankruptcy case under the Bankruptcy Court's supervision, or outside of it in another proceeding.

14.     There is also one predominant party—again, Seashore—who has expressed "distrust" of the Debtor's principal.  The creditors filing their respective Joinders have asserted a similar "lack of faith" in the Debtor's principal.  These sentiments are often present in Chapter 11 debtor cases—though they are not statutory grounds for the appointment of a trustee and should not prevail over sound business decisions.  In this case there is no "factual support" behind these allegations of distrust (and the lack of faith in the Debtor presumably stems either from the "distrust" promoted by the one insider debtor to the Debtor or simply because the Debtor, like most others who find themselves in Bankruptcy Court, has failed to pay all of its debts as they became due).  Rather, there is instead merely one insider to a Debtor affiliate who is in fact a debtor to the Debtor and who is clearly inter-locked in a "two party dispute" with the Debtor's principal and affiliates, joined by an entity so remotely connected to the Debtor as to not even have standing (the Independent Trust, whose trustee is Paul Black's ex-brother-in-law) raising a lot of smoke to try to make this Court and other legitimate creditors in the case think there's a fire.  The smoke is intended to cover the fact that this insider creditor (and net debtor) owes this estate's creditors 45% of a substantial sum of money (at least $1.8 million, or 45% of $4 million, as discussed more fully below) and wants this estate's creditors to ignore this obligation.  In any event a lack of faith in the Debtor and mere "distrust" are not a basis for appointing a trustee which essentially deprives the Debtor and its principal of the chance to retain its business and reorganize.

15.     This Court cannot ignore that the allegations of fraud and mismanagement against the Debtor's principal that is the "smoke" behind the Trustee motion are being brought primarily,

if not exclusively (other than the simple "me too" joinders), by an insider who is indisputably locked in a feud of the likes of the Hatfields and McCoys with the Debtor's principal, Paul Black, and certain affiliates of the Debtor.  This insider, Seashore, is in fact trying to get creditors and even non-creditors riled up and distracted from focusing on the business of reorganizing this Debtor and further distracted from focusing on Seashore as a target.  Importantly, if the Court were to examine the allegations Seashore is making in support of the appointment of a trustee--it is essentially just the single claim that "the Debtor has misappropriated funds".  BUT—Seashore cannot have it both ways--either the allegations which comprise the claims in the arbitration are the subject of the arbitration and are admittedly disputed, or they are not.  The allegations of mismanagement which are part and parcel of the arbitration cannot be "proven fact" for purposes of seeking a trustee and then the counter allegations by the Debtor of Seashore's breach of contract and failure to honor its numerous contractual and financial obligations to the Debtor and its affiliates (which are also arguably part of the arbitration according to Seashore) treated as merely disputed facts, or worse, ignored altogether.

16.      Finally, in addition to Seashore, there are creditors, perhaps even many--who do not like the proposed sale of assets the Debtor has in mind, or the proposed buyer, or the valuation of those assets proposed to be sold, or the procedures for selling those assets or the break up fee proposed for the stalking horse buyer, or the time deadlines imposed by certain of the pleadings, or the proposed release for the Debtor's principal or any of a myriad of other things.  The appointment of a trustee is not the appropriate legal remedy to resolve creditors' objections to a proposed sale of assets or any other controversial pleading that may be filed by the Debtor.  Objections to that proposed sale or the process for effectuating that sale and

participation in the case by the creditors such that they negotiate a better or different deal--that is the answer.[1]

17.    While Seashore wants this Court to believe that the Debtor has concocted some scheme, the Court should be reminded that this Debtor did not voluntarily seek this court's protection—and in fact fought hard to stay out of bankruptcy-- but was forced in by certain of its trade vendors.  Those trade creditors are the real creditors here who stand to benefit if the Debtor is allowed to reorganize its affairs and who would benefit if Seashore would pay its portion of the trade debt due either under the JOA or under the contracts Seashore has signed obligating it to pay 45% of the Debtor's debts.  Appointing a trustee would clearly "un-level the playing field" to the direct advantage of Seashore in its litigation with the Debtor's affiliates outside of this Court with no attendant benefit to the estate.  In fact, such a move would in fact completely damage the estate by eliminating its only known chance for Debtor in Possession financing and would unravel the assignment of assets voluntarily transferred to the Debtor for the sole purpose of trying to monetize non Debtor assets and pay trade creditors.

