## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

United States Courts
Southern District of Texas
FILED

SEP – 1 2009

Clerk of Court

IN RE: § 
§ **Case No. 09-20206**
§
**BNP PETROLEUM CORPORATION,** §
§ **Chapter 11**
DEBTOR. §
§

### PROFFER OF PAUL P. BLACK

1.     My name is Paul P. Black. I am over the age of twenty-one (21), of sound mind, and am competent to make this proffer and affidavit. All of the facts set forth in this proffer and affidavit are based on my personal knowledge, upon information supplied to me by others and the Debtor, upon my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. All of the facts stated herein are true and correct. If I were called upon to testify, I could and would testify competently to the facts and matters set forth herein. I submit this proffer in support of the approval of: the (1) *Emergency Motion for Interim and Final Orders (I) Authorizing Debtor to Incur Post-Petition Debt Pursuant to Bankruptcy Code 364(c), (II) Approving Use of Cash Collateral, (III) Granting Liens and Security Interests, and (IV) Scheduling Final Hearing* [Dkt. No. 99] (the "DIP Motion") and (2) the *Expedited Motion of the Debtor for an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Certain Assets; (B) Scheduling an Auction and Hearing to Consider Approval of the Sale; (C) Approving Notice Relating to the Sale; and (D) Granting Related Relief* [Dkt. No. 156] (the "Bidding Procedures Motion"). I am familiar with the matters set forth below.

2.     I am Chief Executive Officer and Chairman of BNP Petroleum Corporation ("BNP" or the "Debtor"), debtor and debtor-in-possession in this case.

3. I am a graduate of the University of Texas School of Petroleum Engineering. Early in my career, I worked at Tana Oil & Gas, and met an individual named George Placke ("Placke") at Tana, where we worked together during Tana's sale of its assets to Texaco for $476,000,000.

4. After Tana's assets were sold, Placke and I formed BNP Petroleum, an entity which we owned equally. BNP did extremely well in the oil and gas exploration business, eventually selling part of its portfolio for more than $17 million to Coastal Exploration and Production. I was 30 years old. In 2000, I bought out Placke and his family's interests, and acquired 100% ownership in three categories of assets: (i)  oil and gas properties (held by BNP Oil & Gas Properties, Ltd.), (ii)  real estate properties and (iii) bank stock. In doing so, I took on debt, and owned all the assets and liabilities.

## THE DEBTOR

5. The Debtor is primarily an oil and gas operator and was founded in 1990, with offices in Houston and Corpus Christi, Texas. The Debtor has operations throughout South Texas. The Debtor's operations include the contract exploration, development, and production of petroleum reserves primarily in Kleberg and Kenedy Counties, Texas. The Debtor is engaged in a full-cycle exploration and production program that includes seismic interpretation, drilling, facilities and pipeline construction, and oil and natural gas production. The Debtor's strategy for growth is to increase its reserves and production through exploration, development and acquisition of operations projects principally in South Texas. Since its founding, the Debtor has successfully applied its technical knowledge and commercial experience to expand its interests into oil field services management.

## HISTORY LEADING TO BANKRUPTCY FILING

6.      In 2000, Kenton McDonald, the then-husband of Toby Shor, and I reached a formal agreement, whereby Shor, through Seashore Investment Management Trust,("Seashore" or "Shor/Seashore") would achieve tax deductions by initially agreeing to inject capital to acquire a part of the interest I acquired from George Placke through the entity Seashore.  Later Seashore determined to inject only subordinate debt into certain of the acquired business interests and operations pursuant to several agreements including:

   a.  a Third Amendment to Agreement providing for the framework of an indemnity agreement and termination agreement

   b.  an Indemnity Agreement

   c.  a Termination Agreement

   d.  a Subordination Agreement (relating to a Frost Bank $4 million loan);  and

   e.  a Restructure Agreement bridging the transition between the Toby Shor and Kenton McDonald divorce proceeding.

Throughout this time period various of these entities executed amendments to the promissory note reflecting the subordinated debt, ultimately concluding with the Sixth Amendment to Promissory Note.

