IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| BNP PETROLEUM CORPORATION | § | Case No. 09-20206 |
| | § | |
| BNP OIL & GAS PROPERTIES, LTD. | § | Case No. 09-20612 |
| | § | Chapter 11 |
| | § | |
| Debtors. | § | Jointly Administered Under |
| | § | Case No. 09-20206 |

**SEASHORE INVESTMENT MANAGEMENT TRUST'S EMERGENCY MOTION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE**

Seashore Investment Management Trust ("Seashore") hereby files its Emergency Motion for Appointment of a Chapter 11 Trustee (the "Motion") in case number 09-20612 and supplements the Joint Motion of Seashore and Hector Canales, as Trustee for the Black Children's Independent Trust (the "Canales") for Appointment of a Chapter 11 trustee ("First Trustee Motion"), filed in case number 09-20206 on August 12, 2009. (Docket No. 140).[1]  By this Motion, and for the reasons stated herein and in the First Trustee Motion, Seashore requests appointment of a Chapter 11 trustee in these jointly administered cases.  In support hereof, Seashore respectfully shows the court as follows:

**JURISDICTION AND VENUE**

1.  This Court has jurisdiction over this case and this matter pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The First Trustee Motion is fully incorporated herein.

HOU_IMANAGE-753214.3

**FACTUAL BACKGROUND**

2. Seashore hereby incorporates the factual background contained in the First Trustee Motion and all of Seashore's exhibits prepared for the hearing on September 1, 2009 on the First Trustee Motion.

**RELIEF REQUESTED**

3. Seashore requests the appointment of a Chapter 11 trustee to manage the business and affairs of the Debtors pursuant to Bankruptcy Code section 1104(a), or in the alternative, the conversion of this case to a case under Chapter 7, pursuant to Bankruptcy Code section 1112. *See* 11 U.S.C. §§ 1104(a), 1112.

**BASIS FOR RELIEF REQUESTED**

4. In addition to the arguments and bases for appointment of a Chapter 11 trustee that are contained in the First Trustee Motion, which are incorporated herein by reference, the additional independent bases exist for appointment of a Chapter 11 trustee or conversion of these cases to Chapter 7.

**A.     Unauthorized Use of Cash Collateral**

5. Upon information and belief, Debtor BNP Petroleum[2] does not have authorization to use cash collateral, in violation of the order of this Court and to the detriment of creditors and parties in interest. The Interim Order (I) Authorizing Debtor (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 USC § 363, (II) Granting Liens and Security Interests and (III) Granting Adequate Protection to Prepetition Secured Parties ("Cash Collateral Order"), (Docket No. 114), provides that "[t]he Debtor's right to use Cash Collateral under this

---

[2] BNP Petroleum Corp. is referred to herein as "BNP Petroleum" and BNP Oil & Gas Properties, Ltd. is referred to herein as "BNP Oil & Gas."

HOU_IMANAGE-753214.3                                     2

Interim Order shall automatically terminate on the date that is the earlier of (a) three (3) days after an Event of Default under the DIP Facility or (b) the maturity of the DIP Facility." Cash Collateral Order at ¶ 12.

6. Both of the independent conditions stated in the Cash Collateral Order for termination of the right to use cash collateral have occurred. The DIP loan matured on September 4, 2009, because no final cash collateral order had been entered by that date, as required by the Cash Collateral Order. Cash Collateral Order ¶ 20(b). Further, on September 18, 2009 the DIP lender, Blackgate Resources, LLC ("Blackgate"), sent a notice of default letter to BNP Petroleum establishing an event of default under the DIP loan. The letter states that BNP Petroleum failed to pay its obligations under the DIP loan and that Blackgate is terminating such loan. As a result of these events, BNP Petroleum's right to use cash collateral expired upon the maturity of the DIP loan on September 4, 2009, or in the alternative, on September 21, 2009, three days after the date of the default letter. In either case, it is clear that BNP Petroleum's right to use cash collateral has been terminated. *See* Cash Collateral Order at ¶ 12.

7. Upon information and belief, despite the fact that BNP Petroleum is no longer permitted to use cash collateral, BNP Petroleum has been using cash collateral. Further, John Higgins, counsel for Margrave Holdings, Ltd.—who is a holder of prepetition secured debt—requested on September 21, 2009 that BNP Petroleum stop using cash collateral. Upon further information and belief, BNP Petroleum has continued to pay pre-petition claims and claims that arose during the gap period without Court approval. These unauthorized post-petition transfers should be avoided pursuant to Bankruptcy Code section 549, and also further evidence the continued use of cash collateral. BNP Petroleum's counsel must be responsible for the use of cash collateral. *See Midwest Props. No. Two v. Big Hill Inv. Co.*, 93 B.R. 357, 363 (N.D. Tex.