## BASIS FOR RELIEF

### A.    Black Children's Independent Trust Lacks Standing

18.    The Independent Trust is not a "party-in-interest" because it has no pecuniary interest that is directly affected by the bankruptcy proceedings.  Pursuant to 11 U.S.C. § 1104(a), only a "party in interest" and the United States Trustee may move for the appointment of a chapter 11 trustee.  11 U.S.C. § 1104(a).  The term "party in interest" includes the debtor, the trustee, a creditors' committee, an equity holders' committee, a creditor, an equity security holder, or any indenture trustee.  11 U.S.C. § 1109(b).  In addition, the term "party-in-interest" is

---

[1] Attached hereto as **Exhibit B** is a 1.5 page bullet-point summary of the factual underpinnings of the Debtor's proposed sale.

"generally understood to include all persons whose pecuniary interests are directly affected by the bankruptcy proceedings." *Nintendo Co., Ltd. v. Patten (In re Alpex Computer Corp.)*, 71 F.3d 353, 356 (10th Cir. 1995) (citations omitted).

19.     The Independent Trust holds a 33% limited partnership interest in PBF Investments, Ltd., which in turn previously held 55% interest in BNP Holdings, Ltd. Seashore previously held 45% interest in BNP Holdings, Ltd. until such time in May 2008 when those interests were terminated pursuant to the Agreement Regarding Termination of Joint Ownership dated May 1, 2001 (the "Termination Agreement") and signed by Seashore, as amended by the Restructure Agreement, effective May 15, 2006 (the "Restructure Agreement") and also signed by Seashore, which documents are attached hereto respectively as **Exhibit C** and **Exhibit D**, respectively, and incorporated by reference.   Subsequent to May 11, 2008 (the "Termination Date"), PBF Investments, Ltd. became the sole owner of BNP Holdings, Ltd., which in turn owns a 99% limited partner interest in BNP Oil & Gas Properties Ltd. ("BNP Properties").   BNP Properties conditionally assigned assets to the Debtor in partial cancellation of certain intercompany indebtedness as more fully set forth in the Purchase and Sale Agreement filed with this Court at Dkt. No. 158.

20.     The organizational chart attached hereto as **Exhibit E** demonstrates that the interest, if any, of the Independent Trust is extremely minor and totally remote from the Debtor and the Independent Trust should have no standing to appear before this Court in this bankruptcy case seeking the drastic relief of the appointment of a Trustee.

21.     The Independent Trust is not a creditor or an equity security holder of the Debtor. The Independent Trust's only alleged connections to this Debtor and this bankruptcy case are, at best, through non-bankruptcy proceedings to which the Debtor is not a party.   The existence of

alleged discovery disputes between the Independent Trust and the Debtor's principal in his individual capacity is not sufficient to qualify the Independent Trust as a party-in-interest in this bankruptcy case. As a result, the Independent Trust lacks standing to bring the Trustee Motion.

22.     Finally, even if the Court were to find that the Independent Trust has standing, the Court should not ignore a fact the Independent Trust chooses itself to ignore and which demonstrates that ill will and improper motives and not good business judgment are behind the Independent Trust's actions joining with Seashore to request a Trustee.

23.     While the Independent Trust appears to have aligned itself with Seashore, this alliance is misplaced. The Independent Trust gains nothing financially if Seashore somehow manages to prevail on its claims against the Debtor's affiliates. The Independent Trust does benefit, albeit indirectly, if and when Paul Black and the Debtor's affiliates prevail on their claims against Seashore.