7.      Under these agreements, Shor/Seashore ultimately purchased a forty-five percent (45%) limited partnership interest in my business interests involving the oil and gas, real estate and bank stock.  PBF Investments, Ltd. owned the 55% of BNP Holdings, Ltd., and Seashore owned 45% of BNP Holdings, Ltd., which in turn owned 100% of BNP Oil & Gas Properties, Ltd.

8.      Between 2000 and May 15, 2006, the partnership achieved success resulting in the successful development of the Padre Island gas fields owned by BNP Oil and Gas Properties, Ltd., and paying several million dollars each in distributions to the partners.

9.      Between 2000 and 2006, the parties signed five (5) different contractual agreements, under which Shor/Seashore injected subordinated debt into the businesses and Seashore Investments Trust gained equity into the various assets.

10.      During all times, the financial records of all of the jointly owned entities were fully disclosed to Seashore and Shor, with frequent  meetings taking place between me, and my outside accountants, on the one hand, and Seashore and Toby Shor and Kenton McDonald, and their accountants, on the other hand.  It was the full access to all such books and records that documented and accounted for the basis of each of these various agreements.

11.      As Shor/Seashore and I (on behalf of certain affiliates and personally) executed each of the five (5) different contractual agreements, the parties made full disclosures of past accounting activities, settled and resolved outstanding obligations, and executed new agreements as novations or replacements of previous ones.

12.      McDonald and Shor, on behalf of Shor and Seashore Investments Trust, and I (on behalf of certain affiliates), would meet periodically and discuss the details of the businesses' operations, their income, and their liabilities, and the distributions to the owners.  Typically, communications about the partnership occurred regularly between me and Kenton McDonald until some time following his divorce from Toby Shor.

13.      On May 15, 2006, the parties executed a Restructure Agreement, which stated the rights and obligations of the parties and amended the Termination Agreement.  The parties had previously executed a Termination Agreement, which created a Notice of Termination provision,

whereby either party could automatically terminate the business relationship for the purpose, known by both parties at the time, of allowing each to quickly divide the business assets and free up each other's percentage share to all for the protection and reinvestment of their respective interests in previously held Partnership assets. The Restructure Agreement, among other things, clarified certain provisions of the Termination Agreement .

14.     The Restructure Agreement also completely defined the parties' ownership interests primarily carried over from the prior agreements, their rights, and their obligations to each other, including the rights upon any Termination.  The Restructure Agreement stated the relative positions of the parties regarding:

(a)     the parties' relative ownership of the assets in question;

(b)     my exclusive role as the General Partner and Shor/Seashore's role as limited partner;

(c)     the exclusion of limited partner Toby Shor and her trust from the day-to-day operation of the business; and

(d)     my freedom to do transactions and hold investments outside of the partnership.

15.     The Restructure Agreement also stated the amount of subordinated debt owed to Seashore (and the mandatory method to determine the actual amount of that debt), and provided terms for liquidation and payment of that subordinated debt including through Termination.  As noted, the Restructure Agreement amended and supplemented an earlier Termination Agreement of the business relationship by either party, allowing either party to send a "Notice of Termination," immediately triggering certain rights and obligations; and the Restructure Agreement restated a dispute resolution procedure found in almost all of the agreements, requiring the parties to first, meet and confer together; second, mediate; and third, submit the

dispute to binding arbitration. This dispute resolution provision is consistent with provisions in virtually every written agreement between Black/PBF and Shor/Seashore.

16.    In particular, the Restructure Agreement stated that PBF Investments owned fifty-five percent (55%) and Seashore owned forty-five percent (45%) of BNP Holdings, Ltd., which owned 100% of BNP Oil & Gas properties, and terminated all prior provisions allowing for additional equity to be earned by Seashore.

17.    The Restructure Agreement stated that I was the General Partner, Seashore Investments Trust was the limited partner, and that, as a result, Toby Shor and her trust were not permitted to run the business.  I, as the General Partner of PBF Investments, was responsible for running the business operations.