1988); *see also In re Aerosmith Denton Corp.*, 36 B.R. 116, 119-20 (Bankr. N.D. Tex. 1983) (holding that "proper sanctions can be imposed against those responsible" for misuse of cash collateral).

### B. Creation and Use of a Bank Account Without Notice to the Examiner

8. Upon information and belief, BNP Oil & Gas has created a new bank account and has expended funds from such account without providing notice to the Examiner, in violation of the Court's Order Granting Debtor's Motion for the Appointment of an Examiner with Certain Expanded Powers (Docket No. 319). That order granted the examiner "full and complete authority and control over all bank accounts of either Debtor, including any accounts in the consolidated cash management system" as well as "full and complete authority to review and approve any and all payments or transfers by or for the benefit of either Debtor by check, wire transfer or otherwise, prior to any such transfer being made." *Id.* BNP Oil & Gas's unauthorized expenditure of funds from that bank account, subject to the control of the Examiner, is a violation of this Court's order and grounds for appointment of a Chapter 11 trustee with control over the Debtors' actions.

### C. Continued Pattern of Fraud and Misdealing

9. Upon information and belief, BNP Petroleum has incurred substantial payables related to work performed on non-debtor properties to the benefit of affiliates 100% owned and controlled by Paul Black or related entities. For example, the analysis prepared by Sirius Solutions, LLLP ("Sirius"), who was retained by Blackgate in connection with a proposed asset purchase, shows that BNP Operating, LLC ("BNP Operating") a non-debtor entity wholly owned by the Paul Black Heritage Trust ("Black Heritage Trust"), incurred payables of over $850,000 in connection with drilling wells and developing property allegedly owned by SGW Interests, LLC, ("SGW"), another non-debtor entity wholly owned by Black Heritage Trust. In fact, BNP

Operating is listed with the Texas Railroad Commission as the operator of record of two of the three SGW wells. All of this information directly contradicts the Debtors' sworn schedules and numerous proofs of claim. The substantial work performed on the SGW wells that was procured by BNP Operating should have created an obligation owed by BNP Operating, not the Debtors. However, these obligations are included in BNP Petroleum's schedules as payables of BNP Petroleum. The proofs of claim by the listed parties clearly reflects the work performed on the SGW properties. BNP Petroleum has not explained how these obligations of a non-debtor operator became scheduled obligations of BNP Petroleum.

10. It is also unexplained why a $754,193 receivable from BNP Operating was included in BNP Petroleum's schedules at the last minute, when it was previously unscheduled in a prior draft by the Debtors. *See* Schedule B (Docket No. 143); *see also* Exhibit 1 (draft of Schedule B used at Paul Black's deposition that does not include the BNP Operating receivable); *see also* Exhibit 2, at BGATE0010041-49 (Sirius Accounts Receivable Analysis). The BNP Operating receivable is also the only receivable on Schedule B without a general ledger account number. It appears likely that this receivable was added to Schedule B after some transaction which may have resulted in BNP Operating transferring its obligations to BNP Petroleum, yet not transferring the underlying asset to BNP Petroleum.

11. Seashore has not yet been able to determine whose funds were used to acquire the SGW properties and leaseholds themselves, which properties were drilled in late 2008, but clearly costs of developing those properties has been charged to BNP Petroleum. To the extent that BNP Oil & Gas's or BNP Petroleum's funds were expended on drilling and bringing into production the SGW properties, the Debtors have an equitable lien on such properties and they should be transferred to the Debtors immediately. Further, the schedules also reveal that BNP

Petroleum made payments of approximately $175,000 to BNP Operating in the year prior to the involuntary filing without any explanation. It is clear that burdening the bankruptcy estate with non-Debtor obligations and making questionable and unexplained insider payments detriments creditors and is cause to appoint a Chapter 11 trustee.

12. Based upon Seashore's continuing review of proofs of claim filed against BNP Petroleum, Seashore believes that a substantial number and amount of additional claims against BNP Petroleum relate to work on several non-Debtor properties owned and/or controlled by Paul Black. Thus far, Seashore has identified, in addition to the claims related to the SGW properties, over $2.5 million in alleged claims against BNP Petroleum that have no identification of any kind as to which oil and gas properties work was performed on. These facts raise significant issues regarding the validity of the whole body of claims at BNP Petroleum, as it is clearly inappropriate for BNP Petroleum to pay for services performed on non-Debtor properties. Although Seashore has requested information regarding these expenditures, no such information has been produced.