**B.     No Cause Exists for the Appointment of a Trustee**

24.     Seashore, a net *debtor* to the Debtor owing the estate at least $1.8 million just in trade debt,[2] and a party with a relatively small royalty claim against the Debtor (which claim the Debtor proposes to pay in full under the Debtor's proposed sale) is the lead party alleging that a trustee should be appointed in this case. Not surprisingly, Seashore's motives in this case are designed to further her personal interests and are not aligned with the best interests of the true creditors of the Debtor. Seashore's motives are being driven by its involvement in litigation with affiliates of the Debtor and the Debtor's principal, Mr. Black. Seashore's involvement in this

---

[2] Seashore admits that it signed and executed the Restructure Agreement which obligates Seashore to pay 45% of all debts owed by BNP Properties (including the $4MM+ intercompany receivable of the Debtor). *See* Toby Shor Deposition Transcript, pg 145, lines 22-25 and pg 146, line 1 ("I'm guessing what [the Restructure Agreement] means is that I would have to pay if BNP Oil & Gas owed a certain amount of money I would have to pay 45 percent of it and then – and be – and Paul Black would have to pay 55 percent. I don't believe that if I understood that I'd have signed it, but I did.").

non-debtor litigation (the "Non-Debtor Litigation") effectively prevents Seashore from acknowledging the benefit that the Debtor can provide to creditors under the Debtor's proposed asset sale as Toby Shor, Trustee of Seashore, is instead too focused on only what she believes is good for her. *See e.g.,* Toby Shor Deposition Transcript pg 113, lines 10-11 and pg 120, lines 6-8 (Shor acknowledges she does not understand what DIP financing is, yet she objects to the proposed DIP financing unless Seashore is paid) (Question: "Do you know what that is, DIP financing? Shor Answer: "Not at all"); (Toby Shor: "I oppose any more money being loaned to Paul Black until, unless it's an enormous amount and it is tagged this amount will be paid back to Seashore").

25.    Apart from the relatively small royalty claim against the Debtor, Seashore's alleged claims appear to be primarily against Paul Black individually. *See* Toby Shor Deposition Transcript, pg 68, lines 9-25 and pg 69, lines 1-10 (Question: "... the [Seashore] trust is to receive funds under the promissory note, this $2 million note, and what you believe is the second $14 million note, correct? Shor Answer: "Uh-huh". Question: "And do you know who is responsible for paying either one of these notes? Let's start with the $2 million note. Do you know who is responsible for paying that note?" Shor Answer: "Paul Black". Question: "Individually?" Shor Answer: "Uh-huh." Question: "Anybody else". Shor Answer: "I don't know." Question: And how about with respect to the $14 million note .... Who is the ... person that is supposed to pay that money to the trust?" Shor Answer: "Paul Black". Question: "In his individual capacity?" Shor Answer: "Yes". In fact, Seashore admitted that it was unaware that the Debtor is a separate entity from Paul Black. *See* Toby Shor Deposition Transcript, pg 198, lines 5-10 (Question: "Yes, we're talking about the debtor, BNP Petroleum, a corporation." Shor Answer: "And that is not Paul Black?" Question: "No. I notice that you tend to sort of mix those

together."  Shor Answer: "Yeah"); *see also* pg 82, line 14 (Toby Shor: "I can't even figure out who the Debtor is.").  Seashore's inability to distinguish the Debtor from Paul Black further supports the Debtor's contention that Seashore has an ulterior motive in this case, and that such motive is not in the best interests of creditors.  Shor and Seashore fail or refuse to recognize that the Debtor is a separate legal entity from Paul Black and is not an entity in which she owns any interest or against which she holds any claims.