18.    The Restructure Agreement provided that I was free to do deals outside of the partnership, without the participation of Shor/Seashore in such third-party business transactions and through the Restructure Agreement Seashore/Shor sold to me any and all interests it owned in the Debtor.

19.    The Restructure Agreement stated the amount of subordinated debt owed to Shor/Seashore and the provisions under which it was due, including the mandatory 45% reduction in all of the principal and interest due on the Frost Bank debt and the subordinated debt to be made by Seashore promptly upon a termination notice.

20.    In early 2007 and continuing early 2008, Toby Shor and Kenton McDonald became involved in a highly contested and acrimonious divorce proceeding .  Toby Shor began to distrust everyone with whom her husband, Kenton McDonald, had done business on her behalf.

21.     Toby Shor fired Kenton McDonald as her lawyer and as trustee of Seashore Investments Trust, although it was recently discovered that the Trustee never had control over any of the Seashore distributions made to it by the owned entities as Toby Shor required that all trust distributions be deposited in her personal, sole managed, bank accounts (in direct violation of the Indemnity Agreement and Third Amendment to Agreement).

22.     Although the Restructure Agreement and earlier agreements between the parties stated that I had sole managerial authority over the business operations, Toby Shor began to inject herself into the day-to-day decision-making of the business. I attempted to placate Toby Shor, but to no avail. She requested an office at BNP, and asked to get involved with the management of the company, despite her complete lack of oil and gas business experience and her status as a limited partner. I refused because her requests were contrary to the terms of the Restructure Agreement although during this time she often came to the business, talked freely with employees, and sought assistance of employees in her personal affairs.

23.     Although systematic meetings, with accountants present, continued to take place, Toby Shor's behavior became more and more erratic. After she fired her ex-husband as trustee, she acted as both the beneficiary and the trustee of her trust. During this time, I and the business' accountant, Jennings Hawley, CPA, primarily through Misty Mata, met periodically at the accounting firm of Jennings and Hawley, and provided information to Toby Shor's/Seashore's accountant, Jerry Hampton. During the meetings, Toby Shor professed to be fully informed, and stated that she was happy with the accounting provided and pleased at the success of operations only to leave each meeting, and question the same accounting.

24.     These meetings repeated several times throughout 2007 and early 2008 kept Seashore and Toby Shor apprised of the drilling successes and requirements to explore in order

to maintain the Padre Island lease interests.  In particular during this time three (3) successful wells were drilled pursuant to the program described in advance to Seashore which involved the successive drilling of wells (so long as each well resulted in production) toward the ultimate goal of using those successful wells to fund a bank loan to convert short term debt incurred in drilling to a long term loan paid through production.  In fact that program was successful, and in 2008 I negotiated a detailed term sheet for a $50,000,000.00 loan gas hedging program to fully finance the short term debt then owed by BNPOGP, Ltd. to the Debtor.

25.    The partnership also in 2008 owed Frost Bank approximately $4 million on its line of credit and had a good relationship with the bank. However, after one of the early 2008 meetings I had with Shor and all of the accountants, Shor called the partnership's banker and started questioning my actions/decisions, placing that relationship in jeopardy.

26.    I called Toby Shor to discuss with her how detrimental this was to the partnership's relationship to the bank.  In response, I sent Toby Shor an email suggesting an amicable dissolution of the partnership.  This was some time during the first quarter of 2008.

27.    Toby Shor did not respond, but after returning from Israel, Toby Shor engaged counsel at the Houston firm of Gibbs & Bruns, L.L.P., who sent me a written demand stating that I should not talk to Toby Shor, and should talk only through her counsel, and requested a meeting to discuss the business.

28.    I was invited to the Houston office of Gibbs & Bruns, during which meeting I discussed the 2007 – 2008 drilling program and successes, the 2008 bank term loan agreement, and the expectations of closing the loan and use of the proceeds.  Instead of dealing with business issues, Seashore's lawyers  (i)  demanded that I pay in full "my $12 million" guaranty of the subordinated debt; that I cause the jointly owned entities to stop drilling any lease

maintenance wells without Toby Shor's consent, and made other demands in violation of the agreements between me/PBF and Shor/Seashore. Of course during this time the price of natural gas was increasing at a record level, making critical the timing of the long term loans and the hedging of the gas price since natural gas is a traded commodity with volatile price swings.