13. Perhaps even more disturbing, upon information and belief, SGW's interests produce approximately $60,000 in cash per month, which appears to be currently going to Paul Black individually, <u>a blatant fraud on the estate</u>. In other words, BNP Petroleum has no alleged interests in these wells, but has been charged with the costs of drilling and operating them. However, all of the proceeds appear to be directed to Paul Black. Further, Paul Black has provided no evidence of how such properties were acquired.

14. BNP Petroleum's Schedule B lists another questionable transaction, a $422,000 receivable from 5302 Mandell Property L.P. ("<u>Mandell</u>"). Schedule B (Docket No. 143). It appears, additionally, that a minimum of $67,000 was transferred to Mandell in the year before

the bankruptcy filing. Seashore has learned that Mandell was a real estate project of Paul Black's family member, John Black, and that BNP Petroleum apparently financed the business by providing at least $422,000 to the insider limited partnership, Mandell. *See* John Black Spoke.com biography, http://www.spoke.com/info/pFbRdQZ/JohnBlack (Exhibit 3). Seashore has also discovered that Paul Black is the signatory for the general partner of Mandell, and that Mandell's Certificate of Formation lists BNP Petroleum's Houston address as its address along with its general partner. *See* Mandell Certificate of Formation (Exhibit 4). Mandell's purpose was to construct a large single family home in a very expensive neighborhood in Houston, Texas at 5302 Mandell Street. According to the Harris County Appraisal District ("HCAD"), the home contains more than 5,500 square feet and the tax value of the home for 2009 is over $1.8 million. *See* HCAD Real Property Account Information for 2009 (Exhibit 5) and 2008 (Exhibit 6). The home was originally owned by 5302 Mandell Property L.P., but was transferred in 2009 to Holden E. Shannon. After the sale of the home from Mandell to Holden E. Shannon, BNP Petroleum's $422,000 receivable appears never to have been repaid and remains a receivable on the books of the Debtor.

15. It was inappropriate for BNP Petroleum, an operator of oil and gas properties, to use at least $422,000 of its funds to benefit the real estate construction ventures of Paul Black's family members, particularly when BNP Petroleum was paying none of its debts to its legitimate creditors and was insolvent. This misdeed was compounded by the fact that when the home was sold, BNP Petroleum's $422,000 remained unpaid from the proceeds of the sale. Paul Black, as the signatory for the general partner of the limited partnership, undoubtedly was aware of the sale but has failed to explain why BNP Petroleum to not seek repayment of this debt. In fact, Paul Black failed to disclose the very existence of Mandell in his deposition despite being asked

whether there were any other entities not listed on the organizational chart that he had an interest in and had a relationship to BNP Petroleum.

**D.   BNP Petroleum has Been Paying the Employees of a Non-Debtor Entity**

16.   BNP Petroleum has continued to use its own funds to pay the salary of ten employees that work for Land & Bay Gauging, LLC, which is a non-debtor entity, and was wholly owned by Paul Black until the day prior to the order for relief. *See* Debtor's Emergency Motion for Order Authorizing Payment of Post-petition Employee Obligations (Docket No. 340) ("Employee Motion").  It is inappropriate to use estate funds to pay the salaries of staff that does not work for either debtor, and for an entity that has no contract with the Debtor and does work for other entities.

**E.   Transfers to Land and Bay Gauging, LLC Without Consideration**

17.   In his August 18, 2009 deposition, Paul Black testified that the Debtor made loans of approximately $6 million to Land & Bay Gauging, LLC ("Land & Bay"), an entity which apparently currently has no assets. August 18, 2009 Transcript of Paul Black Deposition, at 53-55.  BNP Petroleum in fact made over $3.3 million in transfers to Land & Bay during the year prior to the involuntary bankruptcy filing, some of which funds were loans.  No contract or other documentation accompanied these transfers, none of this money has been repaid to BNP Petroleum, and Land and Bay currently has no assets. *Id*. at 51-56.  It appears that this money has simply disappeared and Mr. Black had no explanation of any kind for these "loans" or where the funds went.  According to Paul Black's deposition testimony, the $6 million receivable that BNP Petroleum listed on its draft Schedule B (Exhibit 1) related to these payments was extinguished in return for the transfer of stock to BNP Petroleum. *Id.* at 52.  Despite being the

100% owner of Land & Bay, Paul Black could not explain what the $6 million "loan" was used for or why no documentation exists to substantiate these transfers. *See id.* at 51-57.

18. Additionally, based upon Paul Black's deposition testimony and BNP Petroleum's schedules, Land & Bay is now owned by BNP Petroleum. However, upon information and belief, Paul Black is now taking a contrary position—despite his deposition testimony and the filed schedules. Paul Black and the Debtors should be bound Paul Black's earlier testimony and the schedules stating that BNP Petroleum owns Land & Bay.