26.     Seashore seeks to hold the Debtor and its creditors hostage by thwarting the Debtor's and Mr. Black's personal attempts at monetizing his personal or controlled assets for the benefit of creditors.  Seashore repeatedly complains about the transfer of assets *into* the Debtor from BNP Properties.  *See e.g.*, Trustee Motion, ¶ 32.  Seashore fails to cite any case law indicating that transfers of assets into the debtor is cause for the appointment of a trustee.  To the contrary, the Debtor is attempting to bring assets *into* the estate which can then be monetized through a sale for the benefit of all creditors.  Seashore has no legitimate basis to oppose this effort—she is simply opposing an action that is in the best interest of the Debtor's creditors because she wants to be obstreperous until and unless she gets paid first.  See Toby Shor Deposition Transcript, pg 120 lines 1-21 (Shor objects to the DIP Financing unless she gets paid before all other creditors of the estate – Question: "... It's your view that you should be paid before anybody else is paid, any other creditors of the debtor?  Is that ... is that your opinion?" Shor Answer: "You're asking for my opinion.  I get – an opinion is just an opinion, right?  Yeah I do.).  Also, Seashore knows that the assets that the Debtor has brought into the estate for sale to a third party are *not* assets that Seashore owns (as her counsel continue to allege) but instead are only the 55% interest in the assets that are owned or controlled by Mr. Black or an affiliate of Mr. Black.  *See* Toby Shor Deposition Transcript, pg 170, lines 4-5, 8-11 (Question: "So are you

7claiming that you own an interest in the 55% that's going to be sold by the Debtor?    Shor
Answer: "Never said that."    Question: "...well, I'm asking you now..."    Shor Answer: "Do I own
it? No I don't ....").

27.    Seashore cannot even articulate its alleged claim against the Debtor.    *See* Toby
Shor Deposition Transcript, pg 83, lines 14-16, 19 (Question: "What is it that you want BNP
Petroleum Corporation to do? What is it that you think they owe you?"    Shor Answer: "I don't
know").    A party that cannot articulate its claims outside of those crafted by counsel should not
be heard to have a trustee appointed in this case.

28.    In addition, the Debtor has not taken any action in this case that has affected any
property of Seashore.    The Debtor's interim DIP Order [Dkt. No. 114] (the "Interim DIP Order")
only affects property of the Debtor.    *See* Interim DIP Order, ¶ 8(a) (granting DIP Lender a "first
priority senior security interest in and lien upon ... *property of the Debtor*") (emphasis added).
Therefore, to the extent the Debtor does not own an interest in the property that was
conditionally assigned to the Debtor on or about August 6, 2009, the Debtor could not have taken
any actions affecting Seashore's property.    Seashore admits that it cannot articulate whether it has
any ownership rights in BNP Properties other than the 45% interest in BNP Properties that was
not transferred into the Debtor.    *See* Toby Shor Deposition Transcript, pg 233, lines 12-15
(Question: "What [is] your interest?  Shor Answer: "...I know its 45 percent or more of that, but
I – I think we're still, you know, trying to ascertain what hat is, so I – I can't.").    The Debtor
caused the transfer of assets into the Debtor for the benefit of creditors and the estate.    Seashore's
attempts to argue otherwise further underline its true motives in this bankruptcy case—which is
to keep the focus directed away from Seashore and its obligation to pay 45% of the Debtor's
financial obligations.

29.     Seashore tries to allege that Mr. Black has engaged in some alleged "improper business activities."   Seashore states that it "seeks discovery to confirm [its allegations] and *believes, on information and belief, that such discovery will reveal improper business policies."* *See* Trustee Motion, ¶ 30 (emphasis added).   Seashore's unspecified fears, borne more from paranoia and refusal or failure to comprehend her own business dealings[3] than from fact, should not be allowed to serve as the basis for appointing a trustee in this case.   Moreover, when a party wants to conduct discovery and learn more—the answer is not to appoint a trustee, but to engage in discovery.   The Debtor has not taken or proposed a single action in this case that would thwart Seashore's discovery rights.