29.     On April 4, 2008 Societe Generale ("SocGen") sent the partnership a term sheet, offering a line of credit of $16 million, with the requirement that the partnership "hedge" its oil and gas production. The terms offered by SocGen constituted a huge vote of confidence in the business, and would have allowed the partnership to dramatically grow its business while protecting its investment through hedging of the future gas production.

30.     I had legal counsel send a communication to Toby Shor, through her attorneys, Gibbs & Bruns, advising them of the good news concerning the new availability of capital to grow the business. I had also told Gibbs and Bruns counsel that Seashore did not have veto power over drilling and exploration decisions nor did Toby Shor have veto power over the long term loan being arranged through SocGen, but that I would keep them fully informed of those decisions.

31.     Because there was no contractual right to control these entities, on April 9, 2008, Toby Shor, through her attorneys at Gibbs & Bruns, filed an action in Corpus Christi, Texas, seeking an order to stop all drilling, exploration, and selling of product, and to stop the company from borrowing money or from encumbering assets. The suit was not a suit to recover money owed since it was filed under the special statutes allowing certain immediate protections for matters subject to arbitration, although the suit made numerous false allegations. The suit had its intended impact, and stopped all further bank loan negotiations since the existence of the suit

was required to be disclosed to the lender. This suit was in direct violation of the Subordination Agreement prohibiting an such action.

32. As a result of the lawsuit and Shor's actions, the partnership was unable to take advantage of the SocGen financing, and consequently this profitable financial opportunity.

33. As a result of the suit, and in order to protect the my interest in at least 55% of these investments, on April 11, 2008, I invoked the Notice of Termination provision, requiring the termination of the partnership interests on or before May 11, 2008.

34. In violation of the Termination Agreement and the Restructure Agreement and in material default under other agreements, Seashore/Shor refused to pay its mandated share of BNPOGP's outstanding debts, refused to accept the assignment of a forty-five percent (45%) interest in its assets (demanding that the assignment be made free from all "vendor debt"), refused to execute the joint operating agreement, which resulted in the freezing of PBF's right to an immediate severance of PBF's fifty-five percent (55%) interest in the partnership from the 45% interest of Shor/Seashore.   With this stalemate, in direct violation of the Termination Agreements terms, PBF had no ability to protect its 55% ownership in all of the remaining assets post termination even though Seashore acknowledge that the termination occurred, it continued now for over 15 months refusing honor the termination agreement.

35. Even though Seashore purported to file suit in preparation for an arbitration, in fact even that allegation was false. From April 2008 through spring 2009,  Seashore never initiated any arbitration proceeding and instead, in 2009 PBF and I filed an arbitration demand and commenced an arbitration proceeding against Seashore to accomplish the termination and recover the damages for the destruction of the business opportunities cause by the wrongful conduct of Seashore/Shor. It is this arbitration proceeding that Seashore now seeks to bring this

Debtor in as a party, even though Seashore has not filed a claim, and under oath, could not articulate any claim against the Debtor.

36.     Seashore Investments Trust and Toby Shor breached the Restructure Agreement and Termination Agreement in a number of respects, including:

(a)     making demands for payment of indebtedness not due or owing to Seashore, including, in particular, a demand by Seashore's lawyers that I pay 100% of the approximately 12 million promissory note (which they claimed was actually a $16 million debt) in the name of Seashore;

(b)     filing an injunction suit before meeting and discussing the controversy prior to suit, before seeking a mediated settlement, and before seeking arbitration of her purported dispute and in violation of the subordination agreement;

(c)     demanding the right to veto all drilling and exploration activity as a limited partner; and

(d)     after the receipt of the written termination notice

(i)     refusing to accept an assignment of the 45% oil and gas interests made subject only to the agreements between the parties, or to communicate any response to the frequent requests for the form of assignment acceptable to Shor/Seashore over an 8 month period;

(ii)     refusing to execute a joint operating agreement within thirty days and instead demanding that Seashore own and have its 45% interest free from the existing written joint operating agreement and free from the debt incurred to vendors and third parties for the work required to generate the production (the "trade payables");

(iii)     refusing to pay 45% of the Frost Bank indebtedness due on May 15, 2006;

(iv)    refusing to pay or give credit for 45% of the 12 million note (instead actually continuing a demand as if such amount was actually due Seashore post-termination).