**F.    Debtors' Ongoing Failure to Disclose and File**

19. BNP Petroleum was required to file its first monthly operating report more than 30 days ago but has still failed to file it. The second monthly operating report also remains past due. BNP Petroleum has also failed to file amended schedules as they claimed they would do in Mr. Black's deposition. The recently filed schedules of BNP Oil & Gas now stand in direct conflict to those of BNP Petroleum. Further, upon information and belief, the Debtors have failed to file their 2008 tax returns. This blatant disregard for the filing requirements of debtors-in-possession is further grounds for appointment of a Chapter 11 trustee for both Debtors.

**G.    Additional Insider Receivables and Payments Listed on Schedules**

20. In addition to the insider transactions and receivables already discussed, a whole range of insider receivables and payments is listed in <u>both</u> Debtors' schedules and statements of financial affairs, including receivables and payments related to the Debtors' funding of various businesses, including but not limited to (1) HBP Ltd., (which apparently is related to HBP Partners, which owns the Havana Club in Corpus Christi) (2) BNP Commercial Properties, Ltd. ($4.8 million in a receivable scheduled by BNP Oil & Gas), which apparently transferred all of

its assets,[3] (3) BNP Networks, (4) 5262 Staples, (5) 5302 Mandell, (6) Intrepid, and (7) BNP Holdings, Ltd.[4]  There are also transfers made to Paul Black himself, for which Paul Black could offer no explanation or documentation, other than to call them repayment of a "loan" made to BNP Petroleum.  Transfers to family members of Paul Black (James Black III, James Black IV, and Wendy Bennett) are also listed.  Finally, as of the filing date, upon information and belief, checks of BNP Petroleum continued to be signed by a non-employee, non-officer of the Debtor, a family member of Paul Black.  Undoubtedly, questionable transfers continually have been made.

21.     Astonishingly, a series of transfers by BNP Oil & Gas cleared the bank without <u>any</u> Court authority, which "cleared" <u>eight days after filing</u> to Harris & Greenwell (Paul Black's personal lawyer), Plunkett & Gibson, and Walter Oblach (Paul Black's college roommate, now in Venezuela, and part owner of the Frost Note), <u>and to Paul Black himself</u> ($30,000)—all from what appear to be a secret, specially created Mutual of Omaha account.  This account was not disclosed to the Examiner.  Even after it was clear that Mr. Black's cash transactions would be scrutinized, Mr. Black unabashedly transferred $30,000 to himself and $50,000 to his personal lawyer from estate funds in transactions initiated just before the filing of the BNP Oil & Gas case.  Mr. Black was thumbing his nose at the bankruptcy court process, the United States Trustee and the creditors of the estates in continuation of his overriding scheme to denude the estates.

---

[3] Seashore has been advised by tax accountants for the Debtors that the real property held by BNP Commercial Properties, Ltd. was transferred in 2008.

[4] BNP Oil & Gas alone disclosed $7 million in affiliate receivables, and BNP Petroleum was owed $6 million by Land & Bay Gauging, another affiliate.  It is clear that tens of millions of funds were transferred to, and used by, Black affiliates.

## **CONCLUSION**

The continuing fraud and other misdeeds by the above-captioned Debtors, independently and in conjunction with the reasons stated in the First Trustee Motion constitute cause for appointment of a Chapter 11 trustee in these cases, or in the alternative for conversion of these cases to Chapter 7.  WHEREFORE, Seashore requests a Court order appointing a Chapter 11 trustee or converting these cases to Chapter 7 and such other and further relief as the Court may deem just and proper.

Respectfully submitted this 23rd day of October 2009.

**KING & SPALDING LLP**

By: /s/ Henry J. Kaim
Henry J. Kaim
Texas Bar No. 11075400
HKaim@kslaw.com
Mark W. Wege
Texas Bar No. 21074225
MWege@kslaw.com
Edward L. Ripley
Texas Bar No. 16935950
Eripley@kslaw.com
1100 Louisiana, Suite 4000
Houston, Texas  77002
Telephone:  (713) 751-3200
Fax: (713) 751-3290

**ATTORNEYS FOR SEASHORE
INVESTMENT MANAGEMENT TRUST**

## **CERTIFICATE OF SERVICE**

      I certify that a true and correct copy of the foregoing Emergency Motion was served on all participants registered to receive service through the Clerk's Office ECF notice facilities as listed on the attached Service List on this 23rd day of October 2009, and by first class mail, postage pre-paid, to the remaining parties entitled to notice, on the 26th day of October 2009.

                                                                            /s/ Henry J. Kaim
                                                                             Henry J. Kaim