30.     Seashore will have ample opportunity to conduct discovery during this bankruptcy case, both as part of this case and through her litigation with non-Debtor parties. Nothing the Debtor proposes or has proposed to date prevents that.   Any attempt to appoint a trustee this early in the case is unwarranted.   Remarkably, by Seashore's own admission, the Trustee Motion is entirely premature and unwarranted because the very fact that Seashore needs to conduct discovery in order to reveal alleged improper business policies indicates that Seashore has no basis upon which it can now assert that a trustee should be appointed.

---

[3] Ms. Shor blames her ignorance with respect to the business dealings of the Seashore Trust on her reliance on her former husband, Kenton McDonald, who served as the trust's trustee for several years. *See* Toby Shor Deposition Transcript, pg 59, lines 6-7, 13 ("I was married to the person…and I trusted him"); *see also* pg 143, lines 12-14 ("…I totally trusted him at that time, totally, and figured, no matter what, he would do what was right and best for me.").   When questioned about whether Ms. Shor, as current trustee of Seashore, knew what other assets the trust may own, Ms. Shor replied "I don't know a lot about this.  I – I really don't."  *See* Toby Shor Deposition Transcript, pg 48, lines 21-25. Ms. Shor testified about notes of $2 million and $14 million that are allegedly owned by Seashore, however she was not sure whether the notes were separate notes, what the terms of such notes were, and whether such notes had even been reduced to writing. *See* Toby Shor Deposition Transcript, pg 60, lines 14-16 (Question: "It's unclear to you whether there are two separate notes?"  Shor Answer: "Yes"); *see also* pg 66, pg 67, lines 2-7 (Question: "No idea what the written agreement says?"  Shor Answer: "No." Question: "So you don't –".  Shor Answer: "Don't even know if it was written.").

31.     Moreover, since the filing of its Trustee Motion, the Debtor has already, by agreement, permitted Seashore and other interested parties to depose Mr. Black.  The Debtor is still in the early stages of its bankruptcy case and Seashore will have additional opportunities to conduct discovery as the case progresses, including the ability to conduct additional depositions and review additional documents or records of the Debtor.[4]  In addition, the Committee has recently been formed, and will also have opportunities to conduct discovery (and otherwise watchdog the activities of the Debtor), thereby providing an excellent source of oversight with respect to the Debtor's actions.  Moreover, the Debtor's DIP Budget specifically provides funding for the Committee to ensure it can properly oversee the Debtor's actions and represent the interests of unsecured creditors in this case.

32.     As another alleged basis for its Trustee Motion, Seashore alleges that Mr. Black "cannot be expected to pursue causes of action against himself or other Black-related entities...." Trustee Motion, ¶ 20.   However, even if such allegation were true, the Committee has the authority to pursue such causes of action if the Debtor unjustifiably refuses to do so.  *See In re Louisiana World Exposition, Inc. v. Federal Ins. Co.*, 832 F.2d 1391, 1397 (5th Cir. 1987) (parties-in-interest may pursue Debtor's causes of action if claim is colorable and the debtor unjustifiably refuses to pursue the claim).  Seashore's request for the appointment of a trustee is merely an attempt to deprive the Debtor of an opportunity to steer its own ship and file a plan in this case for the benefit of creditors, which plan would likely include pursuit of claims against Seashore.  *See* 11 U.S.C. § 1121(b) ("only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter"); *see also In re Pioneer Commercial Funding Corp.*, 114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990) (noting that the automatic stay and the Debtor's

---

[4] Seashore cannot now seem to articulate any claims against this Debtor despite already receiving from the Debtor's affiliates 60,000 pages of documents explaining those affiliates' financial affairs and

exclusivity period are fundamental protections provided to the Debtor under the Bankruptcy Code).