37.    In breach of the Restructure Agreement and the Termination Agreement, Seashore/Shor failed to take any of the steps above so that I/PBF could have the benefit of operating and protecting my 55% interest free from the demands and claims of Seashore's 45% interest, when all parties were aware upon execution of the Agreements that such independent operations would have protected the value of the parties' interests.

38.    Most critically Seashore began these demands at a time when gas prices were accelerating to record levels, and attempted to use the freezing of all of the jointly owned interests to extort a conveyance free from the indebtedness so that PBF could protect its 55% interest from a total loss of value.  What Seashore did not contemplate, although I did, was that the record high gas prices would not continue. I wished to hedge the proven reserves of the Partnership, at a time when the price of natural gas exceeded $13.50 per MCF, and as I negotiated and was required by financing agreements with the banks that agreed to lend operating capital.  After suit by Seashore and termination of the partnership, I knew that it was absolutely necessary to protect PBF's 55% interest through hedging transactions, but could not do so because Seashore refused to acknowledge the termination and to sever its 45% from my 55% interest in the oil and gas properties and began a series of demands for information ultimately resulting in the production of 60,000 pages of financial records without Seashore ever furnishing during all of 2008, a form of assignment acceptable that did not demand the assignment free from "trade payables", among other demands.

39.    Shor/Seashore's breach of the Restructure Agreement and the Termination Agreement precluded me/PBF from, among other things, hedging PBF's fifty-five percent (55%) share of the partnership's proven reserves, while the price exceeded $13.50 per MCF such that when the price began to collapse there was no hedge in place to protect the value of production.

40.    The price of natural gas has since fallen to $2.988 per MCF without PBF being able to hedge the price, borrow to pay its debts, or otherwise operate independent of Seashore's post-termination demands and refusals.

41.    Under the terms of the Restructure Agreement and the Termination Agreement, Seashore Investments Trust and Toby Shor were required to do three (3) things within 30 days of receipt of my/PBF's Notice of Termination:

(a)    pay Frost Bank forty-five percent (45%) of the $4,200,000 owed to Frost by the partnership and guaranteed by me;

(b)    sign a Joint Operating Agreement, thereby providing for the payment of forty-five percent (45%) of the trade debt (which was almost $10,000,000 at the time and was to be paid with the $16 million SocGen long term loan); and

(c)    accept the assignment furnished by my/PBF or promptly propose an acceptable assignment form, to accomplish a prompt termination to allow each to protect their own separated interests.

42.    Specifically, the language of the Restructure Agreement provides:

(a)    Either of the limited partners of BNP Holdings, Ltd. can initiate a termination of the joint ownership either in the oil and gas entities, the commercial properties entities, or both by delivering written notice. The date of termination of joint ownership shall be the date stated in the notice, but no later than 30 days following receipt of the notice by the remaining party.

(b)     In the event the triggering party affects a termination of only one type of entity (oil and gas or commercial properties), the receiving party can force the termination of the other type of entity.

(c)     If joint interest in the oil and gas entities is terminated, Seashore will receive the following:

(i)     45% interest in all cash in excess of trade payables (which payables were approximately  $10,000,000 at the time)

(ii)     45% of all receivables (primarily related to gas production sales)

(iii)     45% assignment in all oil and gas leases and in "all prospects identified by the Oil and Gas Entities as of the effective date of termination [5/12/08]"

(iv)     Seashore will execute Joint Operating Agreements ("JOA's") for all oil and gas leases assigned identical to JOA's already in place for the prospects (which provided for the payment from production of the 45% interest's share of the vendor debt).