33.     Finally, all actions of Mr. Black and the Debtor in this bankruptcy case are subject to this Court's approval.  This Court has handled some of the largest and most complex bankruptcy cases in the nation and is more than capable of supervising the Debtor's actions in this case.  Seashore is looking for some unfair advantage in her litigation dispute with the non-Debtor entities and Mr. Black.  She must believe that the appointment of a trustee in the Debtor's case will effectuate that end as there is no sound business basis for appointing a trustee in this case.  This Court should see past Seashore's ploy to gain advantage in her litigation dispute raging outside this Court and deny Seashore's request to appoint a chapter 11 trustee in this case.

**C.     The Appointment of a Trustee is Not in the Best Interests of Creditors**

34.     The appointment of a trustee in this case is not in the best interests of creditors because it would eliminate the currently available DIP financing and also completely eliminate the Debtor's ability to monetize assets for the benefit of creditors as proposed in the Debtor's Sale Motion.  Absent the Debtor's proposed Sale Motion, the Debtor, as an operating company, will be left with few or no assets to satisfy creditors' claims.  Therefore, Mr. Black and the Debtor have arranged for the conditional transfer of assets *into* the Debtor in an attempt to monetize assets that would otherwise be unavailable for creditors.  The appointment of a trustee will make this monetization impossible and therefore serve no other purpose but to leave unsecured creditors with little, if any, chance of recovering on their claims.

35.     The actions taken to date by the Debtor to monetize assets for the benefit of creditors have not prejudiced Seashore.  To the extent Seashore is concerned about the treatment of its alleged ownership rights in certain assets, Seashore should be comforted by the fact that no

---

having full and unfettered access to the Debtor's and affiliates' outside accountants and all of their files.

actions have been taken (or could have been taken) with respect to property interests other than those owned by the Debtor. For example, as already discussed above, the Debtor's DIP order only affects "property of the debtor." *See* Interim DIP Order, ¶ 8(a). Moreover, any further actions taken by the Debtor in this bankruptcy case, including the sale of any assets, is subject to this Court's oversight and approval.

36.     As discussed above, to the extent creditors have questions regarding the Debtor's management, they will have ample opportunity to participate fully in the bankruptcy case and process. Given that this chapter 11 case is less than four (4) weeks old, creditors understandably have not yet had an opportunity to fully apprise themselves of the terms of the Debtor's proposed sale or all of the details in connection with the Debtor's and Paul Black's efforts to monetize certain assets to try to pay creditors. If a Trustee is appointed in this case the Debtor will lose its proposed DIP funding from Blackgate and will also lose the opportunity to sell non-Debtor assets for the benefit of the Debtor's creditors. Therefore, the appointment of a trustee at this early stage in the case will not only terminate the proposed sale, but it will likely completely deprive other creditors from having an opportunity to recover on their claims outside of the pursuit of litigation, if that. The appointment of a trustee is therefore <u>not</u> in the best interests of creditors.

37.     Finally, Seashore incorrectly alleges that a trustee is needed to protect the interests of creditors in the event the Debtor fails to pursue certain causes of action. Seashore ignores the Fifth Circuit's ruling that other parties in interest, including the Committee, can appeal to this Court to pursue actions the Debtor has unjustifiably refused to pursue. *In re Louisiana World Exposition, Inc. v. Federal Ins. Co.*, 832 F.2d at 1397. Moreover, as stated, the Debtor's DIP Motion, if approved, will provide specific funding to the Committee to perform its

duties for the benefit of all unsecured creditors. If warranted and permitted by this Court, these duties may include prosecuting causes of action the Debtor unjustifiably refuses to assert. Therefore, the appointment of a trustee is not necessary to pursue various causes of action which the Debtor may allegedly refuse to pursue.   It is more likely that Seashore is hopeful that if a Trustee is appointed the estate will not have sufficient funds to pursue a collection action against Seashore for its 45% of the debts of the Debtor.