(v)     The Oil and Gas Entities will be released from Seashore's percentage share (45%) of the indebtedness of the oil and gas entities, save and except trade payables (because those trade payables burden the 45% under the JOA).

(vi)     Seashore will receive no compensation for office furniture, improvements or good will.

43.     If joint interest in commercial properties entities is terminated, Seashore will receive the following:

(a)     ownership of BNP Commercial Properties will be spun off to the limited partners

(b)     40% of all cash in excess of working capital requirements in CP distributed quarterly pro rata.

44.    I and PBF sent Seashore the Notice of Termination, and immediately provided Seashore with the assignment of its forty-five percent (45%) interest subject only to the agreements between the parties.   PBF requested that if any issues with the form of the assignment existed, that Seashore furnish PBF or BNPOGP, Ltd. with the form acceptable. Seashore refuse to do so for almost a year, and only did so after the total collapse in the gas price and long after the loss of all ability to borrow against even the 55% as a result of Seashore's conduct.  I and PBF performed, tendered performance of, or were excused from performing our obligations under the Restructure Agreement and the Termination Agreement by the wrongful conduct of Seashore/Shor.

45.    Seashore breached the Termination Agreement also by demanding payment of the entire balance due on the Seashore note (such note is subject to the 45% reduction due at termination, and payment of the 55% is expressly subordinate to the Frost Bank indebtedness pursuant to a written indemnity agreement Seashore executed with Frost Bank) and actually claimed in sworn pleadings that I and the entities signing the subordinated note owed the entire amount upon Seashore's demand, completely in violation of the various agreements, and in fact a false statement.

46.    Toby Shor personally guaranteed the performance of the Termination Agreement through the Third Amendment of Agreement, and is personally liable for all damages she, individually, and she, acting as Trustee of Seashore, caused me/PBF (and which, in turn, has rendered BNPOGP unable to pay its debt due to the Debtor).  Seashore trust was never funded with anything, and was the alter ego of Toby Shor for all purposes.  Toby Shor refused to allow Seashore's Trustee to deal with the Trust properties, to segregate and maintain in a separate trust

account without distribution to the beneficiary, all distributions from PBF and the affiliated entities.

47.    After losing the $16,000,000 line of credit with SocGen (which provided for a hedging of all of the oil and gas interests) because of the improper actions and/or inactions of Shor/Seashore, I/PBF continued to search for new sources of capital. I met with Rusty Stehr at Sovereign Bank-Dallas.

48.    On April 10, 2008, Rusty Stehr sent me a preliminary term sheet, offering to lend monies conditioned upon my/PBF's obtaining clear title on the fifty-five percent (55%) of the partnership interests owned by the me/PBF and upon my/PBF's entering into a hedge contract with the bank.

49.    This proposed credit facility requested me/PBF to hedge its oil and gas production at the then prevailing price.

50.    I intended to sell the production on PBF's fifty-five percent of the partnership assets with Sovereign Bank-Dallas at the then-prevailing price.

51.    I again made demand on Seashore to accept the assignment and honor its agreements by dividing the oil and gas interests but Seashore continued to refuse, including refusing to furnishing any form of acceptable assignment. Due to the breach of contract by Shor/Seashore, I/PBF was again prevented from hedging even my 55% of the oil and gas production at the then-prevailing price. Natural gas prices continued to fall.

52.    After losing the $16,000,000 line of credit with SocGen due to the actions and/or inactions of Shor/Seashore and losing the Sovereign Bank opportunity, I through PBF continued to search for new sources of capital. I met with Tom Matthews of American Bank in Corpus Christi.

53.     In April and May, Tom Matthews offered me/PBF $6,000,000 in financing of the 55% interest owned by me/PBF, conditioned upon my/PBF's obtaining clear title on the fifty-five percent (55%) owned and upon my/PBF's entering into a hedge contract to protect the bank's collateral and protect the 55% of PBF if the market price for production fell.  Natural gas prices continued to fall from this time.