## RESPONSE TO JOINDERS

38.     The Precision Joinder and the Vantage/CWC Joinder (collectively, the "Joinders") also lack any proper basis for the appointment of a trustee.  The Joinders raise the concern that the Debtor's schedules and statement of financial affairs ("SOFA") contain a broad disclaimer. The Debtor submits that notwithstanding the disclaimer, the Debtor's schedules and SOFA are complete and accurate and will be promptly amended if and as any corrections are needed.  The Debtor has in good faith attempted to disclose all required information and has even included information not technically required.   The Debtor has properly disclosed all transfers made within ninety (90) days of the Petition Date as well as insider transfers made within one (1) year of the Petition Date.  To the extent creditors and parties in interest seek further disclosure from Mr. Black and the Debtor, they will, as already discussed above, have several more opportunities to conduct discovery.   Moreover, the recently appointed Committee will provide additional oversight in the Debtor's actions to ensure that the Debtor is acting in the best interests of creditors.

39.     Finally, the Joinders allege that the Debtor's proposed sale is "rushed" and is not accompanied by sufficient marketing.  The Debtor has proposed a sale process that it believes will both: (1) keep the current potential purchaser interested; and (2) maximize the benefit to

unsecured creditors.  The Debtor has proposed a public bidding process that will in fact give creditors a reasonable time to examine the Debtor's assets and its transactions.  Prior to the hearing on the Sale Motion, the Court must first approve an auction process that will allow parties in interest sufficient time to evaluate the assets and submit bids.  Moreover, the Court will only hold a hearing on the Sale Motion after a Court-approved public auction has been conducted.  The timing of the sale, however, is important because of declining natural gas prices and the increasing risk that the proposed purchaser will cancel the sale.  Precision's Joinder incorrectly states that "oil and gas prices are rising and [are] expected to continue to rise."  Precision Joinder, ¶ 6.  While oil prices may be on the rise, natural gas prices have been steadily declining, and the Debtor is primarily a natural gas operator.  The Debtor is therefore attempting to maximize the value to the estate and its creditors by advocating timely approval of the Sale Motion.  Most importantly, while the joining creditors express concern about a "rushed" sale they appear to ignore that *if a Trustee is appointed there will be no sale* for the benefit of the Debtor.  The assets the Debtor proposes now to sell at auction would instead revert to the non-debtor transferors from which they came.

40.     The Debtor filed its schedules and SOFA in a good faith attempt to provide complete and accurate disclosure.  In addition, the Debtor filed its Sale Motion in an attempt to monetize assets for the benefit of creditors that would otherwise not be available.  Finally, the Debtor has cooperated, and continues to cooperate, with creditors, the Committee, and other parties in interest in an effort to facilitate further discovery and full disclosure in this Case.  Therefore, as discussed more fully above, the Debtor's actions in this case do no provide cause for the appointment of a trustee and such appointment is not in the best interests of creditors.

## **PRAYER**

WHEREFORE, the Debtor respectfully requests that the Court (1) deny the request for the appointment of a Chapter 11 trustee; and (2) grant the Debtor such further and other relief as is equitable and just.

Dated: August 31, 2009

Respectfully submitted,

**BRACEWELL & GIULIANI, L.L.P.**

By: _/s/ Marcy E. Kurtz_
      Marcy E. Kurtz
      Texas Bar No. 11768600
      Marcy.Kurtz@bgllp.com
      Chris S. Tillmanns
      Texas Bar No. 24060730
      Chris.Tillmanns@bgllp.com
      711 Louisiana, Suite 2300
      Houston, Texas 77002
      Telephone:    (713) 223-2300
      Facsimile:    (713) 221-1212

**ATTORNEYS FOR THE DEBTOR**

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing instrument has been served on the parties listed in the attached Service List via electronic means as listed on the court's ECF noticing system or by regular U. S. First Class Mail on this 31st day of August, 2009.

By: /s/ Chris S. Tillmanns_
Chris S. Tillmanns