54.     This proposed credit facility required PBF to hedge its oil and gas production at the then prevailing price.

55.     Again because of the breach of contract by Shor/Seashore, PBF was unable to hedge the oil and gas production on its fifty-five percent (55%) interest at the then-prevailing price, and since the termination date has been unable to independently deal with PBF's' 55% interest in the oil and gas properties.

56.     Between May 2008 and April 2009, the Debtor attempted to obtain financing as natural gas prices fell significantly from $14/mmbtu in the third quarter of 2008, to under $3/mmbtu today.  Because of the conduct of Seashore, traditional forms of financing were therefore not available in this declining market.  The Debtor had anticipated that traditional lending would not be available, and therefore sought non-traditional financing such as a possible sale of assets.  During the first quarter of 2009, the Debtor found a potential purchaser of its assets, Blackgate Resources, LLC however, with the continuation of the suit and litigation by Seashore, no agreement could be reached to finance or sell just the 55% interests of PBF.

57.     Blackgate Resources, LLC was, however, later willing to provide post-petition financing to the Debtor in order for the Debtor to continue its operations until the Debtor could obtain Court approval of its proposed sale of its 55% interest.

## THE BANKRUPTCY FILING

58.    Without the ability to sell or borrow, the BNPOGP, Ltd. debt owed to the Debtor (which should have been paid in mid 2008 through the bank loan) could not be paid.   Creditors of the Debtor became increasingly impatient and on April 3, 2009 (the "Petition Date"), an involuntary petition (the "Involuntary Petition") was filed against BNP Petroleum in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division (the "Court").    Beginning in April 2009 through early August 2009, I negotiated a sale of 55% of the BNPOGP, Ltd.'s oil and gas interests at a value reflecting the current value of the Leases, which, as a result of Seashore's freezing the ability to operate and sell in mid 2008, was far less then its earlier value.

59.    After negotiating a sale transaction for the 55% interest owned by BNOPGP, Ltd., on August 5, 2009, the Debtor filed a Consent to Entry of Order for Relief, consenting to an order for relief under Chapter 7 of the Bankruptcy Code [Dkt. No. 90].  The Debtor also filed a Motion to Convert its case to a case under Chapter 11 of the Bankruptcy Code [Dkt. No. 91] (the "Motion to Convert").

60.    On August 5, 2009, the Debtor filed its DIP Motion consistent with the proposed Blackgate transaction.    Very briefly, the Blackgate transaction:

 a.    provides for the sale of 55% of the BNPOGP, Ltd. oil and gas interests

 b.    the assignment of that 55% interest, not monetized by a proposed sale contract, to the Debtor such that the Debtor would receive 100% of the sale proceeds;

 c.    provides for the credit bid by the Senior lender on the Frost Bank debt of only 55% of secured debt;

d.      provides for the sale of 100% of an affiliate entity's assets Land and Bay, as well as the sale of 10% of an affiliate's oil and gas interests (SWG) with 100% of the proceeds paid to the Debtor at closing, thereby monetizing these assets for use by the Debtor in paying claims;

e.      provides for the payment in full of all past due royalties (including royalties due on the 45% interest of Seashore);  and

f.      provides for the payment in full of all taxes past due (including taxes due on the 45% interest of Seashore); and

g.      will provide for the assignment of all BNPOGP, Ltd. rights to the Debtor to collect for the required payment by Seashore of its 45% due on royalties, taxes, trade debt paid by the sale, and 45% of the Frost Bank remaining debt;

h.      provides for a bidding and auction process to market test the value of the 55% interest to be sold, and allowing for overbids to assure the sale is a fair market value sale;

i.      provides for a DIP loan to allow the bid procedures and operations of the Debtor during the auction period to make up for the fact that the Debtor has no cash and is otherwise administratively insolvent;  and

j.      provides that if the sale is not approved that all interests shall be returned to BNPOGP, Ltd. such that all parties are put back in the same position, with the same rights, that existed just prior to the execution of the Blackgate transaction.

This proposed sale will generate initially at least $500,000.00 to the estate and allow the estate to participate in the recovery of the Seashore 45% of trade payables and other debts due by Seashore.

61.     On August 7, 2009, the Court entered an order for relief under Chapter 7 of the Bankruptcy Code (the "Order for Relief") [Dkt. No. 115] and also entered an order granting the Motion to Convert [Dkt. No. 116]. This case is now pending as a Chapter 11 case with the Debtor in possession of its assets.

62.     On August 12, 2009, the Debtor filed its Bidding Procedures Motion, again consistent with the proposed Blackgate transaction and DIP Motion.

63.     On August 12, 2009, the Debtor filed a Motion for an Order Approving the Sale of Assets Free and Clear of Liens, Claims and Encumbrances and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases [Dkt. No. 158] (the "Sale Motion").

64.     On August 18, 2009, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").

## **DEBTOR-IN-POSSESSION FINANCING**

65.     An immediate and critical need exists for the Debtor to obtain the DIP Loan (as set forth in the relevant Motion) and use the Cash Collateral in order to fund the Debtor's operations until a sale of the Debtor's business can be concluded. Without access to post-petition financing, the Debtor will not be able to maintain its operations until it can conclude a sale of its assets. Consequently, the Debtor's continued viability and ability to reorganize depends heavily upon the expeditious approval of the DIP Loan.

66.     The Debtor is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, or pursuant to sections 364(a) and (b) of the Bankruptcy Code. Under

the circumstances, no source of credit on similar or more favorable terms other than the DIP Financing (as described in the motion for debtor-in-possession financing (the "DIP Motion") exists.

67.     In the Debtor's business judgment, the DIP Financing provides the Debtor with the best source of post-petition financing and, therefore, the best opportunity for the Debtor to successfully obtain confirmation of a plan. The Debtor has requested that the Lender provide the DIP Financing in order to provide funds to allow the Debtor to continue to operate until it is able to conclude a sale of its assets. Without the DIP Financing, the Debtor will be unable to retain or pay employees, to maintain its assets, to attempt to reorganize its affairs, or to perform any of the tasks which the Debtor believes are necessary to maximize the value of its assets.

68.     The DIP Financing will benefit the Debtor and the Debtor's estate. The ability of the Debtor to attempt to reorganize and sell its assets for the benefit of creditors depends upon the Debtor's ability to obtain the DIP Financing from the DIP Lender.

69.     The DIP Facility has been negotiated in good faith and at arm's-length between the Debtor and DIP Lender upon the Debtor's request to continue operations until a sale can be concluded and approved by this Court. Any loans and other financial accommodations made to the Debtor shall have been extended in good faith, as that term is used in section 364(e) of the Code, and DIP Lender shall be entitled to all protections afforded thereunder. The terms of the loan provided under the DIP Facility are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

70.     None of the financial consideration for (1) the purchase of any claims against the Debtor; (2) the Purchase Price (as defined in the Purchase and Sale Agreement (the "PSA"),

which is attached as Exhibit A to the Sale Motion); and (3) the DIP Facility, was or will be provided by Paul Black.

## **BIDDING PROCEDURES MOTION**

71.     The terms of the bidding procedures as set forth in the Bidding Procedures Motion have been negotiated in good faith between the Debtor and Blackgate Resources, LLC, the proposed purchaser (the "Proposed Purchaser"), in an effort to both (1) lock in the Proposed Purchaser under the terms of the PSA; and (2) provide a reasonable auction process to enable to the Debtor to maximize the value of its assets by inviting other potential purchasers to submit bids.

72.     In the Debtor's business judgment, the Bidding Procedures are fair, reasonable and appropriate and in the best interest of the Debtor's estate.

Further Affiant saith not.

AFFIANT:


_/s/ Paul P. Black_____
PAUL P. BLACK

GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this the 1st day of September, 2009.


_/s/ Paul P. Black_____
Paul P. Black

SWORN TO AND SUBSCRIBED BEFORE ME, the undersigned authority, on the 1st day of September, 2009.


_/s/ Barbara E. Smith_____

My Commission Expires:

Barbara E. Smith_____
1/24/2012                             Printed Name of Notary Public